RADIANT GLOBAL LOGISTICS, INC.,

Plaintiff,                                        Case No. 18-cv-12783

                                                  Paul D. Borman
                                                  United States District Judge

v.                                                R. Steven Whalen
                                                  United States Magistrate Judge

CHARLES FURSTENAU, JR., and
BTX AIR EXPRESS OF DETROIT, LLC,
a Connecticut limited liability company,

Defendants.
_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANTS CHARLES FURSTENAU, JR. AND BTX AIR EXPRESS OF DETROIT, LLC

## I.    INTRODUCTION

Before the Court is Plaintiff Radiant Global Logistics, Inc.'s ("Radiant") Motion for a Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65(a). (ECF #7.) Radiant argues that it is likely to succeed on the merits of its claims for threatened or actual misappropriation of trade secrets and/or breach of fiduciary duty.

On September 7, 2018, Radiant filed a six-count Verified Complaint ("Complaint") against Charles "Chad" Furstenau, Jr., and BTX Air Express of Detroit, a Connecticut limited liability company ("BTX Detroit"), alleging the following claims:

Count I   &ndash;   Declaratory Judgment (Against Furstenau);

Count II   &ndash;   Breach of Fiduciary Duty (Against Furstenau);

Count III  &ndash;   Misappropriation of Trade Secrets under the Federal Defend Trade Secrets Act of 2016, 18 USC §1836, *et seq.* ("DTSA") and the Michigan Uniform Trade Secrets Act, MCL § 445.1901, *et seq.* ("MUTSA") (Against Furstenau and BTX Detroit);

Count IV &ndash;   Tortious Interference (Against BTX Detroit);

Count V   &ndash;   Aiding and Abetting (Against BTX Detroit); and

Count VI &ndash;   Common Law and Statutory Conversion Under MCL §600.2919a (Against Furstenau).

(ECF #1.)

On September 14, 2018, Radiant filed a Motion for Preliminary Injunction (ECF #7) and a Motion to Expedite Discovery in Aid of Preliminary Injunction ("Motion to Expedite") (ECF #8). On September 18, 2018, BTX Detroit filed its Response to the Motion to Expedite (ECF #13), and Furstenau filed his concurrence with BTX Detroit's Response (ECF #14). On October 5, 2018, the Court entered a Stipulated Order as to the expedited discovery and timelines for responsive pleading to the Complaint and the Motion for Preliminary Injunction. (ECF #20.)

On October 11, 2018, BTX Detroit filed its Answer and Affirmative Defenses (ECF #25), and Furstenau filed his Answer and Affirmative Defenses (ECF #26). On November 1, 2018, the Court scheduled a full-day Preliminary Injunction evidentiary hearing for December 14, 2018. (ECF #29.) On November 21, 2018, BTX Detroit filed its Response to the Motion for Preliminary Injunction (ECF #32), and Furstenau filed his concurrence therewith (ECF #33). Radiant filed its Reply in support of its Motion for Preliminary Injunction on November 28, 2018. (ECF #34.)

At the December 14, 2018 Preliminary Injunction hearing, Defendants sought to introduce the "expert report" and testimony of Scott Polus. Radiant moved to strike Polus's report and testimony. The Court ordered briefing on the "expert" issue. The evidentiary hearing was continued to December 21, 2018 (ECF #42), at which the Court granted Radiant's motion to strike Polus's report and testimony under Federal Rule of Civil Procedure 26(a)(2). The Court also struck Polus's affidavit attached to BTX Detroit's Response to the instant Motion under that Rule. (Scott Polus Aff., [undated] PgID 1136, ECF #32-9.)

### III.   FACTUAL BACKGROUND

**A.   Radiant's Detroit Location**

Radiant is a third party logistics and supply chain management company in the freight brokerage industry. (Compl., ¶12, ECF #1.) Radiant provides transportation and logistics services – freight forwarding services – to companies in the consumer goods, food

and beverage, manufacturing, and retail sectors. (*Id.* at ¶13.) Radiant has numerous stores (a.k.a., offices or stations) around the country, including 16 company-owned stores and over one hundred independently franchised locations. (Dep. of Tim O'Brien, Vice President of Radiant Company Stores, Oct. 19, 2018, 18:1-12, ECF #36-3, PgID 1688.) Radiant's Detroit location, where Furstenau served as the general manager, was a company store ("Radiant Detroit") primarily serving the automotive industry.

Beginning in 1994, Furstenau worked in the third-party logistics industry ("3PL") for United American, and continued there after it was acquired by the 3PL freight brokerage company Stone Path, in 2002. (Dec. 14, 2018, Prelim. Inj. Hr'g, Tim O'Brien Test. 55:3-19, PgID 2032, ECF #43.) Radiant purchased Stone Path's assets in 2005 and asked Furstenau to stay on with Radiant Detroit as the general manager. (*Id.*) Furstenau was the "highest ranking" manager at Radiant Detroit (Dec. 14, 2018, Prelim. Inj. Hr'g, Chad Furstenau Test. 134:23-135:5, PgID 2111-12, ECF #43) and reported to Tim O'Brien – Radiant's Vice President of Company Stores – who is "responsible for the company-owned offices of Radiant Global throughout the United States." (O'Brien Dep. 7:15-17, ECF #36-3, PgID 1677.) Furstenau also held the title of "Director of Automotive." (*Id.* at 48:17-25, ECF #36-3, PgID 1717-18.)

During his tenure with Radiant, Furstenau never signed a specifically-titled non-compete or non-solicit contract. (12/14/18 Prelim. Inj. Hr'g, O'Brien Test. 95:14-23, PgID 2072.) And in May 2018, when presented with a non-compete contract by Radiant,

Furstenau refused to sign it. (*Id.* at 95:24-25, 96:1-2, PgID 2072-73.) Furstenau (and all Radiant employees) did, however, sign an acknowledgment of and agreement to abide by Radiant's Code of Ethics, which included the following "Conflicts of Interest" and "Confidentiality" provisions:

### CONFIDENTIALITY

Directors, officers and employees should maintain the confidentiality of information entrusted to them by [Radiant] and any other confidential information about [Radiant], its business, customers or suppliers, from whatever source, except when disclosure is authorized….For the purposes of this Code, "confidential information" includes all non-public information relating to [Radiant], its business, customers or suppliers.

****

### CONFLICTS OF INTEREST

Employees must not use their position or knowledge gained as a result of their position for private or personal advantage or for improper benefits. No one should also engage in other duties, responsibilities or obligations that run counter to his or her duty to [Radiant].

Any employee involved in a conflict of interest or a transaction or relationship that reasonably could be expected to give rise to conflict, must report the matter promptly to the employee's management. Any officer or director in such situations must make reports to the Board of Directors or a designated Board committee.

(Joint Ex. Book, Ex. 3.[1]) (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 179:6-13, PgID 2156.)

Furstenau also signed an acknowledgment of receiving Radiant's Employee Handbook ("Handbook") (Pl.'s Mot. for Prelim. Inj., Sep. 14, 2018, PgID 66, ECF #7),

---

[1] The Parties provided a book of 79 stipulated joint exhibits at the Preliminary Injunction hearing, which included the Radiant Code of Ethics and Employee Handbook.

which contained a "Computer, Internet & Software Policy" ("Computer Policy") (Pl.'s Mot. for Prelim. Inj., Ex. B, PgID 99, ECF #7-3). (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 135:17-23, PgID 2112-13.) The Computer Policy required employees to:

> [k]eep confidential all [Radiant] data and all information provided to [Radiant] by other entities….Each user is bound by obligation not to disclose Radiant Logistics' business information unless authorized to do so. Breach of confidentiality through accidental or negligent disclosure may expose User to disciplinary action.

