## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RADIANT GLOBAL LOGISTICS, INC. )
A Washington corporation, )
                            )
        Plaintiff, )
                            )     Case No.: 2:18-cv-12783-PDB-RSW
vs. )
                            )
CHARLES FURSTENAU, JR. and )
Individual and Michigan resident, and )
BTX AIR EXPRESS OF DETROIT, LLC)
A Connecticut limited liability company,)
                            )
        Defendants. )
                            )
_____ )

## DEFENDANT BTX AIR EXPRESS OF
## DETROIT, LLC'S MOTION TO STRIKE THE EXPERT
## TESTIMONY OF J. BRADLEY SARGENT

Defendant BTX Air Express of Detroit, LLC ("BTX Detroit"), by its attorney, Andrew F. Marquis of SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, PLC, hereby submits its Motion to Strike the Expert Testimony of J. Bradley Sargent and in support thereof states the following:

1.     J. Bradley Sargent ("Sargent") has submitted his expert opinions on damages allegedly suffered by Plaintiff Radiant Global Logistics, Inc. ("Radiant") due to the alleged wrongful conduct of Defendants.

2.      Sargent's opinions do not satisfy Federal Rule of Evidence 702 or *Daubert*.

3.      Specifically, Sargent did not utilize reliable principles and methods or apply his principles and methods to the facts of the case.

4.      This Court should strike the opinions and testimony of J. Bradley Sargent.

WHEREFORE, Defendant, BTX Air Express of Detroit, LLC, hereby requests that the Court grant Defendant's Motion to Strike.

Dated: September 11, 2020          /s/ Andrew F. Marquis
                                   Andrew F. Marquis (P82641)
                                   Attorney for Defendant,
                                   BTX Air Express of Detroit, LLC
                                   535 Griswold St. Ste. 1818
                                   Detroit, MI 48226
                                   (313) 237-7400
                                   (313) 963-7425 fax
                                   amarquis@scopelitis.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RADIANT GLOBAL LOGISTICS, INC. )
A Washington corporation, )
)
        Plaintiff, )
)    Case No.: 2:18-cv-12783-PDB-RSW
vs. )
)
CHARLES FURSTENAU, JR. and )
Individual and Michigan resident, and )
BTX AIR EXPRESS OF DETROIT, LLC )
A Connecticut limited liability company,)
)
        Defendants. )
)
_____)

# DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO STRIKE THE EXPERT TESTIMONY OF J. BRADLEY SARGENT

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...............................................................i

TABLE OF AUTHORITIES ........................................................ iii

STATEMENT OF ISSUES PRESENTED ................................... v

STATEMENT OF CONTROLLING OR MOST APPROPRIATE
AUTHORITY ...........................................................................vi

BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE ........1

I.      INTRODUCTION ..........................................................1

II.     RELEVANT FACTUAL BACKGROUND .......................2

        A.   The Parties .........................................................2

        B.   The Experts .......................................................3

        C.   The Third-Party Logistics Provider Market ...........................3

             1.   The competitive nature of the industry ........................4

             2.   Factors that adversely impact Radiant's business ........5

        D.   Sargent's Report, Analysis, and Testimony ...........................9

III.    STANDARD OF REVIEW ..............................................12

IV.     ARGUMENT ...............................................................13

        A.   Sargent Fails to Link Radiant's Potential Lost Profits to
             Defendants' Alleged Wrongdoing ...........................................13

        B.   Sargent's Methodology Is Unreliable ...................................19

             1.   Departure of Furstenau and other factors .................21

             2.   Competition ...............................................................22

             3.   Improper comparison of operating results .................23

             4.   Improper use of BTX Detroit's gross margin .............23

V.    CONCLUSION ...................................................................................25

# TABLE OF AUTHORITIES

## Cases

*360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.,*
  2016 WL 6075566 (W.D. Tex. April 22, 2016).................................21, 22

*Arthur J. Gallagher & Co. v. Babcock,*
  703 F.3d 284 (5th Cir. 2012).................................................................14

*Children's Broad. Corp. v. Walt Disney Co.,*
  245 F.3d 1008 (8th Cir. 2001).............................................................19

*Coastal Aviation, Inc. v. Commander Aircraft Co.,*
  937 F. Supp. 1051 (S.D.N.Y. 1996).......................................................15