(*Id.*) The Computer Policy further required employees to "[e]nsure that computers are not left unattended without first logging out or locking computer and/or securing the entrance to the work area, particularly if the computer system…contains sensitive or valuable information." (*Id.*) The acknowledgment page states that the Handbook "is intended to provide general information about the policies, benefits, and regulations governing the employees of the Company" and is an "overview." (Pl.'s Mot. for Prelim. Inj., Ex. C, PgID 102, ECF #7-4.) Moreover, "[t]he Company reserves the right to modify, supplement, rescind or revise any provision of this handbook from time to time as it deems necessary or appropriate in its sole discretion with or without notice to you." (*Id.*) Above the signature line, the acknowledgment states, "Please sign below to indicate that you have received and read this Employee Handbook[.]" (*Id.*) Furstenau signed the acknowledgment. (*Id.*)

Furstenau testified that he became increasingly disenchanted with Radiant over compensation/bonus issues and Radiant's various attempts to implement a new transportation management software system. (Dep. of Charles Furstenau, Oct. 16, 2018,

58:23-59:20, PgID 1547-48, ECF #36-2.) Furstenau discussed his concerns about the software systems with O'Brien and Joe Bento, Radiant's chief operating officer. (Furstenau Dep. 62:21-63:4, ECF #36-2, PgID 1550-51.) He testified that he thought Radiant was going to terminate him at any moment; he claims he saw an advertisement for his position on LinkedIn. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 165:3-4, PgID 2142; 184:10-15, PgID 2161.) Radiant denies that it ever planned to terminate its manager, Furstenau. (12/14/18 Prelim. Inj. Hr'g, O'Brien Test. 99:1-13, PgID 2076; 103:5-8, PgID 2080.)

Furstenau terminated his employment with Radiant on Friday evening, August 24, 2018, and opened a BTX Detroit office as it manager on Monday, August 27, 2018. He acknowledged engaging in discussions with BTX Global Logistics, Inc.'s ("BTX Global") CEO Rosario "Ross" Bacarella about opening a BTX Detroit office over the preceding seven months, beginning in February 2018. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 142:11-15, PgID 2119.) These discussions culminated in the opening of a staffed and furnished BTX Detroit office on the morning of Monday August 27, 2018. Furstenau brought to BTX Detroit his five key Radiant office employees, two on Monday and the others soon thereafter. (*Id.* at 141:21-142:20, PgID 2018-19.) Present at the new BTX office on that first Monday morning were Angela "Angie" Dupree and Chris Higgins, who had resigned from Radiant on Sunday, August 26, 2018. (*Id.*)

Significantly, while still employed at Radiant on August 14, 2018, Furstenau sent Bacarella an email with a list of the five key Radiant employees who would join his team

when he came over to BTX Detroit from Radiant (including Higgins and Dupree), going so far as to specifically request BTX to purchase computers for them at the new BTX office prior to its opening. (Joint Ex. Book, Ex. 54.) The computers were there for Furstenau and his now-BTX team of former Radiant employees when the two arrived at the new leased and furnished BTX office on Monday, August 27, 2018. The five key Radiant employees that came over to BTX Detroit were: Angela Dupree, Chris Higgins, Liana Renteria, Kari Piper, and, as noted *infra*, indirectly, Ben Watkins. (*Id*.)

**B.     Formation of BTX Detroit**

From 2003 to 2005, BTX Global had serviced the Detroit market through a Detroit office. (Dep. of Rosario Bacarella, CEO of BTX Global, Oct. 18, 2018,  9:4-11, ECF #36-1, PgID 1349.) From 2005 through August 27, 2018, BTX had serviced Detroit from afar – through a BTX independent contractor located in Dallas. (*Id.*) According to Bacarella, BTX Global had plans to open an office in Detroit in fall 2019 to gain business in the automotive market, after completing a three-year term buyout of that Dallas independent BTX contractor beginning in fall 2016 that would conclude in fall 2019. (Bacarella Dep. 20:22-25, ECF #36-1, PgID 1360; 32:12-14, PgID 1372.) However, after discussions with Furstenau beginning in February 2018, Bacarella expedited the opening of BTX Detroit to August 2018 because he believed hiring Furstenau would provide the experience and team necessary to open a new Detroit location. (*Id.* at 21:1-5, ECF #36-1, PgID 1361.)

Furstenau had initially contacted Bacarella in mid-February 2018, expressing his interest in opening an independent BTX contractor store in Detroit. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 153:7-154:12, PgID 2130-31.) At his deposition, Furstenau testified as to the February 17, 2018 email exchange with Bacarella where Furstenau confirms that he met the "criteria" for an independent BTX store – a sales/operations team and $3 million in gross revenue:

> (Hickey) Q: …it's an email from Mr. Bacarella where he says, "Chad, Sorry I had to cut our conversation short last evening. You caught me at an awkward time. In order to be a serious candidate for station ownership, you need to have *a team of operations and salespeople* with a minimum of *3 million in gross revenue*. Please advise if this is the case and we can continue our conversation on Monday. If not, I wish you the very best." Do you see that?
>
> A: Yes.
> …
>
> Q: Did you satisfy him that you were a serious candidate?
>
> A: I believe so.
>
> Q: Did you convince him that you did indeed have a team of operations and salespeople who would could [sic] generate a minimum of 3 million in gross revenue?
>
> A: I don't recall.
>
> Q: Well, you say to him…three days later on February 20, "Ross, yes, *we meet your criteria*…" Do you see that?
>
> A: Yes.

(Furstenau Dep. 129:18-131:3, ECF #36-2, PgID 1617-19.) (Emphasis added.) The Court finds that "we" meant a sales team of individuals. Furstenau testified at his deposition that, in February 2018, he filled out a "business plan" provided by BTX Global that substantiated his "3 million in gross revenue" representation. (*Id.* at 131:20-132:23.)

Furstenau testified that he continued communicating with Bacarella from February to Friday, August 24, 2018, the date of his late-night resignation from Radiant. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 142:11-15, PgID 2119.) Furstenau also developed a pro forma and budget for BTX Detroit at BTX Global's request. (Bacarella Dep. 57:19-23, ECF #36-1, PgID 1397.)

While still at Radiant, Furstenau helped select the new BTX Detroit office location, going so far as installing Formica countertops and selecting carpets – all allegedly after his Radiant work hours. (Furstenau Dep. 79:1-13, ECF #36-2, PgID 1567; 12/21/18 Prelim. Inj. Hr'g, Bacarella Test. 53:24-54:3, PgID 2289-90.) Throughout the January to August 2018 period prior to Furstenau's departure from Radiant, he forwarded approximately 300 emails from his Radiant account to his personal Comcast Account. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 143:4-7, PgID 2120.) Those emails included Radiant financial forecasts, budgets, profit and loss statements, profit margin data, customer lists, customer reports detailing activity and profitability, salaries of the Radiant employees, agent/carrier lists, and some personal emails. (12/14/18 Prelim. Inj. Hr'g, O'Brien Test., 17:9-16, PgID 1994.)

Furstenau testified that he sent Radiant profit and loss emails to his Comcast Account both before and after he had engaged with BTX. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 198:6-16, PgID 2175.) Furstenau initially denied having opened any of the emails he sent to his Comcast Account but later admitted that he had opened some. (*Id.* at 200:17-20, PgID 2177.)