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013)............................................ 1, 3, 4, 5, 6, 8, 13, 19, 25

*Concord Boat Corp. v. Brunswick Corp.,*
  207 F.3d 1039 (8th Cir. 2000).........................................................23, 24

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993).................................................................12, 13, 17

*Expeditors Int'l of Washington v. Vastera, Inc.,*
  No. 01-CV-71000-DT, 2004 WL 6047124
  (E.D. Mich. June 29, 2004) .........................................................2, 7, 18

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997)..............................................................................14

*Horizon Health Corp. v. Acadia Healthcare Co., Inc.,*
  520 S.W.3d 848 (Tex. 2017) ................................................................14

*Isaksen v. Vermont Castings, Inc.,*
  825 F.2d 1158 (7th Cir. 1987)..............................................................15

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999)..............................................................................12

*Sigler v. Am. Honda Motor Co.,*
    532 F.3d 469 (6th Cir. 2008)...............................................................13

*Trugreen Companies, LLC v. Scotts Lawn Service,*
    508 F. Supp. 2d 937 (D. Utah 2007)........................................17, 18, 20

*Zimmer, Inc. v. Stryker Corp.,*
    2014 WL 3866454 (N.D. Ind. Aug. 6, 2014) ...................................15, 16

*Zimmer, Inc. v. Stryker Corp.,*
    2018 WL 276324 (N.D. Ind. Jan. 3, 2018)........ 13, 14, 15, 16, 17, 19, 20

## **<u>Rules</u>**

Fed. R. Evid. 702 .......................................................................1, 2, 12, 17

## <u>STATEMENT OF ISSUES PRESENTED</u>

Pursuant to E.D. Mich. LCR 7.1(d)(2), Defendant, BTX Detroit, identifies the following issues:

1.  Should the Court strike the expert opinions and testimony of Mr. J. Bradley Sargent because Sargent's methods are unreliable and were not specifically applied to the facts of the case?

    **BTX Detroit answers:  Yes.**

## <u>STATEMENT OF CONTROLLING OR MOST<br>APPROPRIATE AUTHORITY</u>

Pursuant to E.D. Mich. LCR 7.1(d)(2), BTX Detroit states that the following authorities are the controlling or most appropriate authorities in support of the Brief:

1.  Federal Rule of Evidence 702

2.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)

3.  *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)

4.  *Zimmer, Inc. v. Stryker Corp.*, 2014 WL 3866454 (N.D. Ind. Aug. 6, 2014)

5.  *Trugreen Companies, LLC v. Scotts Lawn Service*, 508 F. Supp. 2d 937 (D. Utah 2007)

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE

## I.    INTRODUCTION

Expert testimony is often given significant weight by juries; the Federal Rules of Evidence therefore require Courts to assess whether a particular expert will help the trier of fact by offering a relevant opinion supported by reliable analysis. Fed. R. Evid. 702. Radiant's expert, J. Bradley Sargent, does not meet this test, because his lost profits analysis is an unreliable measure of damages for a multi-factor trade secret case. What Sargent offers as his expert testimony is little more than simple arithmetic—a comparison of Radiant's profits before and after the alleged wrongful conduct. But a damages opinion requires more than simple arithmetic.

Indeed, "[t]he first step in a damages study is the translation of a *legal theory of the harmful event* into an analysis of the economic impact *of that event.*" *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (emphasis in original) (quoting Fed. Judicial Ctr., Reference Manual on Scientific Evid. 432 (3d ed. 2011)). Sargent entirely ignores this requirement. In fact, he admits that he is not offering any opinions on causation—he instead assumes lost profits is an appropriate measure of

damages without any further thought. This Court has recognized, however, that a plaintiff must establish a causal connection between allegedly misappropriated trade secrets and damages a plaintiff seeks. *Expeditors Int'l of Washington v. Vastera, Inc.*, No. 01-CV-71000-DT, 2004 WL 6047124, at *7 (E.D. Mich. June 29, 2004). Sargent's testimony is unreliable, irrelevant, and unable to help the jurors understand a fact at issue in this case. The Court must exclude his testimony under *Daubert* and its progeny.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   The Parties

Radiant operates as a third-party logistics and supply chain management company. ECF No. 1 at PageID.4-5. BTX Detroit and Radiant are competitors in the freight forwarding industry. *See generally* ECF No.1. Charles Furstenau was the General Manager of Radiant's Detroit operation until he started working for BTX Detroit. *Id.* at PageID 3. After Furstenau resigned, several other individuals also left Radiant and began working at BTX Detroit. ECF No. 1 at PageID 6-8; Deposition of Liana Renteria, attached as Exhibit A, at 85:17-86:23; Deposition of Kari Piper, attached as Exhibit B, at 56:8-17.