Furstenau emailed his resignation to Radiant on the night of Friday August 24, 2018, and then commenced immediate solicitation of Radiant clients for BTX Detroit that weekend. (12/14/18 Prelim. Inj. Hr'g, O'Brien Test. 33:14-22, PgID 2010; Furstenau Dep. 98:15-24, ECF #36-2, PgID 1586.) The BTX Detroit location headed by Furstenau officially commenced operations on the morning of Monday, August 27, 2018. As noted, *supra*, two long-time Radiant employees – Chris Higgins and Angela Dupree – had submitted their resignations to Radiant on Sunday, August 26, 2018 and joined Furstenau as BTX Detroit employees the next morning. (Furstenau Dep. 72:16-21, ECF #36-2, PgID 1558.) Three other Radiant employees – Liana Renteria, Kari Piper and Ben Watkins (indirectly) – joined BTX Detroit shortly thereafter. (*Id.* at 81:8-15.) Watkins was the only exiting Radiant employee who had executed Radiant non-competition and non-solicitation agreements. (*Id.* 82:21-23.) Because Watkins, who had been embedded by Radiant onsite with its client, the George P. Johnson Co. ("George P. Johnson") in Memphis, Tennessee, to secure business for Radiant, had signed those non-compete/non-solicit contracts, it was arranged for him to become an employee of George P. Johnson to direct its business to

BTX Detroit. (12/14/18 Prelim. Inj. Hr'g, O'Brien Test. PgID 2024-26.) Radiant argues that Higgins, Dupree, Renteria, and Piper all perform the same job functions for BTX Detroit that they did for Radiant (as does Watkins for George P. Johnson).

The Court find inherently incredible the testimony of Furstenau and Dupree, that the five former Radiant team members never discussed with Furstenau leaving Radiant for BTX Detroit before August 24, 2018, the day Furstenau resigned. (*See, e.g.,* Dep. of Angela Dupree, Oct. 15, 2018, 40:6-9, ECF #36-4, PgID 1830; 12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 168:3-170:10, PgID 2145-47.) Furstenau stated in an August 14, 2018 email (Joint Ex. Book, Ex. 54) to Bacarella: "Here are the names of users that need a computer," and then listed the names of his Radiant team that would join him at BTX Detroit. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 161:13-23, PgID 2138.) Indeed, at the time of the December 14, 2018 Preliminary Injunction hearing, all BTX Detroit employees were former Radiant Furstenau team employees. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 174:4-8, PgID 2151; *accord* 12/21/18 Prelim. Inj. Hr'g, Bacarella Test. 44:12-17, PgID 2280.) Furstenau did admit that recruiting these employees was his plan for some time:

> (Hickey) Q: You didn't wake up on Sunday morning and say, Hey, if I can get Chris Higgins, Angie Dupree, and the other employees that you previously identified [Renteria, Piper and Watkins] [to] move over to BTX, I'll offer them a job. You didn't wake up Sunday morning and decide. That's something you'd been thinking and actually discussed with BTX some weeks before, correct?
>
> A: Yes.

(*Id.* at 77:24-78:7, PgID 1565-66.)

The Court finds significant as evidence that Furstenau had discussed with his Radiant team about moving to BTX prior to August 24, 2018, in his email to Bacarella on August 14, 2018, where he stated that "some folks were inquiring on a 401(k)[.] Can you provide any information?" When questioned about his reference to some folks inquiring on a 401(k) at BTX, Furstenau testified, incredibly, that he was probably talking about himself. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 163:1-19, PgID 2140.) When Bacarella, who was present in Court during Furstenau's testimony, was subsequently questioned on December 21, 2018 about Furstenau's explanation of this term "some folks" in this email, he testified that some folks "could mean himself." (12/21/18 Prelim. Inj. Hr'g, Bacarella Test. 72:2, PgID 2308.) This incredible testimony played out further in Bacarella's deposition:

> Q (Jeffers): When [Furstenau] said, "Also, some folks were inquiring on a 401(k), can you provide any information," and then it lists the names of six individuals below, you didn't think [Furstenau] was referring…to one of those individuals…?
>
> A (Bacarella):  Not unless he said "these folks' instead of "some folks."

(Bacarella Dep. 92:16-23, ECF #36-1, PgID 1433.) The Court finds this consistent testimony by both Furstenau and Bacarella to be consistently inherently incredible.

Also incredible is the testimony that the five Radiant employees quit their jobs in advance, without knowing anything about where they would find new employment: no

advance knowledge of BTX or the office location, and then being hired without even submitting an employment application to BTX Detroit, or asking/learning about what their BTX Detroit positions, salaries, or benefits would be:

> Q (Hickey): And they quit their jobs without having any discussion with you about compensation, 401(k), vacation, healthcare benefits, anything of that nature, correct?
>
> A (Furstenau): That is 100 percent correct.

(12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 169:7-10, PgID 2146.) Angie Dupree testified that she did not even know the company name until she saw it on the sign the morning of Monday, August 27, 2018. (Dec. 21, 2018 Prelim. Inj. Hr'g, Angela Dupree Test. 100:14-17, ECF #45, PgID 2336.) The Court concludes this aforestated testimony is inherently incredible.

Bacarella testified to BTX Detroit's measures to prevent any access to Radiant information and his desire to "stay out of trouble," and out of court. (12/21/18 Prelim. Inj. Hr'g, Bacarella Test. 22:17, PgID 2258.) According to Bacarella, Radiant email cannot permeate the BTX servers. Bacarella also told the former Radiant employees not to use any confidential Radiant information. (Bacarella Dep. 115:16-116:14, ECF #36-1, PgID 1455-56.) The former Radiant employees were also required to sign BTX's Terms and Conditions of Employment, compliance with which is overseen by BTX managers:

> 8. <u>Use of Confidential Information of Other Persons.</u> You represent that you have not brought and will not bring with you to [BTX Detroit], any materials or documents of a former employer that are not generally available to the public, unless express written authorization from such

employer for their possession and use has been obtained. You also understand that you are not to breach any obligation of confidentiality that you have to any former employer, and agree to fulfill all such obligations during the period of your affiliation with [BTX Detroit].

(Defs.' Resp., Nov. 21, 2018, PgID 936, ECF #32; Bacarella Aff., Nov. 20, 2018, ¶13, ECF #32-2, PgID 957.) Further, Furstenau had specifically been told not to use Radiant information, and he has "assured" Bacarella that he has not done so. (Bacarella Dep. 115:16-116:14, ECF #36-1, PgID 1455-56.) This attempt by Bacarella to legitimize and ethicize BTX's conduct in this conspiracy between BTX and Furstenau to hijack Radiant's Detroit office is undermined by the testimony and exhibits introduced in Court in this hearing.

Focusing on BTX's conduct, the Court points to Exhibit 56, a June 22, 2018 email from Bacarella to "Carol Furstenau" regarding points discussed:

1. You (CF) [Chad Furstenau] would join BTX as a salaried employee at $175,000 (per submitted budget). We would also hire 4 additional operational support staff at the budgeted amounts.
***

3. BTX would supply all the office essentials at BTX expense….
***

6. Benefits would begin for all employees on day 1[.]

7. All customers that are brought over by CF and any customers acquired by CF will be converted over to CF when CF becomes an independent contractor[.]

8. Once CF is an employee of BTX, BTX will establish an office in Detroit with approximately 7,000 sq. ft. of combined office and warehouse space.
***

15

> 10.  BTX will fund any defense brought against you, by your former employer, as it relates to any non-compete or *confidentiality* issues. To prepare for [sic] we will need to be aware of any employment agreements that are currently in place, if any.

(Joint Ex. Book, Ex. 56.) (Emphasis added.) This establishes that Furstenau will become a salaried employee of BTX, that he would hire four additional operational support staff – he had provided Bacarella with their names – and that his new BTX team would begin receiving BTX benefits on their first day of work. The Court finds significance in Paragraph seven, which anticipates that Furstenau would get credit for bringing over his Radiant customers.