2

## B.    The Experts

Radiant retained Sargent to calculate damages regarding Radiant's claims. Mark Robinson, an expert in the areas of valuation, forensic accounting, and economic damage quantification, was retained by BTX Detroit to analyze Sargent's opinions. *See* Report of Mark Robinson, attached as Exhibit C, at ¶¶ 1, 4. Both experts were deposed. Robinson found that "Sargent's opinions are inconsistent with case facts, have no connection to the allegations in the Complaint, and are completely speculative." *Id.* at p. 55.

## C.    The Third-Party Logistics Provider Market

Analyzing how the alleged wrongful conduct impacted Radiant's alleged lost profits is accomplished in part by reconstructing the logistics market. *Id.* at ¶ 118(a). The "logistics industry is highly fragmented with thousands of companies of various sizes competing in the domestic and international markets." 2019 Form 10-K, attached hereto as Exhibit D, at page 3, ITEM 1. Radiant competitors can do business with the same customers who do business with Radiant; "there is no exclusivity." Deposition of Timothy O'Brien, October 19, 2018, ECF No. 91, Exhibit L, at 29:16-21. For example, Radiant did business with a company called

3

J.W. Cole. Deposition of William Sims, attached as Exhibit E, at 172:25-173:2. Radiant does not own any of J.W. Cole's lanes or shipments and does not have a contract that makes their relationship exclusive. *Id.* at 172:19-24. When Radiant bids for work for J.W. Cole, Radiant may not win that business. *Id.* at 172:25-173:2. J.W. Cole is free to use whomever they want to handle logistics. *Id.* at 173:12-17.

### 1.    The competitive nature of the industry

Radiant does business in "a very competitive environment." ECF No. 91, Ex. L at 87:3-7. Companies like Radiant compete for work by submitting bids online on "bid boards." *Id.* at 48:9-17. Radiant does not have exclusive access to the bid boards. *Id.* at 48:18-24. Bidding on the bid boards is a competitive process, and there are competitors winning bids over Radiant. Deposition of Bohn Crain, ECF No. 91, Exhibit J, at 142:21-24, 145:14-16. "Increased competition may lead to revenue reductions, reduced profit margins, or a loss of market share" for Radiant. Ex. D at page 11, ITEM 1A. For example, Radiant claims it has seen reduced business with a company called Coherent due to increased competition from other competitors, including BTX Detroit. Deposition of Timothy O'Brien, September 26, 2019, attached as Exhibit F, at 85:7-

86:4. Radiant chooses the price to submit on the bid boards and can reduce its price in order to generate business. *Id.* at 93:14-23.

In the Detroit market, Radiant faces competition from Pilot Air Freight, among others. Deposition of Charles Furstenau, October 16, 2018, attached as Exhibit G, at 29:22-30:3. One customer, Tek Exhibit LLC d/b/a Image-Tek Displays & Graphics ("Image-Tek"), has used four different logistics providers—Tasmanian, Time Logistics, Radiant, and BTX Detroit—over the past few years. Deposition of Maureen Englehart, attached as Exhibit H, at 12:22-13:19. Image-Tek has found that there is not one logistics provider that has consistently been able to win business or always have the best prices. *Id.* at 43:19-25.

### 2. Factors that adversely impact Radiant's business

There are several factors that can adversely impact Radiant's business. One factor is the volume of the logistics business. Radiant did in fact experience a decrease in freight volume during the injunction period due to Radiant's customers losing business with their own customers. Ex. E at 190:12-191:3. For example, customer George P. Johnson lost business, which reduced Radiant's revenue separate and apart from alleged actions of BTX Detroit and Furstenau. Ex. F at 105:19-

106:7. In addition, Radiant voluntarily ceased work on its account with customer Ford National Parts Depot, which contributed further to Radiant's decrease in freight volume. Ex. E at 190:12-191:11. The loss of this customer admittedly had nothing to do with BTX Detroit or Furstenau. *Id.* at 191:9-13.