Also significant is Paragraph eight, which states "Once CF is an employee of BTX, BTX will establish an office in Detroit with approximately 7,000 sq. ft. of combined office and warehouse space." This confirms that BTX would not establish a Detroit office until after Furstenau becomes an employee of BTX. Since BTX had secured office space prior to August 27, 2018, under the terms of the email agreement, Furstenau would have been a BTX employee before he left Radiant. This undermines Furstenau's claim that the reason he left Radiant on Friday, August 24, 2018 was because he had informed them on Tuesday, August 21, that he would quit on Friday, August 24, 2018 unless they agreed to all his claims for additional compensation by that Friday. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 165:18-166:2, PgID 2142-43.) Clearly, these demands were a "smoke screen" to try to obscure his already-planned departure to a previously leased and furnished BTX Detroit

office. As Judge Avern Cohn noted in *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 848-49 (E.D. Mich. 1994):

> Walling said that SCC demonstrated bad faith in failing to pay him commissions it owes him….If SCC owes Walling compensation from his employment there, he is entitled to pursue legal remedies against SCC.

Here, Furstenau has done just that in filing a Counterclaim in this case, (ECF #31), which will be dealt with subsequently.

Further, very significant is the fact that Bacarella acknowledged in his Preliminary Injunction hearing testimony that he had testified at his deposition that he and Furstenau had a handshake deal *before* he signed the BTX Detroit lease. (12/21/18 Prelim. Inj. Hr'g, Bacarella Test. 57:12-23, PgID 2293.) This "handshake deal" spawned Bacarella's working with Furstenau to lease and furnish a BTX Detroit office for Furstenau and his team's post-August 24, 2018 "landing." The post-handshake conduct of both parties confirms that it was a contract acceptable to and carried out by both BTX and Furstenau, while he was still a Radiant employee.

## IV. STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). Plaintiff bears the burden of demonstrating entitlement to preliminary injunctive relief and the burden is substantial. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Such relief will only

be granted where "the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002).

When considering a motion for injunctive relief, courts must balance the following four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent preliminary injunctive relief; (3) whether granting the preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by granting the preliminary injunctive relief. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp*., 511 F.3d 535, 540 (6th Cir. 2007). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573.

"The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739. Plaintiff must do more than just "create a jury issue," and persuade the court that it has a likelihood of succeeding on the merits of its claims. *Id*. "This is because the preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." *Id*. (internal quotation marks and citation omitted) (alteration in original). "Although no one factor is controlling, a finding that there is simply no likelihood of

success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Medical Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

## V.    ANALYSIS

Although Radiant's six-count Complaint alleges a variety of claims against Defendants, its request for a preliminary injunction turns only on two claims: breach of fiduciary duty and misappropriation of trade secrets. The Court will analyze the first factor of likelihood of success on the merits of each of the claims, followed by an analysis of the three remaining preliminary injunction factors.

## A.    Likelihood of Success on the Merits – Misappropriation of Trade Secrets (Count III of the Complaint, ECF #1, PgID 19)

Radiant seeks injunctive relief under the state MUTSA and the Federal DTSA.[2] A plaintiff in a trade secrets case bears the burden of pleading and proving the specific nature of the trade secrets. *Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009). The claimed trade secret must be specifically identified, and its unique economic value explained: Michigan courts have held that an alleged trade secret must be identified "clearly, unambiguously, and with specificity." *Utilase, Inc. v. Williamson,* 188 F.3d 510 (Table) (6th Cir. 1999) (quoting *Shatterproof Glass Corp. v. Guardian, Glass Co.,* 322 F. Supp. 854, 867 (E.D. Mich. 1970)).

---

[2] Radiant alleges misappropriation in violation of both MUTSA (state) and the DTSA (federal) against both Furstenau and BTX Detroit. The elements of misappropriation under both acts are substantially similar. MCL §445.1902(b), DTSA §1839(5).

Of significance to the instant case, "[a] departing employee need not be subject to a covenant not to compete in order to violate MUTSA where the employee agreed to keep his employer's confidential information protected from disclosure to others and, upon departure, retains and discloses or threatens to disclose those secrets in the course of his subsequent employment." *PrimePay v. Barnes*, No. 14-11838, 2015 WL 2405702, at *22 (E.D. Mich. May 20, 2015); *Henkel Corp. v. Cox,* 386 F. Supp. 2d 898, 903–04 (E.D. Mich. 2005) (although not subject to a covenant not to compete, defendant signed a confidentiality agreement, and evidence of his subsequent utilization of his former employer's secret formula for the benefit of his new employer demonstrated a likelihood of success on the claim of actual or threatened misappropriation under the MUTSA).

"A trade secret will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue." *Allis–Chalmers Mfg. Co. v. Continental Aviation and Engineering Corp.,* 255 F. Supp. 645, 654 (E.D. Mich. 1966). *See also Kelly Servs., Inc. v. Marzullo,* 591 F. Supp. 2d 924, 942 (E.D. Mich. 2008) ("It is well established that an injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjectural.") (internal quotation marks and citations omitted).

### 1. Identification of Alleged "Trade Secrets"

A "trade secret" is defined under MUTSA as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

MCL §445.1902(d). *See Mike's Train House, Inc. v. Lionel, L.L.C.,* 472 F.3d 398, 410 (6th Cir. 2006).

In determining whether information constitutes a trade secret under MUTSA, Michigan courts consider the following factors:

(1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owners and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.

*Dura Global* at 859 (quoting *Wysong Corp. v. M.I. Indus.,* 412 F. Supp. 2d 612, 626 (E.D. Mich. 2005)). "'To be a trade secret, the information must, of necessity, be a secret.'" *Id.* (quoting *Kubik, Inc. v. Hull,* 56 Mich. App. 335, 347 (1974)). "Trade secrets do not 'encompass information which is readily ascertainable, *i.e.*, capable of being acquired by competitors or the general public without undue difficulty [or] hardship.'" *Id.*

The identification of alleged trade secrets is important because "the general knowledge of an employee does not constitute a trade secret," *Lowry Holding Co., Inc. v.*

*Geroco Tech Holding Corp.,* No. 303694, 2012 WL 1890231, at *3 (Mich. Ct. App. May 24, 2012), and the concept of misappropriation of trade secrets "must not compromise the right of employees to change jobs." *Degussa Admixtures, Inc. v. Burnett,* 277 F. App'x 530, 535 (6th Cir. 2008). Accordingly, to establish a trade secrets claim, the party "must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets." *Id.* (quoting *CMI Int'l, Inc. v. Intermet Int'l Corp.,* 251 Mich. App. 125, 134 (2002)).

> **a.  Information that Derives Independent Economic Value from Not Being Generally Known or Discoverable Through Proper Means to Others**

Radiant claims that a multitude of the approximately 300 emails Furstenau sent to his personal Comcast account ("Comcast Account") contain misappropriated "trade secrets." O'Brien, Radiant's Vice President of Company Stores, repeatedly testified that the emails are the keystone of the claim. (*E.g.*, 12/14/18 Prelim. Inj. Hr'g, O'Brien Test. 29:2-21, PgID 2006.) Radiant bears the burden of demonstrating entitlement to preliminary injunctive relief, and the burden is substantial. "A party alleging trade secret misappropriation must particularize and identify the purported misappropriated trade secrets with specificity." *Dura Global* at 859 (quoting *Compuware Corp. v. Int'l Business Machines,* No. 02-70906, 2003 WL 23212863, at *6 (E.D. Mich. Dec. 19, 2003)).

O'Brien references an email inadvertently sent to Radiant, shortly after August 24, 2018, by a carrier currently used by Radiant that was seeking to establish its approval with BTX Detroit, as proof that BTX Detroit was using the carrier/agent list that was sent among the 300 emails. (O'Brien Dep. 57:1-58:15, ECF #36-3, PgID 1727-28.) Radiant's Motion also lists the following Furstenau Comcast emails, otherwise unidentified, as described *verbatim* below:

> 1) A highly confidential spreadsheet containing a detailed analysis of all Radiant's customers throughout the United States for the prior 12 months, including the identity of the customer, pricing, revenue, origin and destination of the shipment, etc.

> 2) A highly confidential spreadsheet containing the identity and compensation for all employees in the Detroit office.