Radiant's business may also be negatively impacted if Radiant fails "to develop, implement, maintain, upgrade, enhance, protect and integrate information technology systems." Ex. D at page 9, ITEM 1A. Radiant has encountered problems with implementing a new system called SAP and implementation has been slower than expected. Deposition of Edward Bento III, ECF No. 91, Exhibit K, at 112:2-24; Ex. F at 47:19-23, 48:10-13. Furstenau told Radiant that the SAP system was not working, and the Detroit station as a whole was frustrated with the SAP system. ECF No. 91, Ex. K at 66:2-15, 73:17-74:5. Radiant employee Adam Baker testified that he was never trained on the SAP system despite requesting training and that he had to learn the system by "trial and error." Deposition of Adam Baker, attached as Exhibit I, at 35:25-36:24.

6

Radiant's net revenues can be adversely impacted by changes in third-party carriers' business, including higher carrier prices, and Radiant's business is also subject to seasonal trends. [1] Ex. D at pages 9-11, ITEM 1A.

Radiant's dependence on key personnel may have a material adverse effect on its operations. Radiant's success depends largely on the services of key personnel "because of their collective industry knowledge, marketing skills and relationships with vendors, customers and strategic operating partners." Ex. D at page 14, ITEM 1A. If any of these key employees leave Radiant, Radiant "could have difficulty replacing them with qualified individuals and it could have a material adverse effect on [Radiant's] future results of operations." *Id.*  Radiant Detroit was profitable under Furstenau's leadership throughout his time with Radiant up until his departure. ECF No. 91, Ex. L at 132:5-10. Immediately after Furstenau left, Radiant relied on employees Bill Sims, who became the station manager, Tyrell Sears in sales, and Adam Baker

---

[1] Despite Radiant's insistence that its business is subject to seasonal trends, Sargent refused to give credence to seasonality in his analysis. *See* Deposition of J. Bradley Sargent, attached as Exhibit J, at 31:22-32:19.

7

in operations. Deposition of Adam Baker, attached as Exhibit K, at 59:16-60:9; Ex. F at 100:5-9. Furstenau was significantly more experienced than Sims as a station manager and with bid boards. Ex. E at 219:8-22. Baker made mistakes with customers that may have damaged Radiant's reputation. *Id.* at 211:3-213:9. Sears was only able to handle one account and was identified as inadequate by Radiant executives. Ex. F at 122:4-123:5. In addition, Radiant hired Don Harrison to handle the bid boards for XPO Logistics, but Don Harrison "didn't have the same skill set as Chris Higgins and Chad Furstenau," which contributed to less business won on the bid boards for XPO and resulted in the biggest decrease in business for Radiant's largest account. *Id.* at 120:20-122:3. Radiant admitted that it could have brought in a station manager or hired additional salespeople after Furstenau left to offset any damages. ECF No. 91, Ex. K at 136:9-18. The Radiant Detroit station is still not profitable because it is missing sales personnel, but Radiant has not yet hired additional salespeople because it is reportedly difficult to find them. Ex. F at 102:6-12.

### D.     Sargent's Report, Analysis, and Testimony

Sargent analyzed the "potential economic loss suffered by Radiant as a result of the alleged acts by Furstenau and BTX." Report of J. Bradley Sargent, attached hereto as Exhibit L, at ¶ 12. He concluded that Radiant lost profits from August 2018 through January 2019 (the "pre-injunction period") and from March 2019 through August 2019 (the "injunction period"). *Id.* at ¶ 36. He calculated the amount of lost profits for each time period and determined that Radiant lost hundreds of thousands of dollars. *See id.* at ¶¶ 36-37.

Sargent also calculated the amount that he asserts should be disgorged from compensation paid to Furstenau by Radiant based on the assumption that Furstenau allegedly breached his fiduciary duty to Radiant from February 1 through August 24, 2018. *Id.* at ¶ 41. Sargent does not explain how Radiant was damaged by Furstenau's alleged breach of fiduciary duty, particularly since he finds no lost profits for the Radiant Detroit station before Furstenau's departure and no corresponding financial gain by BTX Detroit during that period. *See id.*

Sargent assumes that there is a causal connection between Radiant's lost profits and the alleged acts of Furstenau and BTX Detroit.