> 3) An email titled "Follow up to our call," from Radiant organization's founder and CEO to Furstenau, which contained an Excel spreadsheet file titled "2017-12 R63DTW Customer Analysis.xlxs." This file: (i) lists every customer in the Detroit market, with monthly data regarding revenues, gross margins, and margin rates, and (ii) identifies Radiant's top customers and top sales representatives in the market, with revenue and gross margin trends on a monthly basis. This same email also contained the qualitative assessment of the CEO as to the status of an internal software and process-improvement roll-out, and the company's plans to implement the changes to specific customer accounts.

> 4) An email titled "FYI 19 DTW Budget," containing highly sensitive financial data and projections for the Detroit facility, along with compensation information for the employees.

(Pl.'s Mot. for Prelim. Inj., ECF #7, PgID 68.) Radiant included these emails in the Joint Exhibit Book at the Preliminary Injunction hearing, and the information above – which is

contained in three emails, rather than four – is found in Exhibit Numbers 45 (Nos. 2 and 4 above), 49 (No. 1 above), and 75 (No. 3 above).

O'Brien's testimony describes the ingredients of Radiant's "secret sauce" with particularity when viewed in light of the email attachments:

> Q (Marquis): What is it about the sauce that makes it secret?
>
> A (O'Brien): It's the use of financial data. It's not an inclusive list, but it's P&L, budgetary information, customer analysis information. It's the use of customer information, detail on the history of the activity with the customers, revenue, profitability, cost, number of shipments, volumes, shipping patterns. It's the information around the human capital piece, which is the actual former employees themselves.

(O'Brien Dep. 51:12-22, ECF #36-3, PgID 1721.) The Court finds that these are clearly trade secrets/proprietary information.

Radiant has clearly established why this information is confidential. Indeed, Furstenau and Dupree admitted at the hearing that they believe certain of it is. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 138:14-19, PgID 2215; 12/21/18 Prelim. Inj. Hr'g, Dupree Test. 120:4-12, PgID 2365); *AFT Michigan v. Project Veritas*, No. 17-CV-13292, 2017 WL 6604040, at *5 (E.D. Mich. Dec. 27, 2017). "[I]t is widely accepted that a trade secret can exist in a combination of characteristics each of which, by itself, is in the public domain." *Mike's Train House,* 472 F.3d at 411 (quoting *Catalyst & Chem. Servs., Inc. v. Global Ground Support,* 350 F. Supp. 2d 1, 9 (D. D.C. 2004)) (alteration in original); *Kemper Mortg. v. Russell*, No. 06-042, 2006 WL 4968120, at *5 (S.D. Ohio May 4, 2006) ("even though some pieces of the material which Russell bundled up and sent to himself

as 'Stuff' might not be secret, taken together they comprised a package uniquely useful to someone…who wanted to compete successfully" in the same market).

Here, the financial statistics documents contained in the emails to Furstenau's Comcast Account include detailed reports on the top 20 customers during the last several quarters of Furstenau's Radiant employment. (*See* Furstenau Dep. 46:23-47:10, ECF #36-2, PgID 1534-35; Joint Ex. Book, Exs. 48, 49, 50, and 74). That data clearly exceeds a mere "list of customers compiled by a former employee from personal and public sources available to that employee [that] is not protectable as a trade secret." *Raymond James & Assoc., Inc. v. Leonard & Co.,* 411 F. Supp. 2d 689, 695 (E.D. Mich. 2006). The information that Furstenau emailed to himself, taken together, clearly comprises a package uniquely useful to competition with Radiant in Detroit, and is not information that Furstenau developed or maintained on his own.

While, over the course of his decades in the industry and 11 years with Radiant, Furstenau has accumulated a client contact list that is not protectable, s*ee McKesson v. Micro Bio-Medics*, 266 F. Supp. 2d 590, 594 (E.D. Mich. 2003),[3] his wholesale theft of Radiant's "secret sauce" goes miles beyond client contacts.

---

[3] The defendant in *McKesson* accumulated his own client contacts over the years through "phone books, there were lists that I kept for mailings to my customers, thank you cards that I have done throughout my career with all these companies, there were hospital directories, things of that nature." 266 F. Supp. 2d at 594.

Furthermore, in the instant case, as in *Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 658 (E.D. Mich. 2007), where U.S. District Judge Paul Gadola granted a preliminary injunction after finding the likelihood of a successful trade secret misappropriation claim, Furstenau "acquired or was given access to [the at-issue] information by [Radiant] through his position as a manager with the company" and "makes no claim that he acquired personal ownership over any of this information." *Noretto* at 658. In fact, Furstenau admits this where he testified that he specifically directed his Verizon cell phone customer service representative to *not* transfer his Radiant contacts or emails to his new BTX Detroit cell phone. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 148:6-19, PgID 2125 ("I told her only my personal email address and contacts…I did not want Radiant information on my…[BTX] cell phone.").) Therefore, not only are any client or carrier lists protectable, *see Noretto* at 658, but the significant "secret sauce" content of the multitude of Furstenau's emails to himself go miles beyond mere contacts. It bears noting that Furstenau still has his Radiant phone. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 146:23-25, PgID 2123.)

The Court finds that the emails forwarded by Furstenau to himself in his Comcast Account, and still in his possession, contained in Exhibits 45 through 49, 74 and 75 of the Joint Exhibit Book, constitute part of Radiant's "secret sauce" and derive independent economic value from not being generally known or discoverable through proper means to others.

**b. Radiant's Efforts to Maintain the Information's Secrecy**

Radiant took sufficient measures to safeguard the information that Furstenau collected in his personal email account. "Sufficient measures" under MUTSA have been found in "either an express agreement between the employer and employee restricting or prohibiting disclosure by the latter to third parties; a disclosure by employer to employee in confidence or with a tacit understanding, inferable from the attendant circumstances, that the information is confidential; or security precautions utilized by the employer to insure that only a limited number of authorized individuals have access to the information." *Wysong Corp.,* 412 F. Supp. 2d at 626.

Radiant did all of the above, and then some. O'Brien testified that Radiant utilized selective circulation of information by and among "certain employees" on a need-to-know basis:

> (Marquis) Q:  Are there levels of confidential information within Radiant so that certain documents are restricted to a subset of employees?
>
> A:  Certain employees only receive certain documents. So for the example of the Detroit operation, our rank and file members, our operational staff, the Chris Higgins of the world, Angie Duprees of the world, wouldn't have access to what we deem to be confidential and proprietary. That would be for general manager's eyes only or the vice president's eyes only and people above me. So there are certain protocols we follow in terms of who we distribute what we deem to be confidential. So [Furstenau] as the senior leader of that would receive all that data because he needed that as a tool to help him perform his job. But people below him necessarily wouldn't have that. They just wouldn't see it.

(O'Brien Dep. 66:16-67:9, ECF #36-3, PgID 1737.)

The yearly budget report was a password-protected document. (*Id.*; 12/14/18 Prelim. Inj. Hr'g, O'Brien Test. 29:13-17, PgID 2006.) Furstenau had signed Radiant's Code of Ethics that included a confidentiality provision prohibiting disclosure. (Joint Ex. Book, Ex. 3.) The Handbook's Computer Policy also included a prohibition on disclosure of confidential information and required employees to "[e]nsure that computers are not left unattended without first logging out or locking computer and/or securing the entrance to the work area, particularly if the computer system…contains sensitive or valuable information." (Pl.'s Mot. for Prelim. Inj., Ex. B., ECF #7-3, PgID 99.) Accordingly, Radiant clearly made sufficient efforts to safeguard its confidential information.

## 2. Misappropriation

Radiant proceeds on a theory of actual misappropriation and, alternatively, on a theory of threatened misappropriation. The MUTSA defines misappropriation as either of the following:

> (I) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

> (II) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

>> (A) Used improper means to acquire knowledge of the trade secret.