Ex. J at 23:3-12. In fact, he has no opinions on causation. *Id.* at 22:25-23:1. His analysis does not attempt to determine the cause of Radiant's losses but rather assumes every dollar of lost revenue relates to something improper on the part of Defendants. *Id.* at 50:1-14.

Sargent tellingly admits that Radiant's lost profits may be wholly attributable to factors besides the alleged wrongful conduct of Furstenau and BTX Detroit. *See id.* at 49:15-20. Sargent admits that the departure of Furstenau and the other "key execution employees" "basically gutted Radiant Detroit's operations and caused revenues to go down." *Id.* at 48:22-49:7. He further admits that it is possible for the departure of key employees to have an economic impact without any further alleged wrongdoing. *Id.* Sargent cannot say that the losses Radiant Detroit suffered were based on some wrongdoing rather than simply the departure of key employees. *Id.* at 50:1-14. Sargent did not review Radiant Detroit's efforts to increase profitability in the wake of the departure of Furstenau and the other employees. *Id.* at 53:20-24. He did not compare the experience and quality of Radiant Detroit's staff who remained versus the employees who left. *Id.* at 54:23-55:3. He does not know why Radiant Detroit, after the departure of Furstenau and the

other employees, was able to restore the percentage gross margin but not the actual gross revenue figure. *Id.* at 59:10-60:4. He did not determine whether the people hired to replace Furstenau and the other employees were as capable or more capable than those that left at generating revenue. *Id.* at 64:3-10. Sargent admits that Radiant lost business to other competitors besides BTX Detroit. *Id.* at 67:8-13. He has no opinion on whether Radiant's loss of business was self-inflicted. *Id.* at 67:14-21. He did not examine whether customers still had the same volume of business that they were outputting to forwarders. *Id.* at 81:4-10. He did not consider whether BTX Detroit replicated Radiant's customer solutions or had its own resources for customer service and development. *Id.* at 91:12-25.

Sargent does not connect his damages measure to any specific counts in the complaint. *Id.* at 86:16-87:11. If Defendants were found liable for breach of fiduciary duty but not misappropriation of trade secrets, the amount of damages Sargent calculated would remain the same. *Id.* at 87:18-22. If there are particular alleged trade secrets that are deemed to have been misappropriated but not others, the damages figures would still be the same. *Id.* at 87:25-88:3. When asked how BTX

Detroit was detracting from any kind of earnings for Radiant during the injunction period, Sargent's only response was "the numbers don't lie." *Id.* at 70:18-71:8.

## III.  <u>STANDARD OF REVIEW</u>

Rule 702 of the Federal Rules of Evidence allows an expert witness to provide testimony in opinion form if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

In assessing the reliability of expert testimony, the trial court must decide not only whether an expert's methodology is reliable for some purposes, but whether it is a reliable way "to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 154 (1999). Expert testimony that is merely "subjective belief or unsupported speculation" should be excluded. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). The "party proffering expert testimony must

show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008) (internal quotations omitted). When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Id.* at 595.

## IV.  ARGUMENT

### A.    Sargent Fails to Link Radiant's Potential Lost Profits to Defendants' Alleged Wrongdoing

"The first step in a damages study is the translation of a *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013). When an expert purports to calculate lost profits, he may not skip this initial step and provide no explanation for how to distinguish lost profits caused by a defendant's alleged wrongdoing from lost profits that were caused by other factors. *Zimmer, Inc. v. Stryker Corp.*, 2018 WL 276324 at *3 (N.D. Ind. Jan. 3, 2018). Even when a party proffers an expert solely on damages and not liability, that party still must "establish that it is reasonably certain that the damages it seeks are a consequence of the

breach, not some other factor." *Id.* (internal quotations omitted). "[A]ny

opinion that purports to measure damages without making a judgment

as to which effects stem from the breach and which do not is useless" and

will not assist the trier of fact. *Id.* (internal quotations omitted).

> "[N]othing in either *Daubert* or the Federal Rules of Evidence
> requires a district court to admit opinion evidence that is
> connected to existing data only by the *ipse dixit* of the expert.
> A court may conclude that there is simply too great an
> analytical gap between the data and the opinion proffered."