>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its

secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

MCL §445.1902.

### a. Actual Misappropriation

Radiant argues against Defendants' "attempt to characterize this case as merely one in which an employee leaves an employer for a competitor and begins soliciting customers of that former employer" (Pl.'s Reply, Nov. 28, 2018, ECF #34, PgID 1260):

> Furstenau was not preparing to *comp[]ete* with Radiant Detroit at all; he was preparing to *replicate* Radiant Detroit and leave it a shell of its former self. He plotted surreptitiously and methodically for over six months with BTX Global to create a new office in Detroit that would be all things Radiant; different in name only.

(*Id.* at PgID 1265.) (Emphasis in original.)

Radiant cites as clear evidence of Furstenau's misappropriation/disclosure that the BTX Detroit office was up and running on the Monday morning with Radiant's former office manager and critical members of his former Radiant team contacting Radiant's customers. It is uncontested that BTX wanted "boots on the ground" in Detroit in 2018. BTX had previously operated a failed presence in Detroit in the 1990s. (12/21/18 Prelim. Inj. Hr'g, Bacarella Test. 17:11-12, PgID 2253.) The new 2018 BTX boots on the ground operation in Detroit was composed of Furstenau and his Radiant team, and Furstenau had Radiant's "secret sauce" within his 300 Comcast Account emails. The Court concludes that

29

this evidence establishes that the exodus to BTX was planned by Furstenau and Bacarella over the six months prior to August 24, 2018, and that BTX's quick start business contacts to Radiant's clients that Monday morning, whose complex business history was contained in the 300 emails, had been well planned.

O'Brien testified that Radiant "has seen a decrease in business since [Furstenau] left" (O'Brien Dep. 29:2-5, ECF #36-3, PgID 1699); it has "lost volume from customers" in the two months since BTX Detroit opened. (*Id.* at 51:4-5, ECF #36-3, PgID 1721.) O'Brien also testified that Radiant has lost the business of the George P. Johnson office in Los Angeles. (12/14/18 Prelim. Inj. Hr'g, O'Brien Test. 43:4-9, PgID 2020.) O'Brien further testified to specific financial losses:

> Now, it's very early to tell financially what it looks like, but I can tell you as of [December 13, 2018], if I look at our top six customers in the Detroit marketplace from October, '17, to October, '18, this year the revenue was down about $400,000. That's revenue. And in terms of profitability, if I look at the first fiscal quarter of the year, for us it's July, August, September of '17 versus this first fiscal quarter year, we're down over 300,000 in gross profit.

(*Id.* at 44:9-16, PgID 2021.)

While O'Brien acknowledged that he has not yet seen any specific direct evidence of disclosure as of December 2018, Radiant did not yet have the ability to "drill down" into Furstenau's phone or BTX computer. Further, at the Preliminary Injunction hearing on December 14, 2018, Furstenau did change his testimony from initially insisting that he had never accessed any of the Comcast emails to later admitting accessing at least 24 emails,

but then insisting that none of them involved Radiant. (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 198:20-199:12, PgID 2175-76; 200:17-20, PgID 2177.)

Bacarella testified that he and Furstenau had early-on discussed "that it would be improper for him [Furstenau] to ask or try to recruit any individuals that currently worked there" and added that Furstenau "had not done that." (12/21/18 Prelim. Inj. Hr'g, Bacarella Test. 30:10-22, PgID 2266.) This testimony is undermined by the August 14, 2018 email from Furstenau to Bacarella listing the names of his Radiant team that would serve as his BTX team when the Detroit office opened. Bacarella also testified that he would not have opened the BTX Detroit office without making sure it was staffed properly with a team of qualified people. (*Id.* at 68:1-7, PgID 2304.) And he got this assurance by learning their names in advance. Bacarella guaranteed to hire and pay Furstenau's Radiant team on day one, without even requesting them to fill out an employment application or request for benefits, etc. *See, e.g., Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.,* No. 1:10-CV-450, 2012 WL 2524008, at *11 (W.D. Mich. June 29, 2012) (denying summary judgment based on circumstantial evidence of disclosure). Bacarella's seeking and receiving Furstenau's assurance that he could provide BTX a team and a large sales value, and then over a period of six months of emails and calls, culminating in a handshake deal, and then their leasing and furnishing of a BTX Detroit office while Furstenau was still at Radiant, establishes compelling circumstantial evidence of a plan between Bacarella and Furstenau to misappropriate Radiant's trade secrets.

### b. Threatened Misappropriation

In addition to the incriminatory emails between Furstenau and Bacarella and Furstenau's accumulation of 300 Radiant emails in his personal account, a significant factor establishing Radiant's likelihood of success is the incredulity of Furstenau's in-court testimony regarding the formation of BTX Detroit. Although "threatened misappropriation" has not been expressly adopted by Michigan courts, "[t]o establish threatened misappropriation, a party must specifically identify the trade secret likely to be misappropriated and must convince the court of the former employee's 'duplicity' by proffering evidence indicating a significant lack of candor or willingness to misuse trade secrets." *Gene Codes Corp. v. Thomson,* No. 09–14687, 2011 WL 611957, at *5 (E.D. Mich. Feb. 11, 2011) (quoting *CMI Intern., Inc. v. Intermet Intern. Corp.,* 251 Mich. App. 125, 134 (2002)) (internal citations omitted). The Court finds Furstenau's testimony to be inherently incredible as to many key components that establish threatened misappropriation. In particular, Furstenau's claim that he never accessed his 300 Radiant emails, his initial denial that he made a deal with BTX when he had made a handshake deal with Bacarella before he left Radiant, his immediate calls to Radiant clients with knowledge of their needs and history, his immediate hiring of his Radiant team allegedly without *any* prior discussion with them about their pay, benefits, BTX's location, or any other terms of employment, and the claim that the team would blindly follow him to a

hitherto non-existent BTX office. (*E.g.,* 12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 161:22-162:12, PgID 2138-39; 200:17-201:5, PgID 2177-78.)

Also inherently incredible is Furstenau's insistence that a list he created in the August 14, 2018 email entitled "Computers/Rosters" sent to Bacarella requesting computers for the five *named* Radiant team employees who all left to become the staff of BTX Detroit was pure chance or serendipity – allegedly he had never spoken with any of his Monday BTX "team" about moving to BTX Detroit before he resigned that Friday. (*Id.* at 162:9-17, PgID 2139.) Perhaps the strongest evidence of Furstenau's mendacity on this issue is the August 14, 2018 email, listing the specific names of his BTX team comprised of his Radiant team, which establishes that it was not his "hope" that his team would follow. While he testified that "[i]t was more of a hope" the named individuals would leave Radiant (Furstenau Dep. 128:4-14, ECF #36-2, PgID 1616), the plot to jump ship was confirmed in his email:

> Here are the names of users that need a computer, note there is 1 additional employee who works out of *customer* location in Tennessee [George P. Johnson] who will not need a computer. Also, some folks were inquiring on a 401k can you provide any information?
>
> Chad Furstenau
> Kari Piper
> Liania Renteria
> Angie Dupree
> Chris Higgins
> Ben Watkins (*customer* location)

(August 14, 2018 Email, Joint Ex. Book, Ex. 54.) (Errors in original.) (Emphasis added.) That "customer"-located employee, Ben Watkins, was a Radiant employee working at a Radiant customer, George P. Johnson, Co.. Furstenau's use of the designation "customer" supports the conclusion that his list was all Radiant employees who were then servicing Radiant customers.

The Court concludes that this email confirms that Furstenau's testimony that he had no exit plans (think "smoke screen" ultimatum), and no pre-August 24, 2018 exit discussion with any of his team was inherently incredible. The Court's conclusion is validated with his and Bacarella's locating, leasing, and setting up the BTX office to open for business on Monday, August 27, 2018. The evidence clearly establishes a pre-planned exit by Furstenau and Bacarella that was carried out that late August weekend.