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Courts exclude expert testimony on lost profits when the expert

merely assumes that the alleged wrongful conduct caused a plaintiff to

lose business. *See, e.g., Horizon Health Corp. v. Acadia Healthcare Co.,*

*Inc.*, 520 S.W.3d 848, 861 (Tex. 2017) (expert testimony "insufficient" and

"speculative" because expert admittedly assumed that the plaintiff would

have won additional business over other competitors if not for the

defendants' wrongful conduct); *Arthur J. Gallagher & Co. v. Babcock*, 703

F.3d 284, 295-96 (5th Cir. 2012) (district court abused its discretion by

allowing testimony on damages for lost profits—testimony was "too

speculative" because it was based on assumption that the defendants'

breach caused the plaintiff to lose customers even though evidence

showed plaintiff lost business for other reasons); *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1070 (S.D.N.Y. 1996) (finding expert testimony on lost profits "wrought with unsupported and speculative assumptions"—expert assumed amount of business plaintiff would have done "but for" defendant's wrongdoing), aff'd, 108 F.3d 1369 (2d Cir. 1997); *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987) (comparison of average profits for several years before and several years during the period of unlawful activity "is not a valid methodology of damage calculation, especially when it is apparent that other causal factors are at work.").

In *Zimmer, Inc. v. Stryker Corp.*, the court excluded the damages opinions of the plaintiff's expert. 2018 WL 276324, at *1 (N.D. Ind. Jan. 3, 2018). The parties in *Zimmer* were both manufacturers and competed directly against one another. *Zimmer, Inc. v. Stryker Corp.*, 2014 WL 3866454, at *1 (N.D. Ind. Aug. 6, 2014). One of the plaintiff's sales representatives resigned and began working for the defendant. *Id.* at 3. Plaintiff alleged that defendant incentivized plaintiff's former sales representative to convert plaintiff's customers to defendant and that the former sales representative violated his non-compete agreement by

soliciting plaintiff's customers. *Id.* Plaintiff retained an expert to assess the amount of plaintiff's lost profits that resulted from the alleged wrongful conduct. *Zimmer*, 2018 WL 276324, at *1. To calculate lost profits, the expert looked at the plaintiff's sales revenues before and after the sales representative left. *Id.* at *2. The expert assumed that the defendants' wrongful acts caused the decline in sales. *Id.*

The court found the plaintiff's expert failed to link plaintiff's lost profits to the defendants' alleged wrongdoing. *Id.* at *3. The expert provided no explanation for how to distinguish lost profits caused by the defendants' alleged wrongdoing from lost profits that were caused by the sales representatives' mere departure. *Id.* While the plaintiff argued that its expert was only proffered on damages, not liability, the court found that the plaintiff and its expert confused "the question of whether Defendants may have 'caused' a violation of the non-compete agreements with the question of whether Defendants' violations of the agreements, assuming they happened, 'caused' [plaintiff's] damages." *Id.* The expert could "assume the first kind of causation, but not the second." *Id.* The expert improperly "attribute[d] lost revenues and profits to Defendants' alleged wrongdoing, without ever considering the possibility that the lost

16

revenues and profits flowed from other non-actionable events." *Id.* The expert failed to account for any lost profits that resulted from the plaintiff's own failure to retain its business after its sales representatives left. *Id.* The court concluded that the expert's lost profit calculations did not satisfy Rule 702 or *Daubert. Id.*

Similarly, in *TruGreen Companies, LLC v. Scotts Lawn Service*, the district court excluded plaintiffs' expert. 508 F. Supp. 2d 937, 942 (D. Utah 2007). The parties in *TruGreen* were both providers of residential lawn care and direct competitors. *Id.* at 943. The dispute arose when an employee of TruGreen, a branch manager in TruGreen's Ogden, Utah location, voluntarily resigned and, a few weeks later, began working for Scotts in Ogden, Utah. *Id.* This employee allegedly recruited several other TruGreen employees to join him at Scotts, and several employees did leave TruGreen for Scotts. *Id.* TruGreen retained an expert to opine on damages, but the court found that the expert's conclusions were not sufficiently reliable. *Id.* at 958.