As far back as February 2018, Furstenau's statements to Bacarella indicated that he likely had discussions with his "team" at Radiant regarding a move to BTX Detroit. In email correspondence with Bacarella confirming that Furstenau qualified for consideration as an independent contractor, which required a sales/operations "team" and a $3 million book of business, he indicated, "Yes, *we* meet your criteria." (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 154:4-10, PgID 2131.) (Emphasis added.) At his deposition and the hearing, Furstenau maintained that "it was essentially me but I used the word we." (*Id*.; Furstenau Dep. 131:6-8, ECF #36-2, PgID 1619 ("I use the word we, but at that point it's a me.").) Furstenau again stated at the Preliminary Injunction hearing that "there was no

team" in response to questions regarding an April 4, 2018 email wherein Bacarella states, "Please reach out when appropriate as we remain interested in establishing a relationship with you and your *team*." (12/14/18 Prelim. Inj. Hr'g, Furstenau Test. 157:2-18, PgID 2134.) (Emphasis added.) Furstenau testified, incredibly, "There was, you know, again, there was the same – there was no team." (*Id.*)

Further, Furstenau's breach of the "Conflicts of Interest" provision in the Radiant Code of Ethics (stating in relevant part, "[a]ny employee involved in a conflict of interest or a transaction or relationship that reasonably could be expected to give rise to conflict, must report the matter promptly to the employee's management") by failing to disclose his plans to join BTX Detroit further mars his credibility. (Joint Ex. Book, Ex. 3; 12/14/18 Prelim. Inj. Hr'g, O'Brien Test. 36:18-37:2, PgID 2014.) Radiant's forensic analysis of Furstenau's computer also concluded that Furstenau "deleted files showing his undisclosed interest in BTX while still employed at Radiant, including a document titled 'BTX Freight Business Office 7 30 18.pdf.'" (Pl.'s Mot. for Prelim. Inj., PgID 68.)

As for BTX Detroit, the Court finds Bacarella's testimony that he lacked any knowledge of the staffing at the new office inherently incredible. It bears repeating that there was an early "handshake agreement" with Furstenau "that they were going to do business" prior to Bacarella signing the BTX Detroit office space lease. At his deposition, Bacarella had stated that "BTX would not open the branch without making sure it was staffed properly. Any branch." (Bacarella Dep. 45:12-12, ECF #36-1, PgID 1385.) Despite

documentary evidence to the contrary, he repeatedly denied any awareness that the former Radiant employees would follow Furstenau to BTX Detroit or the status of staffing efforts whatsoever. (*E.g.,* Q (Jeffers): "Did you ever ask [Furstenau] whether he knew any qualified individuals who would be interested in coming over?" A (Bacarella): "No." (*Id.* at 48:8-11, PgID 1388); Q (Jeffers): "Once you found out that those individuals were there, did you glean any information about how they got there?" A (Bacarella): "No, sir." (12/21/18 Prelim. Inj. Hr'g, Bacarella Test. 33:23-25, PgID 2269).) This is inherently incredible.

Bacarella also wavers from acknowledging that he read Furstenau's August 14, 2018 email, claiming that he merely forwarded the email listing the employees to his human resources department without any discussion of the content. (12/21/18 Prelim. Inj. Hr'g, Bacarella Test. 70:20-71:21, PgID 2307-08.) The Court does not find this credible, based on testimony of BTX Founder and CEO Bacarella, who is clearly a "hands on" CEO who had six months of discussions and emails with Furstenau, who came to Detroit to locate and lease the office, and later flew down to Memphis to meet with Watkins, the only former Radiant employee with a non-compete contract. (Furstenau Dep. 82:14-83:18, ECF #36-2, PgID 1570-71.)

The Court finds the complete lack of candor in Furstenau's testimony would support a conclusion of his willingness to use the trade secrets in his possession on behalf of BTX Detroit. *See PepsiCo v. Redmond*, 54 F.3d 1262, 1270-71 (7th Cir. 1995) (affirming district

court's issuance of injunction where court found defendant's conduct deceitful and testimony lacking in credibility, supporting likelihood of threatened misappropriation), *cited with approval in Actuator Specialties, Inc. v. Chinavare*, No. 297915, 2011 WL 6004068, at *4-5 (Mich. Ct. App. Dec. 1, 2011):

> Defendant's behavior is similar to the behavior of the defendant in the Seventh Circuit case of *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (CA 7, 1995)… In that case, the plaintiff sought a preliminary injunction against another company and its employee to prevent its employee, a former employee of plaintiff who had signed a confidentiality agreement, from divulging plaintiff's trade secrets and confidential information and from assuming specific duties. *Id.* at 1263, 1264. A statute in Illinois that is similar to Michigan UTSA "provides that a court may enjoin the 'actual or threatened misappropriation' of a trade secret." *Id.* at 1267. The Seventh Circuit Court of Appeals explained that a "plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Id.* at 1269. The Seventh Circuit Court of Appeals affirmed the district court's grant of a preliminary injunction, finding that the plaintiff established a sufficient likelihood of success despite the lack of evidence that the defendant had used or planned to use any trade secrets. *Id.* at 1271….
>
> The district court also pointed out that the potential new employer seemed to express an "unnatural interest" in hiring PepsiCo employees. *Id.* at 1271. The district court determined that this showed a willingness on part of the new employer to seek out and use PepsiCo's trade secret information. *Id.*

*Actuator Specialties* at *3-4. So too, in the instant case where Furstenau's email sent the names of Radiant team to BTX and they hired them on day one without any interviews. Also, Furstenau forwarded approximately 300 emails from his Radiant computer to his personal Comcast Account. The more confidential information Furstenau possesses, the

higher the likelihood that he will use that information on behalf of BTX Detroit, and the more likely the other preliminary injunction factors, particularly irreparable harm and public interest, will weigh in favor of granting a preliminary injunction. Radiant has identified the lists of customers, carriers and other confidential financial information attached to the emails in the Joint Exhibit Book as specific trade secrets, and has adduced sufficient evidence of mendacity in the testimony of Furstenau and Bacarella to establish likelihood of success on its claims of threatened misappropriation against both BTX Detroit and Furstenau. (Joint Ex. Book, Exs. 45-49, 74-75.)

**B.**   **Likelihood of Success on Breach of Fiduciary Duty Claim (Count II of the Complaint, ECF #1, PgID 18)**

Count II against Furstenau for breach of fiduciary duty is likely to be displaced by MUTSA. MCL §445.1908(1). *Bliss v. Midwest Brake*, 270 F. Supp. 2d 943, 950 (W.D. Mich. 2003) (claims preempted by MUTSA to the extent the allegations are the same as trade secret misappropriation allegations).

MUTSA provides a statutory cause of action and available remedies for the misappropriation of trade secrets. MCL §445.1903. MUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." MCL §455.1908(1); *see also CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich. App. 125, 132 (2002). MUTSA, however, explicitly does not displace other potential causes of action not discussed in MCL §445.1908(1). "This act does not affect any of the

following: . . . (b) [o]ther civil remedies that are not based upon misappropriation of a trade secret." MCL §445.1908(2)(a).

To the extent that Radiant's claim is founded on Furstenau's "preparation" efforts that do not overlap with its MUTSA claim, that would not be displaced. It appears, however, that the facts underlying both the MUTSA and breach of fiduciary duty claims are similar if not identical. (Compl., ¶¶53-57, PgID 18.)

But, even if the breach of fiduciary duty claim is not displaced, Radiant would still be entitled to a preliminary injunction against Furstenau on its claim for breach of fiduciary duty given the evidence of his conduct as the highest level employee at its Detroit office. BTX's clear knowledge of Furstenau's breach of fiduciary duty to Radiant while he was employed at Radiant as its Detroit office manager and his communications with BTX's Bacarella clearly indicate a conspiracy between to two to have Furstenau violate his fiduciary obligation.