The "fundamental problem" was that TruGreen did not explain how the expert could reliably determine the profits earned by Scotts were in fact stolen away from TruGreen. *Id.* at 959. "The expert essentially

17

assumed that the growth in Scotts profits were as a result of the new employees who left TruGreen." *Id.* The expert picked 30% as the percent of customers that Scotts was able to retain as a result of former TruGreen employees joining Scotts, but the expert admitted the figure was an "estimate." *Id.* The court was not given a reason to accept the 30% figure other than that it was how much Scotts' profits increased during the year at issue. *Id.* The court noted that "this methodology [did] nothing more than assume the conclusion—that is, to assume that profits gained by Scotts came from the new employees." *Id.*

Like the experts in *Zimmer* and *TruGreen*, Sargent does not link Radiant's potential lost profits with any of Defendants' alleged wrongful conduct. Instead, he assumes that BTX Detroit's alleged actions collectively not only caused Radiant's alleged damages (i.e., "assumes the conclusion" as in *TruGreen*) but were the only possible contributing factor to any change in revenue. Ex. J at 23:3-12. He admits that he has no opinions on causation and that his analysis does not attempt to determine the cause of Radiant's losses. *Id.* at 22:25-23:1, 50:1-14. As this Court has held, there must be "some correlation between the damages [plaintiff] seeks and the trade secrets misappropriated." *Expeditors*, 2004

WL 6047124, at *7. Sargent's only rationale is "the numbers don't lie." *Id.* at 70:18-71:8.

Sargent also does not connect his damages calculations to any specific counts in the complaint. *Id.* at 86:16-87:11. Without explanation, Sargent asserts that the amount of damages would remain the same whether Defendants were found liable for one count or all of them. *Id.* 87:18-88:3. The assertion that "any misappropriation of any trade secret caused the exact same amount of damage to [plaintiff]" is "dubious." *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001). Sargent's conclusory opinions do not satisfy Rule 702 or *Daubert*.

## B.  Sargent's Methodology Is Unreliable

"When an expert ignores critical data in forming his opinions, he fails to satisfy *Daubert*." *Zimmer*, 2018 WL 276324, at *6 (internal quotations omitted). In *Zimmer*, the expert failed to consider obvious alternative explanations regarding his lost profits calculation even though the record contained many readily apparent facts that posed alternative explanations to the plaintiff's drop in revenue. *Id.* at *5. For instance, customers stated that they chose to switch their business to the defendant because the plaintiff failed to service their needs after the sales

representatives' resignation. *Id.* Despite the expert's own acknowledgment that the loss of sales representatives would result in a loss of business, the expert did not evaluate whether these facts impacted the plaintiff's ability to retain business after the sales representatives' resignation. *Id.*

In *TruGreen*, the expert also did not contend with other potential causes of revenue gains and losses. Specifically, the expert did not consider the specific items of confidential information that allegedly were taken, including the impact that the use of each specific item of confidential information could have on alleged damages. *TruGreen*, 508 F.Supp.2d at 960. The expert also did not consider TruGreen's historical patterns of financial performance and how that performance allegedly was impacted by the Defendants' alleged acts. *Id.* The court concluded that the expert's report was not reliable. *Id.*

Sargent's methodology is unreliable because he ignores material facts in the record showing potential as well as admitted causes of Radiant's alleged lost profits that have nothing to do with the alleged wrongful conduct.

20

### 1.    Departure of Furstenau and other factors

Sargent does not analyze the extent to which Radiant's alleged losses were caused by the mere departure of Furstenau and other employees, despite acknowledging that their departures could have an economic impact without any wrongful acts. In fact, Sargent asserts that Radiant would have reasonably expected steadily declining monthly gross margins after Furstenau and the other employees left even when BTX Detroit was not doing business with "Radiant customers." *See* Ex. L at ¶ 40.

Sargent also does not account for any of the factors that can—and certainly did—impact Radiant's revenues and gross margins, including higher carrier prices, seasonal trends, and Radiant's problems with implementing its SAP system. Sargent also does not examine whether the customers doing business with Radiant still had the same volume of business. Ex. J at 81:4-10. Sargent ignores the fact that many customers expressed frustration with Radiant's level of service once Furstenau and the other employees left. Ex. C at ¶ 118(a)(iii). Sargent's method "invites the Court to waste time by engaging in pure speculation as to why these [customers] are no longer doing business" with Radiant. *360 Mortg. Grp.,*

*LLC v. Homebridge Fin. Servs., Inc.*, 2016 WL 6075566, at *4 (W.D. Tex. April 22, 2016) (finding expert testimony on lost profits was speculative where there was "no basis for determining how much of the damages suffered resulted from the wrongful acts of the defendant and how much resulted from some other causes.") (internal quotation omitted).