## C. Irreparable Harm

Radiant must demonstrate that it is likely to suffer irreparable harm in the absence of an injunction. *See Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. . . . Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

entitled to such relief.") (emphasis in original) (internal citations omitted). "The 'key word' in determining the extent of an injury sufficient to support the award of injunctive relief is 'irreparable.' Mere injuries, however substantial, are not enough. Rather, 'the harm alleged must be both certain and immediate, rather than speculative or theoretical.'" *Hudson v. Caruso*, 748 F. Supp. 2d 721, 730 (W.D. Mich. 2010) (quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). An injury is irreparable if it is not "fully compensable by monetary damages," *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Certified Restoration*, 511 F.3d at 550), that is, "the nature of the plaintiff's loss would make damages difficult to calculate," *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). That includes "loss of customer goodwill." *Id.* at 511–12.

O'Brien has testified to the loss of goodwill among Radiant customers: "You know, I've made sales calls where customers were telling me they were appalled that our entire office would walk out the door and what type of company was Radiant, what kind of ethics did they have and they wanted to only do business with companies that treated their employees fairly." (12/14/18 Prelim. Inj. Hr'g, O'Brien Test. 43:4-9, PgID 2020.) He had one such conversation with the George P. Johnson location in Los Angeles, and Radiant has yet to receive any further business from that client. (*Id.* at 116:2-117:4, PgID 2093.)

At this preliminary stage, Radiant has established sufficient evidence of loss of goodwill, thus demonstrating irreparable harm.

## D.    Harm to Others

In deciding whether to grant a preliminary injunction, a district court must consider the harm that the injunction would cause the non-movant. *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 33 (6th Cir. 2011). Furstenau and the other BTX Detroit employees would be damaged by an injunction prohibiting them from doing business with their former Radiant customers for a six-month period. BTX Detroit would remain free to solicit other customers. Further, because the testimony at the hearing established that there are multiple 3PL companies seeking business in Detroit, the absence of BTX Detroit from the marketplace would not significantly limit the customers' options. Accordingly, this element of harm to others does not weigh in Defendants' favor. *See Brake Parts* at *33 (affirming grant of injunction where "defendant knowingly and illegally placed itself in the position to be placed out of business.").

## E.    Public Interest

The public has an interest in protecting trade secrets, and it is "axiomatic that that the public has an interest in the enforcement of the legislatively enacted laws." *Noretto,* 495 F. Supp. 2d at 660-61. Defendants argue that individuals may choose to seek employment freely, absent a reasonable restrictive covenant in an employment contract. And, the Court recognizes that "[f]iling a trade secret action to restrain legitimate competition and job mobility, needless to say, is not proper." *PrimePay* at *38 (quoting

*Degussa v. Burnett*, 277 F. App'x 530, 535-36 (6th Cir. 2008)). Such is not the case here.

The public's interest in protecting trade secrets has been violated.

## IV.    CONCLUSION[4]

While none of the former Radiant employees (except Watkins) entered into a

non-competition or non-solicitation agreement with Radiant, all of those individuals,

and Furstenau most importantly, did execute and acknowledge a Code of Ethics

containing Conflicts of Interest and Confidentiality provisions. The Handbook

---

[4] After testimony concluded at the December 21, 2018 evidentiary hearing, the Court provided time for Counsel to speak on behalf of their clients. Plaintiff's Counsel Patrick Hickey argued on behalf of Radiant. Defense Counsel for BTX Detroit, Andrew Marquis, stated that he would speak for both Defendants, BTX Detroit and Furstenau. Because evidence at the hearing had established that pursuant to Paragraph 10 of Exhibit 56, the June 22, 2018 email from Bacarella to Furstenau, that BTX Detroit had an obligation to fund any defense to confidentiality claims brought against him by his former employer, BTX had provided counsel for Furstenau. That Counsel, Kurt Kobiljak, although present, had never spoken a word in the two-day hearing. Because of this, the Court took the precaution of asking Defendant Furstenau if he was in agreement with Mr. Marquis arguing on his behalf, as well as for his client BTX Detroit:

> Court:  And that's okay with you, Mr. Furstenau? You're willing to allow Counsel who is representing BTX to argue on behalf of yourself?

> Attorney Kurt Kobiljak:  That's correct, your Honor.

> Court: I just want to get his approval on the record.

> Charles Furstenau: Yes, your Honor.

(12/21/18 Prelim. Inj. Hr'g 148:1-7, PgID 2384.)

Computer Policy signed by all Radiant Employees also prohibits disclosure of Radiant data.

This case involved a long-planned "raid" of the employees of the Radiant Detroit office, carried out by Radiant's former office manager Charles Furstenau and BTX Global Logistics CEO Rosario Bacarella. The "raid" was carried out in late August 2018, after seven months of discussions/emails evidencing plotting between Bacarella and Furstenau, including Furstenau's forwarding of 300 Radiant emails that contained, *inter alia*, Radiant's budgets, customer lists, and logistics plans. The BTX Detroit office was up and running with Furstenau's Radiant "team" – who blindly, or not so blindly, quit their jobs to join Furstenau – Monday, August 27, 2018, the first business day after Furstenau's resignation on Friday, August 24, 2018.

Furstenau's testimony was that all of this "just happened" spontaneously on August 24, 2018. Bacarella's testimony was that "I know nothing" about Furstenau's misappropriation of trade secrets, or the prior recruiting of Radiant employees, or his breaching his fiduciary duty to Radiant. The phrase best describing these accounts is *mirible dicto*, defined as "the intellectual's version of Believe It or Not." WILLIAM MORRIS & MARY MORRIS, MORRIS DICTIONARY OF WORD AND PHRASE ORIGINS 387-88 (2d. ed. 1971). The Court does not believe Defendants' stories.

The Court concludes that Radiant has made a sufficient showing at the two-day evidentiary hearing of the four factors necessary to support this Court's entry of a

preliminary injunction against Defendant Charles Furstenau and Defendant BTX Detroit on its claim of misappropriation of trade secrets under both the Michigan Uniform Trade Secrets Act and the Federal Defend Trade Secrets Act and against Furstenau on its claim of breach of fiduciary duty.

IT IS NOW ORDERED that:

(1) Defendant Chad Furstenau, and all other former Radiant employees now employed by Defendant BTX Detroit are preliminarily enjoined from soliciting business from, providing quotes to, or otherwise contacting customers with which they conducted business during the last 12 months that they were employed by Plaintiff Radiant, for a period of six months from the date of the entry of this Order; and

(2) Defendant Chad Furstenau, and all other former Radiant employees now employed by Defendant BTX Detroit are preliminarily enjoined from soliciting business from, providing business to, requesting quotes from, or otherwise contacting carriers/agents with which they conducted business during the last 12 months that they were employed by Plaintiff Radiant, for a period of six months from the date of the entry of this Order; and

(3) Defendant Chad Furstenau, and all other former Radiant employees now employed by Defendant BTX Detroit are preliminarily enjoined from disclosing and/or using any Radiant confidential information and/or trade secret information; and

(4) the Parties will continue with discovery, including but not limited to the forensic examination and imaging by Plaintiff Radiant of the Comcast email account "cfurstenau@comcast.net," Defendant Furstenau's Radiant-issued cell phone, Defendant Furstenau's BTX-issued cell phone, Defendant Furstenau's personal computer, and Defendant Furstenau's BTX Detroit-issued computer.

FURTHER, pursuant to Fed. R. Civ. P. 65(c), the Court will hold argument on the requirement that Plaintiff provide security in an amount proper to pay costs and damages to Defendants if they are subsequently found to have been wrongfully enjoined.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Court Judge

Date: February 20, 2019