### 2.    Competition

Sargent ignores the evidence demonstrating that the logistics industry is "very competitive" and that there is no exclusivity. Sargent bases his entire damages opinion on the fact that BTX Detroit and Radiant did business with many of the same customers. Radiant, however, has admitted that its competitors, including BTX Detroit, may do business with the same customers and that Radiant has no exclusive customers. ECF No. 91, Ex. L at 29:16-21. In fact, BTX Detroit's parent company had preexisting customer relationships with several automotive customers who also did business with Radiant. Ex. C at ¶ 102(b). Further, Sargent admits that Radiant lost business to other competitors besides BTX Detroit, but he does not include this fact in his analysis. *See* Ex. J at 67:8-13. "Experts cannot ignore relevant evidence by cherry-picking the facts which conform to a desired outcome." *360 Mortg. Grp., LLC,*

2016 WL 6075566, at *4 (excluding expert testimony on lost profits that did not account for market competition). Because he did not consider all aspects of the logistics provider market, Sargent's opinions are conclusory and speculative. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (district court abused its discretion by admitting expert testimony that was "mere speculation"—expert opinion did not "incorporate all aspects of the economic reality of the [] market" and "did not separate lawful from unlawful conduct.").

### 3.    Improper comparison of operating results

Sargent's methodology is also unreliable because he bases his opinion entirely upon his comparison of Radiant and BTX Detroit operating results from period to period. Ex. C at ¶ 93. Radiant acknowledges that it is inappropriate to compare operating results from period to period since "there can be no assurance that [Radiant's] historical operating patterns will continue in future periods or that comparisons to prior periods will be meaningful." *Id.* at ¶ 92. Sargent ignores this guidance *from the group who retained him* to come up with his unsupported conclusions.

### 4.    Improper use of BTX Detroit's gross margin

Sargent's use of BTX Detroit's gross margin for "Radiant

customers" to calculate Radiant's lost profits is "critically flawed." Ex. C at ¶ 118(c)(ii). Sargent performs no analysis demonstrating that the actual revenue achieved by BTX Detroit would be the same revenue lost by Radiant. *Id.* In addition, using BTX Detroit's gross margin is improper because gross margin is derived by subtracting cost of service from revenue and Sargent does not show or even assert that BTX Detroit's cost of service is comparable to Radiant's cost of service. *Id.* Radiant acknowledges that "[e]ach company has their own preferred margin that they would like to set" and that Radiant's own margins are "a continuing evolving process" that "changes…from day to day, week to week, [and] month to month." Ex. E at 120:1-121:3; 159:25-160:14. In addition, Radiant does not necessarily believe that BTX Detroit is using Radiant's pricing. Ex. F at 78:11-15. Without analyzing cost of service, Sargent's assumption that Radiant would have had the same gross margin as BTX Detroit is "fundamentally unacceptable." Ex. C at ¶ 118(c)(ii). In fact, Robinson concluded that "Sargent's use of BTX's Gross Margin for Radiant Customers in his damage calculation for the purpose that he did is against the accepted methodologies used in economic damages quantification." *Id.*

As Robinson explains, "Sargent has failed to utilize generally accepted methodologies, analysis, and principles in attempting to quantify Radiant's economic damages." *Id.* at p. 55. Sargent's methodologies are unreliable, and he does not apply them to the facts of the case. Sargent's opinions do not satisfy *Daubert* or Rule 702 and must be excluded.

## V.   <u>CONCLUSION</u>

Sargent's analysis commits a cardinal sin in lost profits determinations: assuming a conclusion, even in the face of overwhelming evidence that discounts any causal connection at all between the actions of BTX Detroit/Furstenau and Radiant's losses. For the reasons set forth above, BTX Detroit respectfully requests this Court to grant this motion and issue an order striking the expert opinions and testimony of J. Bradley Sargent.

Dated: September 11, 2020

<u>/s/ Andrew F. Marquis</u>
Andrew F. Marquis (P82641)
Attorney for Defendant,
BTX Air Express of Detroit, LLC
535 Griswold St. Ste. 1818
Detroit, MI 48226
(313) 237-7400
(313) 963-7425 fax
amarquis@scopelitis.com

4816-8819-1683,