EXHIBIT J

Deposition of J. Bradley Sargent

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4

 5  RADIANT GLOBAL LOGISTICS, INC.,

 6  a Washington corporation,

 7            Plaintiff,

 8  -vs-                        Case No. 2:18-12783-PDB-RSW

 9  CHARLES FURSTENAU, JR., an    Hon. Paul D. Borman

10  individual and Michigan      Mag. Judge R. Steven Whalen

11  resident, and BTX AIR EXPRESS

12  OF DETROIT, LLC, a Connecticut

13  limited liability company,

14            Defendants.

15  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~/

16  DEPONENT:    DEPOSITION OF JOHN BRADLEY SARGENT, CPA/CFF

17               APPEARING REMOTELY FROM WILL COUNTY,

18               ILLINOIS

19  DATE:        Tuesday, June 9, 2020

20  TIME:        9:34 a.m.

21  REPORTER:    John J. Slatin, RPR, CSR-5180,

22               Certified Shorthand Reporter,

23               Appearing Remotely From

24               Oakland County, Michigan

25          (Appearances listed on page 2)
```

```
 1    REMOTE APPEARANCES:

 2

 3        BENJAMIN W. JEFFERS (P57161)

 4        Hickey Hauck Bishoff & Jeffers, PLLC

 5        1 Woodward Avenue, Floor 2000

 6        Detroit, Michigan  48226

 7        (313) 964-9079

 8        bjeffers@hhbjlaw.com

 9            Appearing on behalf of the Plaintiff.

10

11        KURT M. KOBILJAK (P45297)

12        Pentiuk Couvreur & Kobiljak, P.C.

13        2915 Biddle Avenue, Suite 200

14        Edelson Building

15        Wyandotte, Michigan  48192

16        (734) 281-7100

17        kkobiljak@pck-law.com

18            Appearing on behalf of the Defendant,

19            Charles Furstenau, Jr.

20

21        (Appearances continued on page 3)

22

23

24

25
```

```
 1    REMOTE APPEARANCES CONTINUED:

 2

 3         ANDREW F. MARQUIS (P82641)

 4         Scopelitis Garvin Light Hanson & Feary

 5         535 Griswold Street, Suite 1818

 6         Detroit, Michigan  48226

 7         (313) 237-7400

 8         amarquis@scopelitis.com

 9              Appearing on behalf of the Defendant,

10              BTX Air Express of Detroit, LLC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      TABLE OF CONTENTS

 2

 3    WITNESS                                        PAGE

 4

 5    JOHN BRADLEY SARGENT, CPA/CFF

 6

 7         Examination by Mr. Marquis                  6

 8         Examination by Mr. Kobiljak                92

 9

10    EXHIBITS:                                    IDENTIFIED

11

12            (Exhibits provided electronically

13             to the reporter)

14

15    Exhibit 1     Expert Report of                 98

16                  J. Bradley Sargent,

17                  CPA/CFF, CFE, CFS, CCA,

18                  FABFA, December 16, 2019

19

20

21

22

23

24

25
```

```
 1                              Tuesday, June 9, 2020

 2                              Reported Remotely from

 3                              Oakland County, Michigan

 4                              9:34 a.m.

 5                      *    *    *

 6        THE REPORTER:  The attorneys participating in this

 7   deposition acknowledge that I am not physically present

 8   in the deposition room and that I will be reporting this

 9   deposition remotely.  They further acknowledge that, in

10   lieu of an oath administered in person, the witness will

11   verbally declare his testimony in this matter is under

12   penalty of perjury.  The parties and their counsel

13   consent to this arrangement and waive any objections to

14   this manner of reporting.

15        Will legal counsel please indicate your agreement

16   by stating your name, party represented and your

17   agreement on the record.

18        MR. JEFFERS:  This is Ben Jeffers.  I represent the

19   Plaintiff, Radiant, and I agree.

20        MR. MARQUIS:  I am Andy Marquis, counsel for

21   Defendant BTX Air Express of Detroit, and I agree to the

22   process today.

23        MR. KOBILJAK:  Kurt Kobiljak on behalf of Chad

24   Furstenau individually, and I agree.

25        THE REPORTER:  Thank you.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                          Page 6

```
 1              At this point will the witness kindly present his
 2        government-issued identification by holding it up to the
 3        camera for verification.
 4              THE WITNESS:  (Complying.)
 5              THE REPORTER:  Just a little tighter.
 6              THE WITNESS:  (Complying.)
 7              THE REPORTER:  Yeah.  Great.  Okay.  Thank you very
 8        much, Mr. Sargent.  I appreciate that.
 9              If you will raise your right hand, I'll swear you
10        in.  I just need a "yes" or a "no."
11              THE WITNESS:  (Complying.)
12              THE REPORTER:  Do you solemnly swear the testimony
13        you're about to give will be the truth, the whole truth
14        and nothing but the truth, so help you God?
15              THE WITNESS:  Yes.
16              THE REPORTER:  Great.  Thank you.
17                        *   *   *
18              JOHN BRADLEY SARGENT, CPA/CFF
19        having been first duly sworn, was examined and testified
20        as follows:
21                        EXAMINATION
22   BY MR. MARQUIS:
23   Q.   All right.  Good morning, Mr. Sargent.
24   A.   Good morning.
25   Q.   We're all in new territory here as we endeavor to
```

```
 1        conduct a video deposition.

 2            Have you ever had one of these done by video?

 3    A.  No, I have not.

 4    Q.  Well, I've done some by video but never by Zoom.  So,

 5        it's my first time as well.  So, we'll -- we're going to

 6        give it a shot, and there's probably going to be some

 7        additional kinks here that we don't always have in

 8        regular depositions but I think we can work through it.

 9            And I think if -- a lot of the same rules apply.

10        If you need a break, you'll let us know?

11    A.  Yes.  Absolutely.

12    Q.  Okay.  And if you don't understand a question, it's the

13        same here as it would be if we were all in person.  Feel

14        free to ask for clarification.  I'm not looking for you

15        to guess or speculate.  Just give us the answer if you

16        understand the question.

17            My questions aren't perfect, so I'll reform them

18        whenever you need me to; okay?

19    A.  Yes.

20    Q.  And some of what I'm saying right now is an assumption

21        that you have had a number of depositions taken of you

22        in the past.

23            Correct?

24    A.  That's correct.

25    Q.  Okay.  So, I'm laying out a couple ground rules, but I'm
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                              Page 8

```
 1        not going through the whole, you know, kit and caboodle
 2        because I think you kind of know how this works; right?
 3   A.   That's correct.
 4   Q.   Okay.  And if -- oh, I guess I'll just do this reminder.
 5            We need verbal answers.  I mean, I think you know
 6        that, but I think it's at a premium here that we make
 7        sure we have verbal answers even more because we're kind
 8        of still fitting in some of the communication we're
 9        doing; fair?
10   A.   Yes.
11   Q.   Okay.  So, just start, please, by stating and spelling
12        your name for the record.
13   A.   Certainly.
14            John, J-o-h-n, Bradley, B-r-a-d-l-e-y, Sargent,
15        S-a-r-g-e-n-t.
16   Q.   Okay.  Thank you.
17            And where are you employed currently?
18   A.   I am the managing member of the Sargent Consulting
19        Group.
20   Q.   And what's your title there?
21   A.   Managing member.
22   Q.   Okay.  Is that the only title you have?
23   A.   Yes.
24   Q.   Okay.  And are you more generally -- is your job an
25        accountant, or is there a better way to identify that?
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                      Page 9

```
 1  A.   Well, I'm a forensic accountant.
 2  Q.   And what's the -- what is your definition of a forensic
 3       accountant?
 4  A.   Typically it's an individual with accounting skills and
 5       knowledge that applies those skills and knowledge in
 6       various venues, primarily in litigation or
 7       pre-litigation context.
 8  Q.   Was there a period of time where you transitioned to
 9       becoming a forensic accountant versus a more traditional
10       accountant?
11  A.   Yes.  Certainly, yeah.  I started as a traditional
12       accountant, yes.
13  Q.   How long were you kind of in that more traditional
14       accounting role?
15  A.   Actually, very briefly.  Less than a year.
16  Q.   And at that point, after that less than a year, that's
17       when you started doing exclusively forensic accounting?
18  A.   Yes.  Yes.  Litigation support work, yes.
19  Q.   And about how many years ago was that that you started
20       doing the forensic accounting more exclusively?
21  A.   Twenty-one years ago.
22  Q.   And then within those 21 years, obviously at some point
23       you formed the consulting group that you run now.
24           When was that?
25  A.   In February 2009.
```

```
 1   Q.   And what led you to forming that group, transitioning

 2        over to running your own shop?

 3   A.   Well, it was always a dream of mine absolutely to run my

 4        own business.

 5   Q.   And are there -- you said you're a managing member.

 6             Are there any other managing members as well?

 7   A.   No.  I'm the sole member.

 8   Q.   Okay.  And I understand that today you're physically

 9        located in the Chicago area; right?

10   A.   Yes.  That's correct.

11   Q.   But you've got -- your firm has offices in other cities?

12   A.   Yes.  We are in downtown Detroit and in downtown Denver.

13   Q.   And those are -- are those physical presences with

14        employees?

15   A.   The Detroit office is not.  It's a physical presence.

16        It's a live/work unit right in downtown.

17             The Denver unit is an office with physical

18        employees, yes.

19   Q.   Okay.  So, and you mentioned this forensic accounting

20        work is related to litigation matters.

21             Is that across the board, all of them are either

22        active litigation or potential litigation?

23   A.   Not all across the board.

24             I started my career predominantly doing fraud

25        investigations, and many, many of those never reach a
```

1        litigation stage for multiple reasons.

2   Q.   Sure.

3            Do you still do any of that fraud examination work

4        today?

5   A.   Absolutely.

6   Q.   Do you have an idea of the split that you have currently

7        between fraud investigation and more like a lost profits

8        analysis that we have in this case?

9   A.   Well, if I even backed up and said economic damages on a

10       bigger picture from lost profits, it -- it varies from

11       year to year.  Some years it can be 50/50; some years --

12       it would tend to be more in the economic damages area

13       than it would be in the investigative are.

14  Q.   And --

15  A.   Though there's certainly a lot of overlap and skill sets

16       on both sides.

17  Q.   Okay.  Did you -- have you sort of transitioned a little

18       bit over the years with increasing your emphasis on the

19       economic damages portion of your work versus the fraud

20       examination?

21  A.   Yes.  That's an accurate assessment, yes.

22  Q.   Okay.  But even today could be -- I'm not committing you

23       to this for today's purposes, but today it could be that

24       you're 50/50 or somewhere around that between fraud and

25       economic damages?

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                          Page 12

```
 1  A.   Yes.

 2            But, again, to clarify, there's certain -- I -- you

 3       can be working on a case that is in litigation that is

 4       an extensive and exhaustive fraud investigation that

 5       will need damages quantified based on anything that's

 6       found.

 7            So, they are -- are not mutually exclusive.

 8  Q.   Okay.  Have you done economic damages analysis or

 9       reports for Radiant prior to this case?

10  A.   No, sir.

11  Q.   Did you say "No, sir"?

12  A.   No, sir.  No.

13  Q.   Okay.  Sorry.  I just wanted to make sure I heard you

14       right.

15            THE REPORTER:  Hey guys, can we go off the record

16       real quick?  I apologize.

17            (Discussion held off the record.)

18            THE REPORTER:  (Reading.)

19            "Question:  Okay.  Have you done economic

20       damages analysis or reports for Radiant prior

21       to this case?

22            "Answer:  No, sir.

23            "Question:  Did you say 'No, sir'?

24            "Answer:  No, sir.  No.

25            "Question:  Okay.  Sorry.  I just wanted
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                      Page 13

```
 1              to make sure I heard you right."
 2  BY MR. MARQUIS:
 3  Q.   All right.  John or Brad, so my next question was going
 4       to be, if you had ever had any familiarity or knowledge
 5       of Radiant Global Logistics or Radiant Logistics prior
 6       to this case?
 7  A.   No.
 8  Q.   And then had you ever worked with the attorneys at
 9       Hickey Hauck Bishoff and Jeffers before?
10  A.   Yes.
11  Q.   Do you know about how many times before this case?
12  A.   I would say in the past five years, maybe three, four;
13       possibly two to three.  Something like that.
14  Q.   Okay.  Have you -- do you regularly get involved in
15       cases that involve allegations of misappropriation of
16       trade secrets?
17  A.   I do.
18  Q.   You don't keep track of how many cases per year you work
19       on that involve trade secrets allegations, do you?
20  A.   No.  No, I don't.
21  Q.   What about breach of fiduciary duty?
22       It that a cause of action that is involved in your
23       analyses regularly?
24  A.   In the majority of them, yes.
25  Q.   And then obviously you have these offices in different
```

```
 1       cities.
 2            Do you regularly provide expert analysis in
 3       Michigan?
 4  A.   Yes.
 5  Q.   And do you have a count anywhere of how many cases
 6       overall that you're working on in a given year?
 7  A.   How many cases overall?
 8            No.  Not necessarily.
 9            And, again, that could vary.  I would be
10       speculating.  I could guess a range.  Somewhere between
11       10 and 20, 25 in any given year.
12  Q.   And is that taking into account both active litigation
13       and potential litigation, or are you chopping that up in
14       any way?
15  A.   That would be anything we'd be working on, anything
16       we've engaged on.
17  Q.   And I know I kind of asked this earlier but just to make
18       sure I understand, the cases that are actual litigation,
19       is that more than 50 percent of what you're working on
20       on any given day, any given year?
21  A.   Yes.  As I said previously, it depends on the year
22       because the investigative work can often be very large
23       matters, more so than the litigation work.
24            50 percent and above, depending on the year.
25  Q.   In this case, the report that you put together, was that
```

```
 1        your work exclusively, or do other people in your firm

 2        chip in on that?

 3   A.   Oh, certainly I direct other people -- a team's efforts

 4        on the work.

 5   Q.   Are there other forensic accountants that get involved

 6        in -- specifically in the report that was done for this

 7        case?

 8   A.   I'm sorry.  I'm not sure I understand your question.

 9   Q.   Okay.  Let me kind of rephrase it.

10             Are you the only forensic accountant that has

11        contributed to the report that is part of this case from

12        your office?

13   A.   I would characterize my team as entirely forensic

14        accountants.

15   Q.   Okay.  So, how many forensic accountants worked on this

16        report in the Radiant versus Furstenau case?

17   A.   Without the invoices in front of me, I couldn't give you

18        an exact number.

19             I would say anywhere -- approximately four, five

20        different folks.

21   Q.   But is it a safe assumption that you, as the one who

22        signed the report, you've kind of reviewed everything

23        and formalized it into an expert report?  Is that

24        correct?

25   A.   That's correct, yes.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

```
 1   Q.   Okay.  Ultimately, it's your analysis within the report

 2        that you've offered up in this case?

 3   A.   That is correct, yes.

 4             MR. MARQUIS:  We've previously provided that report

 5        to the court reporter, and I want to go ahead and mark

 6        that as Exhibit 1.

 7             We probably should also say that there's some, I

 8        think, confidential information contained in that

 9        exhibit.  So, we have a protective order in this case,

10        and we want to take stock of the fact that when we're

11        talking about Exhibit 1, that that is a confidential

12        document or it has confidential information within it.

13   BY MR. MARQUIS:

14   Q.   And, Mr. Sargent, do you have that report with you in

15        front of you?

16             I believe you do.

17   A.   I do.

18   Q.   Just for purses of the deposition, I'm sharing my screen

19        to show this is the report I'm talking about.

20             MR. MARQUIS:  Can everyone on the deposition see

21        that report?

22             THE REPORTER:  It's John.  Yes.

23   A.   Yes.

24   BY MR. MARQUIS:

25   Q.   Ben said "yes"?
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

```
 1   A.   Yes, I do.

 2   Q.   I'm going to stop the share because I think everyone has

 3        a copy in front of them.  So, when we talk about it,

 4        we'll know that is, indeed, your report in this case.

 5             Is that correct, Mr. Sargent?

 6   A.   Yes.  It's a cover sheet of it, yes.

 7   Q.   Right.  Right.

 8             And it's a 52-page document.

 9             Is that what you've got in front of you?

10   A.   That sounds about right, yes.

11   Q.   Okay.

12   A.   I don't think all the pages are numbered to the end,

13        including the various exhibits.

14   Q.   Okay.

15             MR. MARQUIS:  And, John, obviously I'm asking that

16        this be marked as Defense Exhibit 1; okay?

17             THE REPORTER:  Will do.

18             MR. MARQUIS:  All right.  Thanks.

19   BY MR. MARQUIS:

20   Q.   So, Mr. Sargent, I know this is dated December 16th,

21        2019.

22             Do you know when you actually started working on

23        this report?

24   A.   Well, I -- I believe I was engaged earlier in 2019 -- I

25        can't recall specifically -- with the idea of that
```

1           engagement leading to, you know, analyses that would be

2           part of this report.

3    Q.    Okay.  And this in the report -- the only report from

4           you I've seen in this case.

5                Are there any other reports?

6    A.    No.

7    Q.    I want to go through a couple of specific questions that

8           I have about the report.

9                Page 4, down at the bottom, paragraph 7 -- let me

10          know when you're there.  Just give me a verbal

11          confirmation.

12   A.    I'm on page number 4, and paragraph 7 is at the top of

13          the page?

14   Q.    Right.

15   A.    Okay.  Page 4 on the bottom is where it says page 4.

16          Okay.

17   Q.    Yeah.  That's what I mean; just how it's marked on the

18          document, not the PDF itself.

19   A.    Yes.

20   Q.    So, in that paragraph you say:

21                "It is not intended to be a summary of

22           all facts considered in forming my opinions."

23                And I think what you mean is that you've relayed

24          some facts within the report; is that fair?

25   A.    Yes.  Yes.  Some factual "Background," as the heading

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 19

```
 1         says right above it, yes.

 2    Q.   So, are you saying that there are other facts you'd

 3         consider, but just haven't mentioned in this report?

 4    A.   No, no, no.  In this Background section.

 5    Q.   Okay.  Okay.

 6    A.   I'm being very specific to what follows is the basic

 7         background and the parties to the dispute.

 8    Q.   Okay.  So, does that mean that the facts that you have

 9         considered in forming your opinions, if they're not in

10         the Background, they're somewhere in the report?

11    A.   Yes.  Yes.

12    Q.   Okay.  And the reason I ask is, I didn't know if there

13         were any other facts that you weren't mentioning in the

14         report but that were still relevant to you.

15    A.   Well, certainly there are -- there are contextual facts

16         that I may not mention in the report that may have some

17         relevance to the dispute, yes.

18    Q.   Any that you can identify as you sit here today, or are

19         you thinking more broadly?

20    A.   I'm thinking more broadly, but by way of example, I

21         reference clearly and I measure damages through an

22         injunction and certainly the fact that an injunction was

23         issued, but I don't go into any kind of discussion about

24         the injunction.  And I don't cite anything from that

25         opinion.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 20

```
 1              That's an example, but something that's clearly
 2        relevant in my calculations; the timing.
 3   Q.   Okay.  You're referencing the six-month period, or what
 4        part of the timing is relevant?
 5   A.   Yes.  Yes.  Right.  The dates.  Right.
 6   Q.   Okay.  I know I asked a minute ago if you had any of the
 7        reports.
 8              What I didn't ask was, do you have any plans to put
 9        together any supplemental report in this case as you sit
10        here today?
11   A.   No.  Not as I sit here today.
12   Q.   Okay.  All right.  The next page of the report,
13        paragraph 11 is up at the top.  I wanted to ask you
14        about that.
15              That first sentence says:
16                   "It is my understanding that the central
17              dispute in this matter arose from Furstenau
18              leaving Radiant on August 24 -- and joining
19              BTX on August 26 --"
20              Do you see that?
21   A.   I do.
22   Q.   And you go on in that paragraph to identify the fact
23        that Furstenau left and then the fact that other
24        employees also left for BTX.
25              Do you see that?
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                          Page 21

```
 1   A.   Yes.

 2   Q.   You identified it as a "central dispute."

 3        Is that -- what are you basing that off of; that

 4        this is the "central dispute"?

 5   A.   Well, I believe it's the semantics that -- you know,

 6        sort of the core issue is Mr. Furstenau and these key

 7        employees and the various knowledge skill set they

 8        brought, leaving at the time this is -- is what

 9        predicated this litigation.

10   Q.   Is it the fact that these employees left from Radiant

11        and went to BTX?

12   A.   I certainly think that's part of it, yes.

13   Q.   Well, that's what you're calling the "central dispute";

14        right?

15   A.   My understanding, yes.

16   Q.   But you don't mention in there about trade secrets, I

17        note.

18        Any reason why not?

19   A.   In that specific paragraph?

20   Q.   Right.

21        When you identify the "central dispute."

22   A.   No.  No specific reason that I did not mention it.

23   Q.   Do you consider it part of the central dispute from your

24        understanding?

25   A.   Well, as I just stated, I think that the knowledge, and
```

```
 1          I think what's been characterized and disputed, the

 2          characterization, of customer solutions for Radiant, I

 3          think certainly a great deal of that left with those

 4          people.

 5   Q.     And what are you basing that off of?

 6   A.     That's the allegations, it's my understanding, of the

 7          dispute.

 8   Q.     The next page, which is page 6 down at the bottom, I'm

 9          in paragraph 12, that paragraph starts off:

10                  "This report presents my analyses, findings

11               and opinions of the potential economic loss

12               suffered by Radiant as a result of the alleged

13               acts by Furstenau and BTX."

14             When you say "as a result of the alleged acts," are

15          you making a connection between the acts and the

16          damages?  The alleged acts and the damages?

17   A.     Well, certainly I have to consider causation, but as the

18          following sentence clarifies completely -- kind of

19          answers that question -- that my opinions are for

20          economic damages purposes only and based on a subsequent

21          determination of liability by the trier of fact.

22             So, I'm not determining liability in any way, shape

23          or form.  I'm -- I'm assuming a subsequent determination

24          of liability and my work was for economic damages.

25   Q.     Do you have any opinions on causation?
```

1    A.   Not that I'm offering.  None.

2         Economic damages.

3    Q.   Well, because here in that paragraph you say that the

4         economic loss was as a result of the alleged acts by

5         Furstenau and BTX.

6    A.   I say the -- and I use some pretty strong disclaimer

7         language, "potential economic loss" on the alleged acts,

8         yes.

9    Q.   Okay.  So, your clarification today is that you're not

10        saying that it is a causal connection there?  You're

11        assuming a causal connection?

12   A.   Yes.

13   Q.   Okay.

14   A.   I'm assuming the determination of liability by the trier

15        of fact.

16   Q.   Later on that page, paragraph 14, you say:

17             "During the course of my analysis, I

18             conducted independent research into the facts

19             upon which I subsequently based my assumptions

20             and opinions."

21        What is the "independent research" that you

22        conducted?

23   A.   Certainly I spoke to people at Radiant, and I sought

24        financial data both from Radiant and from BTX.

25             Certainly did some market research on both entities

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                          Page 24

```
 1          to try to understand them both.  Fairly large with big

 2          footprints.

 3               Things of that nature.

 4    Q.    Do you remember who you spoke to at Radiant?

 5    A.    Specifically, I know I was on the phone with Mr. Crain,

 6          but I don't believe for any kind of lengthy period of

 7          time.  And I believe I spoke with Mr. O'Brien.  And

 8          there may have been one or two others, but it has been a

 9          while.

10    Q.    Did you speak with Tom Macomber, the CFO?

11    A.    I don't recall.

12    Q.    Do you remember what kind of information you were able

13          to gather from Mr. Crain or Mr. O'Brien that helped you

14          put together your report?

15    A.    Absolutely.

16               The financial data that's scheduled out as exhibits

17          to my report.

18    Q.    And do you mean they helped you understand it, or they

19          just provided it?

20    A.    I would say much more the latter, and we may have had a

21          question or two about certain transactions or certain

22          items that we noted in the report that they may have

23          given us some background on, but they provided it.

24    Q.    Anybody that actually works in the Detroit station that

25          you spoke with to try to understand some of the facts
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 25

```
 1        and background?

 2   A.   Well, it's my understanding that Mr. O'Brien spent a

 3        great deal of time in and around the Detroit station

 4        after Mr. Furstenau left, but I don't recall

 5        specifically speaking with somebody in Detroit.

 6             Mr. O'Brien might have been there when we spoke,

 7        but it was all telephonic communication.  So, I don't

 8        recall.

 9   Q.   And specifically I was wondering if you had any

10        conversations with Bill Sims, who is, I think, the

11        operations manager at Detroit?

12   A.   I do not recall.

13   Q.   And you mentioned a moment ago that you did some market

14        research.

15             If you could clarify in your line of work what that

16        constitutes, you know, market research on entities?

17   A.   Well, specifically in this case, I mean, I'm just

18        literally looking at how does Detroit fit into BTX

19        overall, how does Detroit fit into Radiant overall.  You

20        can derive the majority of that information from their

21        websites.  And as Mr. Robinson references in his report,

22        you know, 10-K, public filings, as well.

23   Q.   That was going to be my next question; whether you were

24        looking at the 10-Ks, as well.  I assume so.

25             And does that, what we covered now, kind of sum up
```

```
 1        the independent research you were referencing within

 2        your report?

 3   A.   I believe on a very general basis, yes.

 4   Q.   Anybody else that you talked to in the market, like

 5        competitors of Radiant or BTX, or customers?  Any third

 6        parties like that?

 7   A.   No.

 8   Q.   That same paragraph, 14, which is on page 6, you say at

 9        the end of the paragraph:

10             "A complete list of documents relied on

11          as bases for my opinions is included."

12        And that's back in "Exhibit B" of your report.

13        Do you see that?

14   A.   I do.

15   Q.   And we can look at that later, but my general question

16        on that is, are there other documents, since this

17        report, that you looked at or considered or reviewed

18        beyond the ones that are listed in Exhibit B?

19   A.   I have very recently seen some communication, some

20        Radiant internal communications between Mr. O'Brien and

21        a Mr. Sangsland, I believe.  And that's very recent,

22        within the last several days, and that certainly

23        wouldn't have been listed in Exhibit B.

24        Other than that, there's nothing that I'm aware of

25        I can recall.
```

```
 1   Q.   Okay.  Obviously since that time, you've reviewed
 2        Mr. Robinson's report?
 3   A.   That's correct.  Yes.
 4   Q.   And then did you review schedules or exhibits referenced
 5        in Mr. Robinson's report?
 6   A.   I think Mr. Robinson just provide one schedule, and it
 7        was -- it appeared to be basically a summation of my
 8        schedules.
 9   Q.   Did you review any of the references he made within the
10        report?
11   A.   Well, he certainly referenced a lot of narrative, a lot
12        of deposition testimonies.  I didn't go back and read
13        those depositions, no.
14   Q.   Okay.  My understanding from your Exhibit B is that you
15        looked at Mr. Furstenau's deposition from the fall of
16        2018, but there weren't other depositions that you
17        reviewed.
18            Is that correct?
19   A.   I -- I may have reviewed Mr. Crain's deposition, as I
20        recall.
21            And, again, this it not an exhaustive list of
22        documents reviewed.  It's the documents relied upon that
23        generate my opinions and serve as a basis for my
24        opinions.
25   Q.   Right.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                    Page 28

```
 1            And Exhibit B doesn't identify the Crain
 2      deposition, but -- so, you reviewed it, but you just
 3      didn't use it in putting together your analysis?
 4   A. That's correct.
 5   Q. The e-mails you just mentioned between Mr. O'Brien and
 6      Matthew Sangsland, did those -- the review of those
 7      e-mails, they did cause you to have to revisit any
 8      conclusions or analysis found in your report that's
 9      Exhibit 1 today?
10   A. No.
11   Q. Are they useful in any way with respect to your ultimate
12      conclusions in this case?
13   A. No.
14   Q. The next page, which is page 7 down at the bottom, I'm
15      looking at paragraph 16-A.
16            And here you say:
17            "For the period of September 2016 through
18      August 2018, Radiant averaged monthly revenues
19      and gross margins of $636,862 and $159,647,
20      respectively."
21            And then you gave an average monthly gross margin
22      percentage in that paragraph.
23            Do you see that?
24   A. I do.
25   Q. So, what was it that led you to use a method of
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                              Page 29

```
 1          averaging the monthly revenues and gross margins here?
 2   A.     Well, certainly you want to establish -- and the damage
 3          model I created was establishing a baseline.  And I am
 4          sure we will discuss seasonality/cyclicality, but by
 5          observation and the graph that I provided, and I'm sure
 6          we'll get to it later on in my report, removing two
 7          months of well above that average, over a million
 8          dollars, and then two months that were a little less
 9          than -- or a little more than half that average, I took
10          out the two outliers to come up with that number.  And
11          I -- the numbers over that two-year period were fairly
12          smooth and did not evidence seasonality or cyclicality.
13                So, establishing on a two-year basis what business
14          at Radiant Detroit as far as income and profit looked
15          like.
16   Q.     But I notice you did -- you did it on an average monthly
17          basis versus like an average quarterly basis or just a
18          Q1 versus Q1 basis.
19                What was the thinking behind that?
20   A.     Again, as I just stated, I did not see evidence of
21          seasonality/cyclicality.
22                The numbers were fairly consistent, and I know
23          we'll get there in my report, as presented on a graph in
24          page -- on page 10 of the report, when you take out the
25          two highs and the two lows, it's a -- it's a fairly
```

```
 1         stable -- there's exceptions, of course, but not great

 2         evidence of seasonality and cyclicality in that two-year

 3         period.

 4    Q.   In the conversations you had with folks at Radiant, did

 5         you discuss seasonality at all?

 6    A.   I believe so.  I don't recall specifically, but I

 7         believe that I mentioned something that, "Hey, the

 8         numbers seem to indicate that things are fairly flat,"

 9         and that was confirmed.

10              Certainly if they had said, "No.  We get a lot of

11         seasonality, a lot of cyclically," I would have

12         absolutely considered that.

13    Q.   Did you see any mention of that in the e-mails between

14         Mr. O'Brien and Mr. Sangsland that you brought up

15         earlier?

16    A.   You know, I believe I saw something talking about Q4

17         versus Q1 numbers, and Q4's tended to be more robust

18         than Q1, but, again, I noted in the data that I had for

19         that two-year period, those two million dollar months, I

20         believe they were a March and April, and they were

21         consecutive.  So, this very exceptional earnings period

22         which would sort of dispel a Q1, Q4 analysis.

23              And, again, fairly consistent once you remove those

24         outliers.

25    Q.   Those months you mentioned, I think those are Q3
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                 Page 31

```
 1        bleeding into Q4 for a fiscal year that Radiant uses.

 2            Is that correct?

 3   A.   I believe so, yeah.

 4   Q.   So, did -- then after those big months, was there a

 5        drop-off in the Q1 that followed?

 6   A.   Well, you can actually see that on page 10 of my report.

 7            Things certainly returned, I would say, more toward

 8        normal toward that $650,000 or so number.

 9   Q.   And Q1 for Radiant actually starts up in July of '18

10        after those big months; right?

11   A.   Correct.

12   Q.   And --

13            MR. JEFFERS:  Andy, could you just clarify the

14        year, just for the record, that you're talking about?

15            MR. MARQUIS:  Sure.

16            This is -- the two months that I believe

17        Mr. Sargent is referring to are March of 2018 and April

18        of 2018.

19   BY MR. MARQUIS:

20   Q.   Is that correct, Brad?

21   A.   That is -- that is correct.

22   Q.   And so what I'm asking is, in July of 2018, shortly

23        after is the start of Q1 for Radiant; correct?

24   A.   Correct.

25   Q.   And you do see a drop-off there; correct?
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                            Page 32

```
 1   A.   I do.

 2            But I note in other periods, big months in October

 3        and December of '17, a big month in November of '16,

 4        March of -- I mean, June of '17 was a big month at the

 5        end of Q4.

 6            Again, I would not interpret this -- that graph to

 7        represent seasonality or cyclically at Radiant Detroit

 8        over that two-year period.

 9   Q.   What about on a customer-by-customer basis such as with

10        the trade show customers?

11   A.   I don't -- I'm sorry.  I know you're asking a question,

12        but I'm not sure what question you're asking there.  I

13        apologize.

14   Q.   Okay.  On a customer-by-customer basis, is there any

15        seasonality from what you saw?

16   A.   I don't recall specifically.  I think I looked at things

17        overall.

18            Could there be seasonality and cyclically on a

19        customer-by-customer basis?  Absolutely.

20   Q.   Do you know if anybody has testified to that within the

21        case?

22   A.   I don't recall.

23   Q.   And specifically with the trade show customers, do you

24        know anything about whether there's seasonality with

25        respect to when those trade shows are hot and heavy and
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 33

```
 1        when they cool off?

 2   A.   I don't.  I don't recall specifically.

 3   Q.   Do you know if Radiant Detroit has trade show customers

 4        that they work with?

 5   A.   Yes.  I'm aware of certain entities.  I know

 6        Mr. Robinson, in his report, referenced Hillsdale

 7        College and people's setting up for various shows with

 8        Hillsdale College in his report.

 9   Q.   Do you know of any of the other customers that are

10        relevant in this case that involve trade show work?

11   A.   Not specifically.  Not right off the top of my head, no.

12   Q.   When you review some of the financial documents that

13        Radiant puts together, including the 10-Ks that we

14        talked about earlier, do they use average gross margin

15        as a -- a figure to rely upon and with any kind of

16        baseline when they're reporting to their investors?

17   A.   I don't recall that at all.  I don't recall.

18   Q.   Do you know if they do period to period comparisons,

19        like a Q4 to a Q4, in order to try to come up with

20        whether this was a good quarter or a bad quarter?

21   A.   I don't recall.

22   Q.   Did you talk to --

23   A.   I --

24   Q.   Go ahead.  Sorry.

25   A.   No, I mean I -- in the 10-Ks to investors, speaking
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                        Page 34

```
 1           about Radiant overall, the $800 million entity, I don't
 2           recall specifically but I wouldn't be surprised at all
 3           if they gave comparables year to year so investors can
 4           see how things are going on a year-to-year basis.
 5    Q.     So, why does that not factor into your report here?
 6    A.     I'm sorry.  Why does what not factor in?
 7    Q.     If it's valuable for the investors to compare a Q4 of
 8           2017 to a Q4 of 2018, why is that not part of the report
 9           in this case?
10    A.     I had a two-year baseline of, again, what I saw as
11           fairly static economic performance, and that was more
12           than sufficient to establish a baseline.
13    Q.     Is that -- when you're putting together these types of
14           reports for lost profits, is that your typical method to
15           do an average gross margin as sort of a baseline on a
16           month-to-month basis?
17    A.     Oh, absolutely.  Projecting, you know, profit and doing
18           a but-for analysis, you have to establish a baseline of
19           profitability.  It is, as you said, a lost profit, and
20           margin is a measure of profit.
21    Q.     In those 10-K reports, was there any discussion of
22           seasonality in there that you found?
23    A.     I don't recall that from my review, but I know that
24           Mr. Robinson certainly references discussions of
25           seasonality and comparing period to period.
```

1   Q.   Is it fair to say that you disagree with Mr. Robinson

2        thinking that that's relevant?

3   A.   I would -- I would state this:  That it's approximately

4        an $800 million entity, of which Detroit contributes

5        approximately $8 million, which means Radiant Detroit

6        was approximately one percent of Radiant overall's

7        performance.

8             An analogy I might use is that's like the CEO of

9        General Motors making a proclamation about ebbs and

10       flows in General Motors, and applying it to a Buick

11       dealership in Woodhaven, Michigan.

12            I just don't think it's a reasonable extrapolation

13       and -- I just don't think it's a reasonable

14       extrapolation at all.

15  Q.   What's true generally for the overall entity isn't

16       necessarily true for the individual stations?  Is that

17       another way of saying it?

18  A.   That's absolutely a way of saying it.

19            And, again, I had the numbers in front of me, and

20       the numbers don't lie.  And the numbers, other than two

21       very big months, two smaller-than-normal months, were

22       very consistent over a full two-year period.

23  Q.   Let's jump ahead to page 9, paragraph 19.

24            And this is where -- you kind of brought this up a

25       couple of times, so I wanted to ask you about these, you

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 36

```
 1        said, exceptionally high months and then taking out a

 2        couple lower months.

 3             Do you see that?

 4   A.   I do.

 5   Q.   So, yeah, you mention there that:

 6                "The revenue per customer data contained

 7             two months with exceptionally high ($1 million

 8             plus) revenues --"

 9             March and April of 2018.

10             And then you said:

11                "I removed those two outlier data points

12             from my calculation."

13             Do you know why those were exceptionally high?

14   A.   I know we had conversation, and I know, candidly, I was

15        told, and I don't recall as I sit here today.

16             Once I removed them from the analysis, I'm sorry,

17        I -- but I know I was told.  I know I asked.

18   Q.   Do you know if it had anything to do with anything

19        Mr. Furstenau specifically was doing?

20   A.   I don't recall specifically, but certainly Mr. Furstenau

21        was the ranking employee at Radiant Detroit for these

22        high months as well as the low months.

23             High and low according to an average.

24   Q.   These high months, if I'm understanding right, in March

25        and April of 2018, those are also months where you're
```

```
1          saying that his wages should be disgorged as part of the
2          damages in this case; correct?
3     A.   Yes.  That's correct.
4     Q.   Despite those being exceptionally high revenue months?
5     A.   That's correct.
6     Q.   How do you square that?
7     A.   I simply square that based on the data that I have
8          reviewed, Mr. Furstenau's own deposition, he was -- he
9          sought out Mr. Bacarella and BTX in early '18.  They
10         were exchanging information.  He was making
11         representations to Mr. Bacarella and BTX in early 2018.
12         About a $3 million practice or book or whatever term
13         of -- business, annual business, with a team of
14         individuals.  And it appears that they were working in
15         concert to prepare for him to come with this team to
16         BTX in the late summer of 2018, beginning in January of
17         2018, as I say.
18              So, I square that by saying that Mr. Furstenau, it
19         appears, was serving two masters at that time, and
20         that's the predicate for my economic analysis in that
21         particular area.
22    Q.   So, but for him serving the two masters, as you've
23         identified it, there would have been higher than
24         exceptionally high revenues in March and April of 2018?
25    A.   Well, and, candidly, if I had not averaged out these
```

```
 1          numbers, as I do state in this report, treated in

 2          paragraph 18, my damage calculation would be a larger

 3          number; that Mr. Furstenau and those folks were even

 4          more valuable to Radiant, and the damages figure would

 5          have been a higher monthly revenue and a higher monthly

 6          profit margin.  But by taking the outliers out of the

 7          data, making it a more statistically relevant data, it's

 8          lowered my damage calculation.

 9   Q.     And I understand that from your report.  That wasn't

10          what I was asking, though.

11              I was asking, are you kind of assuming that March

12          and April of 2018, despite being exceptionally high, in

13          your own words, would have been more than exceptionally

14          high but for Mr. Furstenau allegedly serving two

15          masters?

16   A.     I'm not making that determination at all.

17   Q.     Well, and the reason I ask is because part of your

18          damages calculation here is to specifically disgorge

19          earnings of Mr. Furstenau during these months, March and

20          April of 2018; right?

21   A.     That is correct.

22   Q.     So, if his earnings are disgorged, do we think that him

23          not being there and working, they still would have had

24          these exceptionally high months?

25   A.     I have no -- I have no opinion on that.
```

```
 1   Q.   But your opinion is that Radiant should be entitled to

 2        those exceptionally high months but also should not have

 3        to pay Mr. Furstenau for those two months?

 4   A.   I think that is a pretty strong mischaracterization of

 5        my opinion.

 6             Again, my opinion is economic damages purposes

 7        only.  What Radiant should be entitled to is up to the

 8        trier of fact in this matter, not me.

 9   Q.   But you've given the opinion that he shouldn't have any

10        wages for that month but Radiant still is entitled to

11        what it's earned in those exceptionally high months?  I

12        mean, that's part of your report; right?

13   A.   Certainly.  Certainly.

14   Q.   You don't find any inconsistency in there?

15   A.   None.

16   Q.   In that paragraph, you obviously describe those two

17        months, March and April of 2018, as exceptionally high.

18        Then you -- the lower ones, you say "the two lowest

19        revenue months."  You don't say "exceptionally low."

20             Is there a reason why the difference in language

21        there?

22   A.   No, none at all.

23   Q.   Were those exceptionally low revenue months?

24   A.   Well, I mean, if you -- if you look at an average of

25        approximately $650,000, again, the numbers do not lie.
```

```
 1        If you have a couple of months -- if you have a month

 2        where you do almost a $1.3 million, you're two times

 3        your average.

 4             The month of a million, you're, you know, almost

 5        double, looking at the numbers.

 6             Looking at -- looking at the low months of $380 and

 7        $350, on a percentage basis, they're -- they're not as

 8        low as those other two months are high compared to the

 9        average.

10   Q.   So, is it still -- does it still make sense to subtract

11        out exceptionally high two months and then just sort of

12        low two months on the other end?

13   A.   No.  I think you're -- you're placing an awful lot of

14        emphasis on my use of the term "exceptionally."  I could

15        have certainly used it as "exceptionally low."  The

16        exception is that I've taken the two highest and the two

17        lowest out, and that is the -- that is the result of my

18        work.

19   Q.   Well, but if you had two months that were two times and

20        then two months -- two times above, and then two months

21        that were $5 low, you'd throw off the numbers a little

22        bit by just calling them two high and two low months; is

23        that fair?

24   A.   Listen, as I said, and I state in the preceding

25        paragraph, I give the actual numbers, as did
```

```
 1        Mr. Robinson, without taking those numbers out.  In
 2        fairness and in a conservative approach, I removed the
 3        outliers, which lowered my calculated potential economic
 4        damages.  It led to a lower number being provided by me
 5        in this matter.
 6   Q.   Well, you mentioned the word "outlier."
 7             You only used outliers when you talked about the
 8        exceptionally high months.  You didn't call the other
 9        two months outliers.
10             So, what I'm asking is, if you just removed what
11        you called outliers, you'd actually have an even lower
12        month if you kept in those two months from 2017.
13             Do you see what I mean?
14   A.   I sort of see what you mean, but, again, they are -- it
15        seems like you are arguing semantics.
16             They are -- all four of these months are identified
17        as outliers and removed from the data set, and they are
18        removed from the data set because they are outliers.
19             We saw --
20   Q.   Are you --
21   A.   I observed two very, very high numbers, months, and I
22        could have kept them in the data, and it would have led
23        to a higher damage calculation number on an average
24        basis.  But I removed them to be conservative and on the
25        other hand, if I'm going to remove the two high, to be
```

```
 1        consistent, I'm going to remove the two low.  So, the
 2        two low that I took which were not $5 lower, they were
 3        in the hundreds of thousands lower than the average,
 4        that makes a consistent data set.
 5   Q.   You said you identify all four as outliers.  I don't see
 6        you identifying the two lower ones as outliers.
 7             Can you show me where you did that?
 8   A.   I may not specifically state they're outliers, but
 9        that's the entire concept; that I took out the outliers,
10        the two highest points and the two lowest points.
11   Q.   You want us to imply that the two lower months are also
12        outliers?
13   A.   Correct.
14             MR. JEFFERS:  I'm going to object.  This has been
15        asked and answered.
16             Andy, I think he -- how many times can he explain
17        this to you?
18             MR. MARQUIS:  Just a couple more times.
19             MR. JEFFERS:  Well, I object to you doing that.
20        Let's move on.
21             MR. MARQUIS:  I'm getting there.  I'll be done in a
22        second.
23   A.   I'd like to also reference my footnote in Exhibit C-2a.
24             That exhibit very specifically identifies revenue
25        and margin and margin percentage for Radiant Detroit
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 43

```
 1        from September '16 through August of '18.
 2              In that schedule, I have a footnote, one, next to
 3        four months; April of 2017, July of 2017, March of '18,
 4        April of '18.  And my note specifically states:
 5                   "Outlier months.  Not included in monthly
 6              average."
 7              So, in that schedule, I'm very specifically
 8        identifying them as outliers.
 9   Q.   And is that a -- thank you for that.
10              It that a term of art, "outlier"?  Does that have a
11        meaning ascribed to it, or is that sort of your own
12        term?
13   A.   No.  That's a statistical analysis term of art, yes.
14        Definitely.
15   Q.   And how do you determine what constitutes an outlier?
16   A.   Well, when you're examining a data set, if you observe
17        data that falls on the far -- that happens with less
18        frequency or may have a value that is not within the
19        rest of the data set, that could be determined.  It's
20        not consistent with the rest of the data.  That could be
21        possibly identified as an outlier.
22   Q.   And when you find outliers, do you always have to
23        balance it out so that you get rid of outliers on both
24        ends of the spectrum?
25   A.   I found that to be most appropriate in this analysis,
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                      Page 44

```
 1      yes.

 2  Q.  And why?

 3  A.  Because I was taking out the two highest months, to be

 4      consistent in my application to balance that, seeking

 5      balance, I took out the two lowest months.  And as

 6      you've identified, by taking out the -- because the

 7      higher months were so much higher, it lowered my number

 8      and lowered the damages that I calculated, again, being

 9      conservative with the data set.

10          MR. JEFFERS:  When you're ready to move on to

11      another topic, Andy, let's just take a short break.

12      We've been going for about an hour.  But up to you.

13          MR. MARQUIS:  This is a fine time.  We can take a

14      break now.

15              (Short recess at 10:30 a.m.)

16                      *   *   *

17              (Record resumed at 10:38 a.m.)

18          MR. MARQUIS:  All right.  Back on the record.

19  BY MR. MARQUIS:

20  Q.  Brad, next item, moving down to paragraph 23 which is on

21      page 10 of your report, the last sentence in that

22      paragraph is what I want to ask about.

23          You write there:

24              "This data indicated that not only did

25              Radiant lose these significant cash flows,
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                     Page 45

```
 1              they lost established and highly profitable

 2              customers."

 3         Do you know which customers you're referring to

 4    when do say that "they lost established and highly

 5    profitable customers"?

 6  A.  I believe I go on to cite a list of customers in

 7      paragraph 25, two paragraphs later.  And I begin that to

 8      test and validate if BTX took Radiant's most profitable

 9      customers.  I reconciled the customers listed in BTX

10      accounting data, the customers listed in Radiant

11      accounting, and I identified 19 customers.  So,

12      certainly they would be amongst the 19 listed in

13      paragraph 25 of my report.

14  Q.  And those -- I see what you're talking about on the next

15      page.

16         You identify those 19 customers.

17         You're saying those 19 are lost established and

18      highly profitable customers?

19  A.  Well, I am not saying all 19 are.  I believe that some

20      are certainly more profitable and far more a larger

21      chunk of Radiant Detroit's business than others.

22         But certainly the profitable customers are amongst

23      this list.

24  Q.  But are they lost?

25  A.  Well, certainly a large chunk of revenue from those
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 46

```
 1         customers was lost, yes.
 2   Q.    The reason I ask is because in the report it seems to
 3         suggest that the customers -- the established and highly
 4         profitable customers were lost, rather than the revenue
 5         from those customers was lost.
 6             Do you see the language?
 7   A.    Well, I think the vast majority of the business, and
 8         particularly after August 27th of 2018, from certain of
 9         these customers went to BTX at Radiant's expense.
10   Q.    Which ones are you thinking of that that happened?
11   A.    I would have to go back and look at a by-customer
12         analysis, but clearly I'm indicating the 19 in paragraph
13         25.
14   Q.    But do you know if any of those 19 -- if Radiant simply
15         wasn't able to do any business with them any longer?
16   A.    I can't say.  I don't know.
17   Q.    Have you seen any testimony to that effect?
18   A.    I have seen in Mr. Robinson's report, which I'll be able
19         to clarify once we make that an exhibit, quotes from one
20         of the customers or a contact at one of the customers on
21         this list that talks about how, when Mr. Furstenau left,
22         they went with BTX, and that when the injunction was in
23         place, it hurt that customer.  Some testimony along
24         those lines.
25   Q.    Do you know -- are you referring to Hillsdale College?
```

```
 1   A.   I believe so.  That was Ms. Kaiser, I believe was the

 2        lady's name at Hillsdale.

 3   Q.   Correct.

 4   A.   Yes.  Yes.

 5   Q.   Because my understanding from her testimony was that she

 6        stayed with Radiant after Mr. Furstenau left, but then

 7        sometime in early 2019, she left Radiant because of

 8        service issues.

 9             Are you thinking of somebody else?

10   A.   No.  But my -- again, I'm sure we'll get to it when we

11        get to Mr. Robinson's report, but my observation was,

12        again, I'm an accountant.  So, I rely on numbers, and

13        numbers don't lie.

14             Hillsdale College's revenue as a percent of Radiant

15        Detroit's, I believe was less than one percent of the

16        revenue.  They were a -- what I would characterize as a

17        very small customer of -- so, they are not one of the

18        big impact dollar-wise lost customers in paragraph 25.

19   Q.   Does that mean you're saying paragraph 25 identifies all

20        these customers, but a certain subset of those are the

21        highly profitable ones?

22   A.   Higher revenue, higher profit, yes.  Definitely.

23   Q.   And are you thinking of specific ones right now, or you

24        can't recall that as you sit here?

25   A.   I know that George P. Johnson was clearly a large
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                      Page 48

```
 1          customer.  I know that the Xpo Nlm line was a large

 2          customer.  I don't recall with specificity the other

 3          ones in this group, but I have that data available and

 4          could certainly recall it with specificity.

 5   Q.     In putting together your analysis, did you ever put it

 6          together specific to customers, like these are the

 7          customers that lost revenue when Furstenau departed

 8          versus these are customers where revenue might have

 9          actually increased after Furstenau departed?

10   A.     No.  Again, I looked at the numbers on a month-by-month

11          basis on a total basis as far as impact to Radiant

12          Detroit and BTX Detroit.

13   Q.     And did you see in those e-mails between Mr. O'Brien and

14          Mr. Sangsland that there was some specific accounting

15          for customers that decreased when Furstenau departed

16          versus some that actually increased when Furstenau

17          departed?

18   A.     I don't recall that specifically.

19              But obviously the overall impact was that revenues

20          went down very substantially once Furstenau and the

21          other employees left.

22   Q.     And do you have any understanding of what it was about

23          their departure that caused the revenues to go down?

24   A.     My understanding is that when Mr. Furstenau, as the

25          ranking key employee at Radiant Detroit, left and took
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                              Page 49

```
 1          other key execution employees with him, all
 2          simultaneously, my words, that that -- that basically
 3          gutted Radiant Detroit's operations.  And I use the
 4          analogy, as often used in professional services -- what
 5          I do, what you all do -- a practice in a box; that it
 6          appears to me that the practice was boxed up and brought
 7          to BTX on the 27th, opened up and off and running.
 8   Q.     And is there anything specifically that you're relying
 9          upon to kind of give it that characterization?
10   A.     Certainly there's been testimony to that effect.
11          Certainly looking over as far as context, the example
12          that I gave earlier, the injunction opinion certainly
13          had addressed those issues at length.  But that's my
14          overall understanding.
15   Q.     Would it be possible for employees -- key employees to
16          leave and there to be an economic impact simply based on
17          departure of key employees without any further alleged
18          wrongdoing?
19   A.     Well, that is a hypothetical, but absolutely.  That
20          could be what makes them a key employee.  Certainly.
21   Q.     And if a key employee leaves, particularly one with
22          customer relationships or inherent knowledge and
23          experience, there could be a vacuum left behind; is that
24          fair?
25   A.     Again, hypothetical, but yes.  Absolutely.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 50

1    Q.   Are you able to say, based on what you know, with any

2         confidence that the losses that Radiant Detroit suffered

3         were based on some wrongdoing rather than simply

4         departure of key employees?

5    A.   Again, I think that's one of the primary issues that the

6         trier of fact will have to determine, and those are the

7         facts that are among many, but I think they all sort of

8         revolve around that issue that are in dispute in this

9         case.

10   Q.   But from where you sit, you don't necessarily hold any

11        responsibility for trying to tie things together from a

12        causation standpoint?

13   A.   No.  No, I'm not -- I am not addressing the liability.

14        My analysis is for economic damages purposes only.

15   Q.   That paragraph 25 we were talking about before that

16        lists the customers, you don't have in that paragraph

17        the customer Ford National Parts Depot.

18             Did you look at anything related to that customer?

19   A.   I certainly recall Ford NPD, I believe I noted it as,

20        but I can't recall anything specific about Ford NPD,

21        per se.

22   Q.   Another one that's actually listed here, "Specialized

23        Transportation, Inc.," do you know if that was one where

24        profits actually went down after Mr. Furstenau departed?

25   A.   I don't recall specifically.

```
 1              Give me just one moment.  I want to -- I notice in

 2         the next paragraph I reference "Exhibit C-6."  So, I'm

 3         going to take a quick look at that and see if that has

 4         the by-customer data.

 5              No, it does not.

 6              So, no, I don't recall specifically.

 7    Q.   Well, the e-mails that you talked about reviewing

 8         between Mr. O'Brien and Mr. Sangsland, I'll represent

 9         to you that they say -- and we can make it an exhibit

10         if people want to look at that specifically, but I'm

11         representing to you that they say between October of

12         2017 and October of 2018, there was actually a

13         $187,000 increase in revenues from Specialized

14         Transportation, Inc., for that Radiant Detroit station.

15              Did you notice that in those e-mails with

16         Mr. Sangsland and Mr. O'Brien?

17    A.   I don't recall --

18              MR. JEFFERS:  Hang on.

19    A.   -- that specifically.

20              MR. JEFFERS:  Hang on.

21              And you're saying year over year?

22              MR. MARQUIS:  Right.

23              MR. JEFFERS:  Just the snapshot of October to

24         October, year over year?

25              MR. MARQUIS:  Right.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                Page 52

```
 1   A.   Again, I don't -- I don't recall that specifically.

 2   BY MR. MARQUIS:

 3   Q.   When Mr. Furstenau departed, do you know factually if

 4        the Radiant Detroit station was actively pursuing

 5        non-profitable customers?

 6   A.   I'm not sure I -- I'm sorry.  I'm not sure I understand

 7        your question.

 8   Q.   Okay.  Do you know from anything that you've reviewed in

 9        the case if there were customers that Radiant Detroit

10        was trying to maintain or pursue after Mr. Furstenau

11        left that actually turned out to not be profitable

12        historically?

13   A.   Well, this -- you're asking me about facts?  I don't

14        know.

15        I do know the fact that once Mr. Furstenau left,

16        the customers that remained before the injunction was

17        put in place, their profit margins went down

18        substantially.  That's factual.

19   Q.   And you say the ones "that remained."

20        Were there actually customers that departed and

21        were doing no business with Radiant between the time

22        Furstenau left and the time of the injunction?

23   A.   I have that data available.

24        I don't -- I don't recall now as I sit here, no.  I

25        don't recall.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                          Page 53

```
 1   Q.   And the question I asked a minute ago about

 2        non-profitable customers, the one I'm thinking about is

 3        that Ford NPD, which my understanding from the evidence

 4        is that a determination was made by Radiant that it was

 5        not a profitable account.

 6             Do you recall that?

 7   A.   No.

 8   Q.   Is it true generally that going out, spending time and

 9        resources on a non-profitable account can distract from

10        the pursuit of profitable accounts?

11   A.   Again, you're asking me a very basic sort of Business

12        101 question.

13             You know, profits are desirable in any business

14        environment.

15             My understanding of the facts, once Mr. Furstenau

16        left, was that Mr. O'Brien specifically and Radiant were

17        doing everything they could to triage and mitigate the

18        situation of basically the office being replicated

19        elsewhere and gutted in their Detroit office.

20   Q.   Did you find from what you reviewed that those efforts

21        were indeed being made adequately to try and increase

22        profitability as much as possible in the wake of the

23        departure, or is that beyond your scope?

24   A.   That was way beyond my scope in this matter.

25   Q.   Is it fair, then, to say that you assume in your
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                          Page 54

```
 1        analysis that Radiant is mitigating its damages to the

 2        full extent?

 3             MR. JEFFERS:  I'm only going to extent(sic) to your

 4        use of the term "full extent."  That sounds like kind of

 5        a term of art or a loaded term.  I think you can ask the

 6        same question a little more factually.

 7   A.   I'm rendering no opinion on Radiant's mitigation

 8        efforts.  I did not render any opinion in my report on

 9        Radiant's mitigation efforts.

10             Based on the data that I have reviewed, it

11        certainly appeared that they were triaging and trying to

12        deal with the situation that was at hand as of August

13        27th, 2018.

14   BY MR. MARQUIS:

15   Q.   And more specifically on that triaging, did you see

16        anything about whether there was adequate sales

17        personnel at the station in order to generate revenue?

18   A.   Again, I did not focus and I'm not rendering my opinion

19        on, you know, Radiant's mitigation efforts.

20             And who was left at the station, it seemed somewhat

21        clear to me that the key employees were now BTX

22        employees or soon to be BTX employees after August 27.

23   Q.   Is it fair, then, based on what you're saying, to assume

24        that you didn't necessarily do any kind of comparison of

25        the experience and quality of the staff that left versus
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                          Page 55

```
 1        the experience and quality of the staff that remained or

 2        that was hired after the departure?

 3   A.   No.  I did no such analysis.

 4   Q.   Could it affect revenues, the quality of the staff

 5        that's on hand out there trying to generate sales?

 6   A.   Again, that -- that is a possible -- there are many

 7        points to consider, which I'm sure as we get into

 8        Mr. Robinson's report we'll discuss in more detail, but

 9        the numbers on this particular matter in dispute simply

10        did not lie on a factual basis that when the group left

11        Radiant Detroit and went to Radiant BTX, the -- what

12        arrived at Radiant BTX numerically was almost

13        statistically identical to what left Radiant Detroit.

14        And, again, the analysis of -- the analogy of a box

15        being packed up and being moved over.  I have also

16        thought of the analogy of a tree being taken right out

17        of a yard and put into another yard.  It's the exact

18        same tree.

19             And so that's -- that's my answer.

20   Q.   This might be beyond your scope, but was there something

21        that you saw that Mr. Furstenau had that was Radiant's

22        that was part of that package or that box that you're

23        describing versus his own knowledge and experience?

24   A.   Well, I'm certainly aware of a substantial number of

25        e-mails that were forwarded by Mr. Furstenau.  I know
```

```
 1        that I have not seen any forensic -- computer forensic

 2        experts' reports.  I know that Mr. Robinson relied on a

 3        report generated by the computer forensic expert.  I'm

 4        not here rendering any opinions on that, but I'm aware

 5        that there were approximately just under 300 e-mails

 6        forwarded with Radiant domains.

 7   Q.   Okay.  But based on what you're saying, is it fair to

 8        assume that you're not relying on anything about those

 9        e-mails in order to come to whatever conclusions you

10        have in your report or your testimony today?

11   A.   No.  Again, that's more in the causation area of things,

12        and those are disputes that the trier of fact will have

13        to determine.  Mine is the economic damages.

14   Q.   Meaning you're not sure if something in those e-mails

15        was of value in order to impact revenues and

16        profitability; is that correct?

17   A.   Well, certainly I've seen the allegations that those

18        e-mail contained a great deal of financial information

19        in attachments and documents.

20            I don't know that, though, for fact.  I have not

21        seen.  So, I can't opine to that.

22   Q.   And my question was more, do you know if whatever those

23        e-mails contained was useful in contributing to

24        profitability or generation of revenues?  Do you have

25        any idea about that?
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

```
 1   A.   Again, I -- I go back to the same answer.

 2             I have no opinion on that.  I have not seen the

 3        data.  I've only seen allegations and testimony to it.

 4   Q.   I'm skipping ahead to page 13, paragraph 29 of your

 5        report.

 6             And actually, it's kind of 28 and 29.

 7             You're covering here, it looks like, the time

 8        during the injunction, what happened to BTX's average

 9        monthly revenues.

10             Do you see that?

11   A.   I do.

12   Q.   And there you kind of did an analysis of what the

13        reduction in average monthly revenue was and average

14        monthly gross margin in paragraph 28, and then in

15        paragraph 29 you say that when expenses were applied,

16        here's what BTX, on average, lost per month, $50,000.

17             Do you see that?

18   A.   I do.

19   Q.   That calculation of what BTX lost after expenses were

20        applied, that's not a calculation you've done for

21        Radiant in this report, is it?  The application of the

22        expenses to then show losses?

23   A.   No.

24   Q.   And why -- why not?  Why is that applicable in that

25        portion of the report with respect to BTX's losses
```

```
 1        during the injunction period, but not for Radiant in the
 2        other periods?
 3   A.   Specifically showing that during the injunction period,
 4        BTX was -- the injunction certainly had economic impact
 5        on BTX, and that is what this -- that's what these
 6        paragraphs are about and describing the economic impact
 7        on BTX.
 8   Q.   But is this like a different modeling that you're doing
 9        when you apply expenses for BTX's losses, versus when
10        you have calculated lost profits for Radiant?
11   A.   It's not a complete different model.  It's -- as I begin
12        paragraph 29, I say it's "noteworthy."  It's just
13        something I'm noting that if you go to the bottom line,
14        not gross margin, that they're losing $50,000 on average
15        per month.
16   Q.   Okay.
17   A.   But we did not do a bottom line analysis here.  We did a
18        gross margin analysis.
19             So, I didn't change the model, didn't add a
20        separate model.  Just made it's "noteworthy."
21             And then I conclude paragraph 29 by talking about
22        the impact on gross margin; how it went from
23        approximately 25 percent down to approximately
24        15 percent during the injunction period.
25   Q.   And on that subject of gross margin percentage, my
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                        Page 59

```
 1        understanding from your report is that for Radiant, they
 2        had what I think you would probably call a baseline
 3        gross margin percentage before Furstenau left, and then
 4        they had a lower gross margin percentage before the
 5        injunction but after he left, and then their gross
 6        margin percentage rebounded to maybe predeparture or
 7        close to it.
 8             Is that all correct?
 9   A.   That's accurate, yes.
10   Q.   So, is it -- is it your opinion that they were --
11        Radiant Detroit was able to get back to at or close to a
12        baseline margin -- gross margin percentage, but just not
13        a gross revenue figure the same as predeparture?
14   A.   Well, I think I state that -- that's one of my
15        subsequent opinions, yes.  Yes, that is my opinion.
16   Q.   And why, from what you've reviewed, was Radiant Detroit
17        able to get back the percentage of gross margin but not
18        the -- the actual number that could meet the baseline
19        from before?
20             Do you know?
21   A.   No.  But, again, the numbers don't lie.  So, it is
22        indicative that the revenue that retuned to Radiant --
23        because certainly revenues came back once the injunction
24        was in place -- was a more profitable revenue.  They
25        were making -- they were clearing more on margin for
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 60

1          every dollar of revenue they added.

2                  They did not return to their pre-Furstenau

3          departure levels of revenue, but they did return to

4          comparable levels of profitability.

5    Q.   Right.

6                  And in paragraph 30 there, you say that during the

7          injunction "Radiant was able to reclaim a portion of

8          their lost customers' business, but not all."

9                  Do you know why they -- there was not an ability to

10         get back to the baseline when BTX had an injunction on

11         it?

12   A.    Well, I specifically cite Mr. O'Brien's testimony that

13         follows that talks about potential loss of goodwill for

14         Radiant, that customers were telling them they were

15         appalled that the entire office would just get out --

16         entire office would walk out the door and what type of

17         company was Radiant.  And that's Mr. O'Brien's testimony

18         that I'm citing specifically in my report.  And then he

19         goes on to describe his mitigation efforts -- what I'll

20         characterize as his mitigation efforts, trying to get

21         out there and repair -- not being boots on the ground in

22         Detroit, trying to repair the relationships and

23         establish credibility in the marketplace.

24   Q.    So, then, are you having to make an assumption that what

25         Mr. O'Brien is describing in that testimony you just

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                          Page 61

```
 1        mentioned is the cause of -- the ability to regain

 2        margin percentage during the injunction, but not the

 3        overall top line revenues?

 4   A.   I'm sorry.  Could you repeat that for me?

 5             I missed the first part of it.  I apologize.

 6   Q.   Sure.

 7             With citation to that testimony from O'Brien, are

 8        you basically assuming that the loss of goodwill that

 9        he's identifying there is the cause for still not being

10        able to recover top line revenue when BTX has an

11        injunction against it?

12   A.   Oh, I think -- well, goodwill in the form of

13        reputational goodwill is one component, and as

14        Mr. O'Brien goes on in the top of page 14 in my report

15        to state at his deposition they had a vacuum.  The

16        practice was gutted.  The key people were gone.  So,

17        they certainly, I'm sure, had extensive execution

18        challenges with key people being gone.

19   Q.   And his testimony that you're citing to is, I think,

20        with respect to George P. Johnson; correct?

21   A.   I don't recall that specifically.

22             The question leading up to it, which I try to

23        always include to give context to the testimony, is

24        about the six key employees and what impact did it have

25        on Radiant.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                              Page 62

```
 1              I don't specifically see Mr. O'Brien referencing
 2       Johnson, per se.
 3              I think he's talking more overall.  That's my
 4       interpretation.
 5   Q.  Do you know if that's borne out by the rest of the
 6       testimony in this case?
 7   A.  I'm sorry.  What would be borne out?
 8   Q.  That that's a more general description of loss of
 9       goodwill versus specific to one customer?
10   A.  I don't know.
11   Q.  Do you know if there's any loss of goodwill for Ford,
12       Xpo Nlm?
13   A.  I don't know.
14   Q.  And more generally with any bid board work, do you know
15       if there's any kind of loss of goodwill that impacted
16       the profitability on bid boards?
17   A.  I don't know.
18   Q.  Do you know about the bid boards that are relevant to
19       these stations in Detroit?
20   A.  I have a -- a pretty solid working knowledge of them,
21       yes.
22   Q.  And do you know what it takes in order to win bids on
23       the bid boards?
24   A.  Certainly.  I have --
25   Q.  What would --
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                Page 63

```
 1   A.   -- an idea.

 2   Q.   What would you say it takes to win them?

 3   A.   Well, I think that -- again, I'm not rendering expert

 4        opinion in this area at all.  So, I'll disclaim anything

 5        I say on that area, but I believe I've seen some

 6        testimony -- and people are certainly price sensitive,

 7        and anybody is going to say, number one, price

 8        sensitivity; responsiveness; speed of execution; and

 9        competency of execution are going to be critical.  And I

10        think that if people have experience with individuals or

11        entities that are positive, just like in my world and

12        just like in yours, they may tend to use them again and

13        again based on positive experiences.

14   Q.   Do you know if there was any kind of impact on the bid

15        board work specifically with respect to the e-mails that

16        were sent or the fact that these employees departed?

17   A.   I do not know.

18   Q.   Was there anything else that suggested -- besides this

19        testimony about loss of goodwill that suggested to you

20        why the rebound wasn't more significant once the

21        injunction was put into place?

22   A.   Well, I think that the -- my statement that they gutted

23        the practice is pretty comprehensive; that they took the

24        entire key practice and boxed it up and delivered it

25        next working day to BTX.
```

1          I think that covers all of the things that go with

2      that practice.

3   Q.  What about any hires that were made after some of these

4      people departed?  Did you see anything about whether

5      there were people that stepped into the shoes that were

6      as capable or maybe even more capable than those that

7      left at generating revenue?

8   A.  Well, I certainly didn't make that determination.  That

9      was well beyond the scope of my engagement on this

10     particular matter.

11         Obviously, Mr. O'Brien, being Mr. Furstenau's

12     direct supervisor, which I believe he was, I would

13     assume he would bring a great deal of capability, but,

14     again, he wouldn't have the familiarity with that local

15     market, I'm assuming.  I'm not stating that as an

16     opinion or as fact.

17  Q.  And in that regard, you're not able to state an opinion

18     with respect to whether there were capable, qualified

19     personnel to step into the shoes of those that departed?

20  A.  Again, I relied on the numbers.  The number were very

21     clear.

22  Q.  But is it true generally that the numbers that you

23     interpret can't be looked at in a vacuum?  They have to

24     be looked at in the context of the facts?

25  A.  Well, the facts are in dispute.  I think a great many of

```
 1         the facts in this case are in dispute.  And this case is

 2         extremely compelling with the numbers.  The numbers tell

 3         a very compelling, in my opinion, story.

 4   Q.    And what do you define as "a very compelling story"?

 5            What are you referring to?

 6   A.    Well, I think the factual evidence that the numbers

 7         provide clearly shows a certain amount of revenue, a

 8         certain profit margin attached to that revenue, and the

 9         impact of the -- the impact of Mr. Furstenau and the

10         others leaving on Radiant, and the impact on the

11         injunction on Radiant and BTX.

12   Q.    And what --

13   A.    Very cause and effect.

14   Q.    But to reiterate, that's based on just the facts that

15         you've reviewed that have been given to you identified

16         in your Exhibit B; right?

17   A.    That's -- that's the story the numbers tell.

18   Q.    The numbers, plus the facts that have been relayed to

19         you in Exhibit B; right?

20   A.    Well, I think the numbers, based on the timing of the

21         two major events that I described, Mr. Furstenau and the

22         others leaving, August 27th, and the injunction going

23         into place February 20th, 2019 and ending six months

24         later.  Those -- those provide data around the numbers,

25         and the numbers tell a very factual story around those
```

 1        dates.

 2   Q.   In paragraph 31, right after that section of O'Brien's

 3        testimony we were just talking about a few minutes ago,

 4        you kind of say, I think what you're trying to say here

 5        today as well, which is:

 6             "O'Brien's testimony, given in real time

 7             as Radiant was dealing with the aftermath of

 8             Furstenau's defection to BTX, explained why

 9             Radiant's average monthly revenue continued to

10             fall even with the injunction in place."

11             So, I think, if I'm understanding right, that's the

12        one thing -- that testimony is the one thing you're

13        citing to as to why the revenues continued to decline

14        even after the injunction went in place; is that fair?

15   A.   Sorry.  The testimony is the one thing that I'm citing?

16   Q.   Right.

17   A.   Well, again, it's my overall understanding, again, of

18        the replication of the practice, and that testimony

19        discusses the replication of the practice; the entire

20        Radiant Detroit becoming BTX Detroit, or the key parts.

21   Q.   I think I know the answer to this, but there wasn't any

22        analysis of what other competitors were up against

23        Radiant during the injunction that might still have been

24        trying to vie for the business on the bid boards or with

25        these other, you call them, established and profitable

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 67

```
 1      customers?

 2             That's not part of your analysis; right?

 3   A.  Well, certainly I considered competition, but the

 4       numbers in this case and the clear movement in that box

 5       is not just Chad Furstenau and the other employees, but

 6       in that box it's the revenue and the gross margin going

 7       right over.  And the numbers indicated that.

 8   Q.  Well, but if that's true across the board, then when BTX

 9       goes down to near zero, all of those numbers would have

10       gone to Radiant; right?

11   A.  I did not use that analysis because Radiant continued to

12       lose business to, obviously, other competitors.

13       Obviously.

14   Q.  And why wouldn't they be able to beat those competitors

15       if BTX was out of the way?

16   A.  Oh, I think we've discussed how completely hamstrung

17       their operations were, you know, as of August 27th, and

18       that they were in triage mode is my understanding.

19   Q.  And is it your understanding that none of that was

20       self-inflicted?

21   A.  I have no opinion on that.  None.

22   Q.  And your ultimate opinion, I think, if I'm understanding

23       it right, is that all of the BTX earnings from the

24       so-called Radiant customers should be moved over to

25       Radiant as the damages in this case; is that correct?
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                      Page 68

```
 1   A.   It's a fairly accurate approximation, yes.

 2   Q.   So, if that's the case, that all those should be moved

 3        in one direction as an ultimate conclusion, then why

 4        weren't all of those moved during the injunction over to

 5        Radiant where they bumped up higher?

 6             That's where I'm having a disconnect.

 7   A.   Well, I used a different measurement for pre-injunction

 8        versus post-injunction or during injunction.

 9             During the injunction, I used a different

10        measurement.  I used a before and after analysis.

11   Q.   And is that because Radiant's performance wasn't as good

12        as one might expect when the competitors get sliced out

13        of the market?

14   A.   Right.  Exactly.  And, again, being conservative saying,

15        okay, Radiant went into this injunction period averaging

16        certain revenues and profits, and they exited the

17        injunction period at a certain place, and it was a lower

18        place.

19             And that analysis -- so, the before the injunction

20        and after the injunction.

21             My analysis basically determines and assumes that

22        had Radiant been able to, in a linear fashion, lose the

23        business versus it just dropping completely, there's

24        economic damages.

25   Q.   And then at what point -- I mean, I think your report
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

```
 1         suggests that the damages stop at the end of the

 2         injunction and then leaves open a possibility of

 3         additional damages beyond.

 4              Is that fair?

 5    A.   It references there's possible damages, yes, but I did

 6         no measurement of and I did not present those as a

 7         damage number.

 8    Q.   The damage number you present has a finite end at the

 9         conclusion of the injunction?

10    A.   That's correct.

11    Q.   And what is the thinking behind ending it there, just

12         generally?

13              I know what your report says with more specificity,

14         but what made you stop your damages calculation at that

15         point?

16    A.   That the purpose of the injunction, again, generally

17         speaking to use your terms, was to provide Radiant an

18         opportunity to recover and perform the triage, and that

19         at the end of the six-month period, if that is what the

20         judge determined was the appropriate period, the theory

21         then, being conservative, is that while Radiant

22         certainly could continue to suffer reputationally and

23         continue to suffer potential damages in the area, that

24         that's the point that was determined was reasonable, a

25         six-month period, that's good for me.  That a good -- a
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                              Page 70

```
 1        great measurement spot for me.

 2    Q.  But would it not be more conservative to end it at the

 3        beginning of the injunction when BTX is no longer in the

 4        market?

 5    A.  No.  I think, in fact, analyzing the injunction itself

 6        clearly shows that Radiant still suffered, continued to

 7        suffer, and was -- and was economically damaged even

 8        during the injunction, and that's why I measure that

 9        second period.

10    Q.  But is there something factually that suggests that

11        whatever damage was occurring when BTX was subtracted

12        from the market, that still was caused by Furstenau and

13        BTX?  I mean, how does that -- how do those connect?

14    A.  I'm sorry.  I'm going to ask you to repeat that

15        question.

16    Q.  Sure.

17    A.  I apologize.

18    Q.  If BTX -- you know, if there's an assumption of improper

19        conduct that occurs and then BTX is told to no longer

20        engage in any of that allegedly improper conduct, and

21        you find in your report that they're not servicing those

22        customers, then how are they the ones that are

23        detracting from any kind of earnings during the

24        injunction period?

25    A.  Oh, I think that lends itself completely to -- for one,
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                          Page 71

```
 1          the liability is the trier of fact and their
 2          determination.
 3              But assuming a determination of liability, the
 4          numbers don't lie that Radiant is clearly still
 5          suffering economic damages and losses during the
 6          injunction period.
 7              The numbers don't lie.  They're still suffering
 8          economic losses.
 9  Q.   Well, and the numbers don't lie that what you're
10          suggesting is that BTX has these losses of at least
11          $50,000 per month and they should be responsible for
12          damages to Radiant during that injunction period.
13              Why is that not double dipping?
14  A.   Again, I'm not -- I'm not making the determination of
15          "and they should be responsible," but if they are found
16          responsible, these are the damages that Radiant has
17          suffered.
18  Q.   But Radiant is not the beneficiary of two forms of
19          payback or remuneration if they get BTX to suffer losses
20          during the six-month period and get lost profits from
21          that same competitor?
22  A.   Again, my profit analysis is the before and after
23          analysis, where were they before the injunction and
24          where were they after the injunction, and if it's
25          determined that BTX and Mr. Furstenau are liable, then
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                    Page 72

```
 1         the damages that Radiant suffered during that period

 2         based on the before and after analysis are very clear.

 3    Q.   But you stand by the idea that taking it all the way

 4         through the end of the injunction period is the most

 5         conservative way of calculating?

 6    A.   Yes.

 7    Q.   I think we'll cover this some when we look at a couple

 8         of pieces of Robinson's report, but with the before and

 9         after, is it true that your -- when -- BTX's earnings

10         from the alleged Radiant customers, those are being

11         pulled over to Radiant as the lost profits using BTX

12         costs?

13    A.   And, again, I think I know what you're going to.

14              Using BTX costs, yes, as a determining gross

15         margin, because the numbers clearly indicated that

16         whoever was driving revenue from these specific

17         customers was seeing approximately a 25 percent gross

18         margin.

19              If there had been a large variance between BTX's

20         gross margin while they were doing business with these

21         customers and Radiant's gross margin while they were

22         doing business with these customers, I think that

23         Mr. Robinson's point would be valid.  However, the

24         numbers and the gross margins were statistically almost

25         identical; approximately 25 percent gross margin whether
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                  Page 73

```
 1          it was BTX servicing them or Radiant servicing them.
 2   Q.   What about the shipment count?  Did you see anything
 3          about the shipment count for Radiant that played into
 4          the volume of work that they were getting before the
 5          injunction and after the injunction?
 6   A.   No.  I measured volume in top line dollars and margin.
 7   Q.   So, the analysis wasn't focused on whether or not the
 8          energy of bidding on work was squared at profitable work
 9          versus non-profitable work?  That wasn't part of your
10          analysis necessarily?
11   A.   I don't -- I mean, when you talk about the energy of
12          bidding on work, I'm not sure I -- I don't follow your
13          question.  I'm sorry.
14   Q.   I think I know the answer to this, but I'll just ask it
15          another way.
16          Your analysis did not focus on whether Radiant was
17          still winning the same number of shipments, but simply
18          was bidding on shipments that weren't as profitable as
19          they had been when Mr. Furstenau was there?
20          You didn't analyze that; right?
21   A.   Well, certainly profitability in margin and top line
22          revenue.
23          The numbers of measurement, I did not measure, no.
24   Q.   I think what I'm hearing today is that you're
25          comfortable as you sit here that your damages model
```

 1          extends to the end of the injunction period and no

 2          further; right?

 3     A.   Correct.

 4     Q.   And you're -- obviously with your report, I think it's

 5          fair to say you're also reserving your right to amend

 6          your opinions to and through trial; is that correct?

 7     A.   Should facts become available, certainly.

 8     Q.   But for now, the facts as you know them, that's the end

 9          date for the damages model is the conclusion of the

10          injunction?

11     A.   I am expecting to testify at court, at trial, to this

12          report --

13     Q.   Okay.

14     A.   -- unless some new data becomes available.

15     Q.   We talked a little bit earlier about the disgorgement of

16          Furstenau's earnings.

17              On that, did you -- did you give any credence to

18          whether or not there were bonuses that were owed to

19          Mr. Furstenau that were not paid?

20     A.   I only contemplated the compensation he received.

21     Q.   But did bonuses in any way, positive or negative, go

22          into that analysis?

23     A.   Yes, as I detail in my report.  There was a bonus for, I

24          think, January, February, March of 2018, and I prorated

25          that because I believed -- and I used February 1 as the

```
 1        measurement date for disgorgement.  I prorated that
 2        bonus.
 3   Q.   Do you know if there were any other bonuses that were
 4        earmarked for Mr. Furstenau that were able to be used
 5        for other things after he departed?
 6   A.   Again, I was measuring what he received, and that's the
 7        data that I got.  I didn't ask for or measure what was
 8        earmarked.
 9   Q.   When -- when you got the assignment or the gig to
10        provide a report in this case, did you have a stated
11        objective as far as what you were to do in putting
12        together the report?
13   A.   My recollection is that that objective never really
14        varied.  And certainly in many, you know, litigation
15        matters that can change depending on facts as they
16        become unearthed or evidence becomes unearthed, and it's
17        right at the onset of my report in writing that, you
18        know, measure damages with the assumption of a
19        determination of liability by the trier of fact.
20   Q.   In the model with essentially, as we talked about, the
21        earnings of the BTX group in Detroit transferring to
22        Radiant with respect to those so-called Radiant
23        customers -- that's kind of the model we've been talking
24        about today; right?
25   A.   I think you said the BTX Detroit transferring to
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                    Page 76

```
 1          Radiant?
 2              I think we're talking about the Radiant Detroit
 3          transferring to BTX --
 4    Q.    Well --
 5    A.    -- pre-injunction.
 6              And then post-injunction, to clarify, maybe a
 7          little of the -- you know, moving in the other
 8          direction.
 9    Q.    Yeah, what I'm talking about is just -- I think you got
10          a number of $564,000 of gross revenues that you're
11          moving from what BTX has earned over to Radiant as part
12          of the damages that you think have been suffered?
13    A.    I'm sorry.  You're getting that number -- is that
14          post-injunction?  The revenues?
15    Q.    Yeah, I'm -- here I'm looking at pre-injunction period,
16          paragraph 43.
17    A.    Okay.
18    Q.    You say:
19                  "As a result of Furstenau and BTX's
20              alleged actions, Radiant lost, from business
21              with existing customers, $2.2 in revenue,
22              $564,863 in gross margin."
23    A.    Yes.
24    Q.    So, with that concept, is that sort of assuming that all
25          that -- all that revenue would have been Radiant's if
```

```
 1          the key personnel would have stayed at Radiant?

 2    A.    Well, I think the personnel and all the things that come

 3          with the personnel in that box that I've described to

 4          you.

 5    Q.    I mean, is there anything beyond that you can cling onto

 6          besides just the simple fact that they depart?

 7    A.    Well, there are many allegations in this case, and

 8          the -- and very few of the facts are not disputed, is my

 9          observation, other than what I've included in the

10          background about the entities at the beginning of my

11          report.

12              But you used the verb "cling onto," and I would

13          tell you simply that I -- I have, for context, reviewed

14          much, but for my opinion in this report to calculate

15          economic damages, you know, presuming a determination of

16          guilt.

17    Q.    But is -- is Radiant's ability to handle those

18          pre-injunction period earnings that we were just talking

19          about from paragraph 43, is that, in your mind,

20          dependent upon those key employees still being there to

21          solicit business and generate revenue for the Radiant

22          station?

23    A.    That is certainly a component of it, but, again, that

24          sort of undersells and under-describes what is involved

25          with those key employees; their knowledge, any data that
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                          Page 78

```
 1          they may have had, confidentiality, confidential data,

 2          proprietary data that is Radiant's.  And I know those

 3          are all in dispute.

 4   Q.     Do you know if there's any evidence or allegations

 5          against any of the employees beside Mr. Furstenau?

 6   A.     Hang on.  I apologize, but my -- I think these are

 7          running out of juice.  So, give me a minute.

 8              MR. MARQUIS:  Well, why don't we go ahead and take

 9          a break if you need a minute to get those charged.

10              MR. JEFFERS:  Andy, I mean, that's fine with me.

11          Want to just take a normal break, or where are you in

12          your questioning in terms of a --

13              MR. MARQUIS:  I've got less than an hour for sure.

14              MR. JEFFERS:  Okay.

15              MR. MARQUIS:  Maybe only a half hour.

16              THE REPORTER:  Guys, did you want to go off the

17          record?

18              MR. JEFFERS:  Yes.

19                  (Short recess at 11:35 a.m.)

20                         *   *   *

21                  (Record resumed at 11:45 a.m.)

22              THE REPORTER:  (Reading.)

23                "Question:  Do you know if there's any

24          evidence or allegations against any of the

25          employees beside Mr. Furstenau?"
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 79

```
 1   A.   I don't believe any other employees are named defendants
 2        in this suit, no.
 3   BY MR. MARQUIS:
 4   Q.   And just beyond that, if there's anything that you've
 5        reviewed that has shown something improper by or
 6        allegedly improper by any employees besides
 7        Mr. Furstenau.
 8             Do you know?
 9             MR. JEFFERS:  Objection.  Compound.
10   A.   I can recall, I mean, just one sort of contextual
11        atmospheric, I would describe it.  I recall, I believe
12        it was, Mr. Watkins, who was with the Johnson entity,
13        embedded, and when he originally went over, there was an
14        attempt to -- he became a Johnson employee, not a BTX
15        employee, and then I think there was an attempt to have
16        him be a BTX national employee to try to circumvent the
17        injunction around BTX Detroit.
18             That's a very vague recollection.  It may not be
19        factually correct.
20             But other than that, no, I'm not.
21   BY MR. MARQUIS:
22   Q.   Okay.  Do you know anything about whether the bid board
23        work that Radiant Detroit was doing and that BTX in
24        Detroit was doing lent itself to use of any of that
25        information that was in the e-mails?
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 80

```
 1                 Or in that beyond your scope?
 2   A.   Not part of my scope.
 3   Q.   Is it true that with what you are doing in your report,
 4        you have to assume that there was something used or
 5        disclosed with those e-mails that Mr. Furstenau sent to
 6        himself?
 7   A.   Do I have to assume that?
 8              No.  No.
 9   Q.   To arrive at your conclusions, you don't have to
10        necessarily assume that?
11   A.   No.  Again, I think they're just indicative of what
12        could be in that box.
13   Q.   I think I know the answer to this, but is there anything
14        specific about the economy during this stretch of time
15        that you looked at, 2016 through 2019, that played a
16        role in your conclusions here?
17   A.   I believe I did a little research about any type of
18        factors that might have been impacting logistics and
19        brokerage -- freight brokerage businesses.  I don't
20        recall anything specific.  I know there are references
21        to strikes that may have occurred.
22              But, again, all of that background information,
23        interesting context to explain anomalous movements of
24        revenues and margins.
25              What I observed over that period, but for the
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                    Page 81

```
 1        outlier high and the two lowest, fairly consistent

 2        streams of revenues and very consistent profit margins

 3        on those revenues.

 4   Q.   Was there anything that you examined with respect to

 5        whether certain customers still had the same volume of

 6        business that they were outputting to forwarders during

 7        this stretch of time?

 8   A.   So, did -- I believe I understand your question.

 9             My answer would be, no, I did not do any customer

10        specific.

11             Certainly I was aware of and there are in the

12        backgrounds, I think in everybody's pleadings, you know,

13        there's a clear acknowledgment that Radiant Detroit and

14        BTX Detroit serviced the automotive industry, among

15        others.

16             So, clearly any kind of movements within the

17        automotive industry, I might have tried to have been

18        aware of, but the numbers didn't lie.  I didn't see --

19        other than, you know, the two big months up and the two

20        months down, I didn't see a whole lot of movement in

21        revenue over a two-year period.

22   Q.   Was there anything that you saw that was relevant to you

23        as far as how this -- what I think is a term of art for

24        Radiant -- customer solutions, how that is defined or

25        described?
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                              Page 82

```
 1              Did that play a role at all in your analysis?

 2   A.   Well, I think "customer solutions" is not a term of art

 3        but one that's been adopted, it sounds like, by folks,

 4        and there's varying definitions of that from what I

 5        understand.  I think Mr. Robinson brought that up his

 6        report.

 7              But I would call it -- I think one term that I

 8        heard from O'Brien, I believe, was "secret sauce," you

 9        know, customers with -- you know, what else is in that

10        box other than those exact people, what all do they

11        bring, what left Radiant and was replicated at BTX.

12   Q.   And do you know what any of that is besides the people

13        themselves?

14   A.   Well, I think there's obviously allegations of financial

15        information that only Mr. Furstenau would have had

16        access to, customer lists, pricing information, things

17        of that nature.

18   Q.   But then what you've done, there's no further -- there's

19        not taking any of that information further to say, yes,

20        indeed that information within that box, pricing,

21        customer list, played a role in the numbers that you put

22        together?

23              I mean, that's not something that you've looked at

24        in detail; right?

25   A.   Well, again, the conclusion is the box picked up, moved
```

```
 1        right over, you know, from Radiant Detroit to BTX

 2        Detroit, and the economic hole that that left at Radiant

 3        and the economic -- well, on the other side -- pile, for

 4        lack of a better term, not a very artful term, that it

 5        created immediately for BTX.  The numbers don't lie.

 6        It's very clear.

 7   Q.   Do you know if during the time after Furstenau departed

 8        if there was any loss of goodwill for Radiant that had

 9        nothing to do with Furstenau?

10             MR. JEFFERS:  I think this has been asked and

11        answered, but I could be wrong.

12   A.   Well, listen, I hate to cite the opposing expert's

13        report so much in my own deposition, but I think

14        Mr. Robinson alluded to, you know, level -- service

15        level issues, and he cited several entities that, in

16        researching their volume by customer, they were

17        extremely small customers of both Radiant's and BTX's,

18        and they described service issues that -- I don't recall

19        Mr. Furstenau being specifically mentioned in any of

20        those descriptions that are in Mr. Robinson's report,

21        but certainly Mr. Furstenau was in charge at the time

22        for some of those issues.

23             I think I also noted some e-mails that Mr. Robinson

24        might have cited that were after Furstenau and the group

25        left, later -- and I think I saw a November of 2018
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                              Page 84

```
 1        reference to something, and I thought that's kind of
 2        unusual, but that was, you know, part of the discovery
 3        process in this case.
 4   BY MR. MARQUIS:
 5   Q.   Well, I think what you're bringing up is that there's a
 6        customer that I don't think fits into the one percent or
 7        less, XPO Logistics, Inc., that said communication was
 8        terrible in October, November 2018, after Furstenau was
 9        gone.
10             Is that what you're referring to?
11   A.   Well, as far as the one percent, no.  That's Image Tek
12        and Hillsdale College.
13             XPO is certainly a larger customer, as I recall,
14        and, again, seeing that type of communication, the
15        practice has been gutted and it's 60 days later, to me,
16        that -- again, that's not my expert opinion.  That's a
17        business opinion.  That's not surprising.
18   Q.   But you're not here to tell us why the communications
19        were terrible at that time or to say if they have
20        anything causally related to the allegations in this
21        case; right?
22             MR. JEFFERS:  Andy, you're the one that keeps
23        asking about them.
24             MR. MARQUIS:  I just want to see how much causation
25        he is speaking to and where he draws the line.
```

```
 1   A.   Well, so I -- you know, your -- you characterized this

 2        as communications are "terrible."

 3             I'm a believer that feedback from clients is

 4        valuable.  Whether it's positive or negative feedback,

 5        it's valuable if it's candid.  That's my own personal

 6        belief as a business expert, business professional.

 7             I'm -- you know, I did not evaluate other than to

 8        simply identify the fact that, as I stated, Radiant was

 9        in triage in Detroit once Mr. Furstenau and the other

10        employees left for BTX.  When the box was gone, they had

11        a hole.

12   BY MR. MARQUIS:

13   Q.   And are you assuming that the triage was because the

14        departure was perceived as sudden, or does that not play

15        a role in whatever you're analyzing?

16   A.   Well, the suddenness may or may not have been a factor,

17        but certainly just the fact that the key people were

18        gone.

19   Q.   Yeah, my question was geared towards whether some of

20        this inability to rebound, in your mind, was based on

21        lack of foreseeability or predictability of what was

22        going to happen with Mr. Furstenau.  I don't know if

23        that played a role at all for you.

24   A.   Well, no.  No.

25             MR. MARQUIS:  Just give me a minute.  I'm making
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                      Page 86

```
 1        sure that we don't necessarily need to introduce

 2        Robinson's report, because I think we've covered most of

 3        what's in here that I wanted to talk about.

 4   BY MR. MARQUIS:

 5   Q.   We talked a second ago about the customer solutions or

 6        secret sauce.

 7             Did you get any kind of background information on

 8        when any of that was developed, if there was any kind of

 9        period of time when that came to be or was created in

10        order to give it value?

11   A.   No.

12   Q.   Do you have any background information on, guidance on

13        pricing or outreach to customers that was given to

14        Mr. Furstenau when he was an employee at Radiant?

15   A.   Other than a general understanding, no.

16   Q.   I don't think we need to do Robinson's report as an

17        exhibit, but one other thing I wanted to ask about in

18        his report -- and if you need to see it, we can put it

19        in front of us as an exhibit.

20             But he says that:

21                  "Mr. Sargent has not specified for which

22        Counts in the Complaint that his opinion that

23        Radiant has sustained a loss -- total loss of

24        $811,415."

25             So, is there -- are there specific counts that
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 87

```
 1          these damages relate to?

 2    A.    I think I do specify very clearly in my report about the

 3          breach of financial duty and the misappropriation of

 4          trade secrets.  I think Mr. Robinson was very incorrect

 5          in that interpretation of my report.

 6    Q.    Meaning you connect the damages that you've identified

 7          to those two counts?

 8    A.    Again, I'm not necessarily connecting my damage measure

 9          to any specific counts, and I'm relying on a

10          determination of liability by the trier of fact and the

11          economic damages that Radiant suffered.

12    Q.    So, hypothetically -- and we'll see where this goes, but

13          hypothetically if there was a finding against the

14          Defendants on misappropriation but not on breach of

15          fiduciary duty, would that affect your conclusions in

16          your report about the damages?

17    A.    No.

18    Q.    And then the flip -- it's probably the same answer, but

19          if there's a finding of liability for breach of

20          fiduciary duty but not misappropriation, the numbers

21          would be the same?

22    A.    The same.

23    Q.    And then I think Mr. Robinson covers this, and we'll

24          just see if it's the same, too.

25          If there's particular alleged trade secrets that
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 88

1        are deemed to have been misappropriated but not others,

2        the damages figures would still be the same?

3    A.  Same.

4    Q.  In your report, I want to make sure that I am correct

5        that you're not saying that there was any tail off in

6        profitability before Mr. Furstenau left; is that

7        correct?

8    A.  Well, I think we had mentioned -- and I provided the

9        data -- I don't use terms -- I mean, the data doesn't

10       lie.  I don't need to describe this but they had two

11       very unusual exceptionally high months in March and

12       April of '18.  Mr. Furstenau is gone June, July,

13       August -- 90 days later.

14            I think, based on my graph -- I think it's on

15       page 10.

16   Q.  I think you're right.

17   A.  Yeah, 10.

18            I mean, I wouldn't call it a tail off.  I would say

19       things seemed to come back to a more normal near that

20       $600 or so.  And as you've identified, if there's any

21       possible cyclically on that year end, you know, July is

22       lower than June and August, but August is back up.

23            So --

24   Q.  But that's -- so, I mean, I think the short question and

25       answer is, you're not identifying any damages before

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                        Page 89

```
 1        Mr. Furstenau actually leaves employment with Radiant;
 2        right?
 3   A.   Other than his compensation while at Radiant, serving
 4        two masters.
 5   Q.   But there was -- in what you've estimated or put
 6        together, during that time when you're talking about his
 7        wages being disgorged, there's not any damages for the
 8        profitability of the station as a whole; right?
 9   A.   I could see no evidence of economic loss as far as
10        revenues and gross margins, no.
11   Q.   And any gains on the side of BTX Detroit during that
12        time period?
13   A.   Yeah.  Correct.
14   Q.   None?
15   A.   I don't recall specifically, but they were doing minimal
16        work in that -- in the Detroit market at that point.  I
17        believe they were handling most of their automotive
18        business from their Dallas location or --
19   Q.   And I --
20   A.   -- location.
21   Q.   Okay.
22            THE REPORTER:  I'm sorry.  "-- Dallas location
23        or --"
24   A.   Or, I said, a Texas location.
25            THE REPORTER:  Thank you.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                      Page 90

```
 1              MR. MARQUIS:  Yeah.  Sorry, John.  I spoke over

 2        Brad there.

 3   BY MR. MARQUIS:

 4   Q.   But specific to BTX Detroit, there's not evidence that

 5        you reviewed that suggests that business that Radiant

 6        could have had while Furstenau was still in the employ

 7        of Radiant was being pushed over to BTX Detroit; right?

 8   A.   Diverting?

 9              No.  In fact --

10              MR. JEFFERS:  I'm going to object as to foundation,

11        Andy, relative to when BTX Detroit even opened, but I

12        don't -- I think your question is a little misleading to

13        the witness in suggesting facts that may not be in

14        evidence.

15   BY MR. MARQUIS:

16   Q.   Okay.  If you don't understand it, you can let me know.

17   A.   Based on a review of the financial information I

18        received from Radiant and from BTX, I saw no gains by

19        BTX at Radiant's expense in revenue or gross profits

20        prior to Mr. Furstenau and the other leaving.

21              Now, certainly the argument on Mr. Furstenau

22        serving two masters would be potentially a Radiant

23        expense, hence the disgorgement calculation, but not in

24        the revenue and gross profit analysis.

25   Q.   And you mentioned BTX Dallas a moment ago.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                        Page 91

```
 1              You're aware from some of the facts you reviewed
 2         that BTX had that station that was in the automotive
 3         industry generally; right?
 4    A.   Yes.  Yes, I am.
 5              And it's -- I won't say common knowledge, but in
 6         freight forwarding, because so much product moves back
 7         and forth from Mexico, certainly freight forwarding
 8         businesses in Texas do an awful lot of automotive work.
 9    Q.   Did any of the BTX customer solutions play a part in any
10         of your analysis in this case?
11    A.   No.
12    Q.   Are you -- do you have any awareness of what customer
13         solutions BTX might offer that are different from
14         Radiant or even the same as?
15    A.   I would assume there's a great deal of similarity in --
16         just their functionality is obviously extremely similar.
17              I would assume that with Mr. Furstenau and the
18         others there now, they're extremely similar in
19         replicating the practice, but I did not -- that was not
20         a part of the calculation or was not considered.
21    Q.   And that concept of replicating the practice, that is an
22         assumption by you because you haven't reviewed all the
23         facts; right?
24    A.   Well, I know the -- I reviewed many things but I know
25         they're in dispute, so --
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

```
 1   Q.   All right.  I think I know the answer to this one, and
 2        this might be my last one, which is, did the respective
 3        shipping software that was in place for the entities and
 4        the functionality of that software play any role in your
 5        analysis here?
 6   A.   No.
 7            MR. MARQUIS:  All right.  I think that's all the
 8        questions I've got for you, Mr. Sargent.  I'll turn it
 9        to the other attorneys.
10                         *   *   *
11                      EXAMINATION
12   BY MR. KOBILJAK:
13   Q.   Mr. Sargent?
14   A.   Good morning.
15   Q.   Good morning.
16   A.   Well, afternoon now in Detroit.
17   Q.   Yeah, that's true.
18            My name is Kurt Kobiljak.  I represent
19        Mr. Furstenau in his Counter Complaint that he filed
20        against Radiant.
21            Are you aware of that Counter Complaint lawsuit?
22   A.   I'm aware of it, yes.
23   Q.   All right.  So, I'm going to -- I potentially want to
24        ask you some similar questions.  If I do, I apologize,
25        but these are very short and brief.
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                                    Page 93

 1              But if we take a look at your report and just going
 2         through some of this, on page 7, sub F, we've referenced
 3         and you've referenced the fact that when you take a look
 4         at Furstenau and his compensation, you use a baseline of
 5         February of 2018 and you run that through August of '18.
 6              What leads you to start your basis from February of
 7         '18?
 8    A.   I believe that is when Mr. Furstenau -- I believe he
 9         might have reached out directly to Mr. Bacarella in
10         January of '18, but I believe that Mr. Furstenau
11         testified or there was testimony that representations of
12         a practice level, certain economic metrics, $3 million a
13         year in revenues, and a team in place -- an operations
14         team in place were in February of '18 time frame.
15         That's why I chose February.
16              August, obviously he left at the end of August.
17    Q.   So, it's his testimony that you're using, the February
18         '18 day?
19    A.   There may be additional testimony to that, but my
20         recollection is, yeah, that's Mr. Furstenau's testimony
21         at deposition or at -- and/or hearings.
22    Q.   All right.  And obviously you've made it very clear that
23         your testimony today is regarding more economic damages
24         than being the trier of fact; is that correct?
25    A.   That's correct.

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                          Page 94

```
 1   Q.   All right.  Can you tell me just from -- between
 2        February through August of '18, how was Radiant
 3        economically damaged by Furstenau?
 4   A.   Well, certainly -- and, again, it's the compensation.
 5        If he is serving two masters, this is a very common
 6        breach of fiduciary duty type of analysis for somebody
 7        receiving payment while serving another master.
 8   Q.   All right.  So, we take a look at your graph on page 10,
 9        and, again, just during your testimony previously with
10        Andy, if we look at February of '17 through August of
11        '17 and compare that with 2- -- February '18 through
12        August of '18, from a revenue standpoint it looks like
13        five of those seven months were better in '18 than they
14        were in '17, from a revenue standpoint; is that correct?
15   A.   That appears to be correct, yes.
16   Q.   All right.  And there's no -- you're not testifying
17        today that during that period of time from February to
18        August that Mr. Furstenau was not performing his job as
19        the station manager at the Detroit station, are you?
20   A.   No.
21   Q.   And it's clear that revenue actually was more solid in
22        '18 than it was in '17 during that period of time?
23   A.   That appears to be correct, yes.
24   Q.   All right.  So, your economic damages is more the fact
25        that because he was -- as you've indicated, he was
```

```
 1        servicing two masters, there's somehow -- there's rhyme
 2        or reason as to why you disgorged his compensation?
 3   A.   That's correct, yes.
 4   Q.   And again getting back to some of your testimony with
 5        Andy, just so that I'm aware, when we talk about
 6        outliers, obviously you took the two highest and the two
 7        lowest.
 8             What leads you to take two and two or three and
 9        three or one and one?
10             What leads you to take two and two in the case
11        before you today?
12   A.   Well, much as we're in the COVID era, the data drives
13        the decisions.  And in this specific instance, the facts
14        that there were these two months that were just, as the
15        graph shows, way beyond any other months in this
16        two-year period, that's why we removed them.  And then
17        we took two low points out again just to be consistent
18        and to balance the data.
19   Q.   And you would might have already answered this,
20        Mr. Sargent, but is there any reason why those two
21        months were so high?
22   A.   I did answer that, and unfortunately I can't recall
23        specifically.  But I know we had conversations with the
24        folks at Radiant about it, and I just don't recall
25        specifically why these were -- you know, you would go
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                              Page 96

```
 1        from $600,000 in January and February and literally

 2        double that in March.  We don't -- I don't recall the

 3        explanation.

 4   Q.   But you're not suggesting that somehow Mr. Furstenau was

 5        creating two exceptionally high months as a forecast of

 6        him departing, are you?

 7   A.   No.  No.  In fact, if I were taking that tact, I would

 8        have absolutely be including these months in my

 9        analysis.

10   Q.   All right.  If you could just take a look at your sub 41

11        on page 17?

12            And, again, it's getting to Mr. Furstenau's

13        compensation.

14   A.   Sure.

15   Q.   You indicate at the very bottom, the very last sentence:

16                "He received a bonus of $18,705 for

17            January, February and March of 2018."

18            That's what it reads; correct?

19   A.   Correct.

20   Q.   How do you know he received a bonus for $18,705?

21   A.   Well, I'm sure we got that data from Radiant and

22        possibly payroll records.

23   Q.   All right.  Are you aware at any other time in your

24        review of Mr. Furstenau's compensation that he received

25        any other bonuses other than this $18,705?
```

```
 1   A.   Not in this period that I've examined, no.

 2   Q.   They didn't provide you any other payroll other than

 3        payroll for this quarter?

 4   A.   It's beyond a quarter.  It was from, you know, basically

 5        January of '18 through August of '18.

 6   Q.   Correct.

 7             But the $18,705 is for that January, February,

 8        March of '18; correct?

 9   A.   That's what I was told, right.  And I prorated that.

10             MR. KOBILJAK:  Thank you, Mr. Sargent.  That's all

11        I have.

12             MR. JEFFERS:  So, I don't have any questions.

13             I did, Andy and Kurt, want to, for now just

14        designate the whole transcript as confidential.  I mean,

15        certainly Brad's background and whatnot is not

16        confidential, but just given really the substance

17        concerning his opinions, I just want to start out with

18        that as a default, and then we can work through page and

19        line later on if you guys think there are things that

20        need to be de-designated.

21             Is that fair?

22             MR. MARQUIS:  I agree.

23             MR. KOBILJAK:  Very good.

24             MR. JEFFERS:  Okay.

25             THE REPORTER:  Andy, this is John.  Just wondering
```

```
 1   if -- U.S. Legal would like us to ask if you'd like to

 2   order the original of the transcript.  Just need a "yes"

 3   or "no" at this point.

 4       MR. MARQUIS:  Yes.

 5       THE REPORTER:  Thank you.

 6       Ben, would you like a copy?

 7       MR. JEFFERS:  Yes.  Yes.

 8       THE REPORTER:  Thank you.

 9       Kurt, would you like a copy?

10       MR. KOBILJAK:  No, I'm good.  Thank you.

11           (Deposition Exhibit 1 marked

12            for identification.)

13       (Deposition concluded at 12:17 p.m.)

14                       *    *    *

15

16

17

18

19

20

21

22

23

24

25
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                    Page 99

```
 1    STATE OF MICHIGAN )

 2    COUNTY OF OAKLAND )

 3               CERTIFICATE OF NOTARY PUBLIC

 4        I do hereby certify that the witness, whose

 5    attached testimony was taken in the above matter, was

 6    first duly sworn to tell the truth; the testimony

 7    contained herein was reduced to writing, via remote

 8    attendance of the witness, by means of stenography;

 9    afterwards transcribed; and is a true and complete

10    transcript of the testimony given.

11        I further certify that I am not connected by blood

12    or marriage with any of the parties; their attorneys or

13    agents; and that I am not interested, directly or

14    indirectly, in the matter of controversy.

15        In witness whereof, I have hereunto set my hand

16    this day at Highland, Michigan, County of Oakland, State

17    of Michigan on Monday, June 15, 2020.

18

19    _____

20    _____

21    John J. Slatin, RPR, CSR-5180

22    Certified Shorthand Reporter

23    Notary Public, Oakland County, Michigan

24    My commission expires:  July 25, 2023

25
```

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

### $

**$1** 36:7

**$1.3** 40:2

**$159,647** 28:19

**$18,705** 96:16, 20,25 97:7

**$187,000** 51:13

**$2.2** 76:21

**$3** 37:12 93:12

**$350** 40:7

**$380** 40:6

**$5** 40:21 42:2

**$50,000** 57:16 58:14 71:11

**$564,000** 76:10

**$564,863** 76:22

**$600** 88:20

**$600,000** 96:1

**$636,862** 28:19

**$650,000** 31:8 39:25

**$8** 35:5

**$800** 34:1 35:4

**$811,415** 86:24

### 1

**1** 16:6,11 17:16 28:9 74:25 98:11

**10** 14:11 29:24 31:6 44:21 88:15, 17 94:8

**10-K** 25:22 34:21

**10-ks** 25:24 33:13,25

**101** 53:12

**10:30** 44:15

**10:38** 44:17

**11** 20:13

**11:35** 78:19

**11:45** 78:21

**12** 22:9

**12:17** 98:13

**13** 57:4

**14** 23:16 26:8 61:14

**15** 58:24

**16** 32:3 43:1

**16-A** 28:15

**16th** 17:20

**17** 32:3,4 94:10, 11,14,22 96:11

**18** 31:9 37:9 38:2 43:1,3,4 88:12 93:5,7,10,14,18 94:2,11,12,13,22 97:5,8

**19** 35:23 45:11, 12,16,17,19 46:12,14

### 2

**2-** 94:11

**20** 14:11

**2009** 9:25

**2016** 28:17 80:15

**2017** 34:8 41:12 43:3 51:12

**2018** 27:16 28:18 31:17,18, 22 34:8 36:9,25 37:11,16,17,24 38:12,20 39:17 46:8 51:12 54:13 74:24 83:25 84:8 93:5 96:17

**2019** 17:21,24 47:7 65:23 80:15

**20th** 65:23

**21** 9:22

**23** 44:20

**24** 20:18

**25** 14:11 45:7,13 46:13 47:18,19 50:15 58:23 72:17,25

**26** 20:19

**27** 54:22

**27th** 46:8 49:7 54:13 65:22 67:17

**28** 57:6,14

**29** 57:4,6,15 58:12,21

### 3

**30** 60:6

**300** 56:5

**31** 66:2

### 4

**4** 18:9,12,15

**41** 96:10

**43** 76:16 77:19

### 5

**50** 14:19,24

**50/50** 11:11,24

**52-page** 17:8

### 6

**6** 22:8 26:8

**60** 84:15

### 7

**7** 18:9,12 28:14 93:2

### 9

**9** 35:23

**90** 88:13

### A

**a.m.** 44:15,17 78:19,21

**ability** 60:9 61:1 77:17

**absolutely** 7:11 10:3 11:5 24:15 30:12 32:19 34:17 35:18 49:19,25 96:8

**access** 82:16

**account** 14:12 53:5,9

**accountant** 8:25 9:1,3,9,10, 12 15:10 47:12

**accountants** 15:5,14,15

**accounting** 9:4,14,17,20 10:19 45:10,11 48:14

**accounts** 53:10

**accurate** 11:21 59:9 68:1

**acknowledgment** 81:13

**action** 13:22

**actions** 76:20

**active** 10:22 14:12

**actively** 52:4

**acts** 22:13,14, 15,16 23:4,7

**actual** 14:18 40:25 59:18

**add** 58:19

**added** 60:1

**additional** 7:7 69:3 93:19

**addressed** 49:13

**addressing** 50:13

**adequate** 54:16

**adequately** 53:21

**adopted** 82:3

**affect** 55:4 87:15

**aftermath** 66:7

**afternoon** 92:16

**agree** 97:22

**ahead** 16:5 33:24 35:23 57:4 78:8

**allegations** 13:15,19 22:6 56:17 57:3 77:7 78:4,24 82:14 84:20

**alleged** 22:12, 14,16 23:4,7 49:17 72:10 76:20 87:25

**allegedly** 38:14 70:20 79:6

**alluded** 83:14

**amend** 74:5

**amount** 65:7

**analogy** 35:8 49:4 55:14,16

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

**analyses** 13:23 18:1 22:10

**analysis** 11:8 12:8,20 14:2 16:1 23:17 28:3,8 30:22 34:18 36:16 37:20 43:13,25 46:12 48:5 50:14 54:1 55:3,14 57:12 58:17,18 66:22 67:2,11 68:10,19, 21 71:22,23 72:2 73:7,10,16 74:22 82:1 90:24 91:10 92:5 94:6 96:9

**analyze** 73:20

**analyzing** 70:5 85:15

**and/or** 93:21

**Andy** 31:13 42:16 44:11 78:10 84:22 90:11 94:10 95:5 97:13,25

**annual** 37:13

**anomalous** 80:23

**answers** 8:5,7 22:19

**apologize** 12:16 32:13 61:5 70:17 78:6 92:24

**appalled** 60:15

**appeared** 27:7 54:11

**appears** 37:14, 19 49:6 94:15,23

**applicable** 57:24

**application** 44:4 57:21

**applied** 57:15, 20

**applies** 9:5

**apply** 7:9 58:9

**applying** 35:10

**approach** 41:2

**approximately** 15:19 35:3,5,6 39:25 56:5 58:23 72:17,25

**approximation** 68:1

**April** 30:20 31:17 36:9,25 37:24 38:12,20 39:17 43:3,4 88:12

**area** 10:9 11:12 37:21 56:11 63:4, 5 69:23

**arguing** 41:15

**argument** 90:21

**arose** 20:17

**arrive** 80:9

**arrived** 55:12

**art** 43:10,13 54:5 81:23 82:2

**artful** 83:4

**ascribed** 43:11

**assessment** 11:21

**assignment** 75:9

**assume** 25:24 53:25 54:23 56:8 64:13 80:4,7,10 91:15,17

**assumes** 68:21

**assuming** 22:23 23:11,14 38:11 61:8 64:15 71:3 76:24 85:13

**assumption** 7:20 15:21 60:24 70:18 75:18 91:22

**assumptions** 23:19

**atmospheric** 79:11

**attached** 65:8

**attachments** 56:19

**attempt** 79:14, 15

**attorneys** 13:8 92:9

**August** 20:18, 19 28:18 43:1 46:8 54:12,22 65:22 67:17 88:13,22 93:5,16 94:2,10,12,18 97:5

**automotive** 81:14,17 89:17 91:2,8

**average** 28:21 29:7,9,16,17 33:14 34:15 36:23 39:24 40:3, 9 41:23 42:3 43:6 57:8,13,16 58:14 66:9

**averaged** 28:18 37:25

**averaging** 29:1 68:15

**aware** 26:24 33:5 55:24 56:4 81:11,18 91:1 92:21,22 95:5 96:23

**awareness** 91:12

**awful** 40:13 91:8

---

**B**

**B-R-A-D-L-E-Y** 8:14

**Bacarella** 37:9,11 93:9

**back** 26:12 27:12 44:18 46:11 57:1 59:11, 17,23 60:10 88:19,22 91:6 95:4

**backed** 11:9

**background** 18:25 19:4,7,10 24:23 25:1 77:10 80:22 86:7,12 97:15

**backgrounds** 81:12

**bad** 33:20

**balance** 43:23 44:4,5 95:18

**based** 12:5 22:20 23:19 37:7 49:16 50:1,3 54:10,23 56:7 63:13 65:14,20 72:2 85:20 88:14 90:17

**baseline** 29:3 33:16 34:10,12, 15,18 59:2,12,18 60:10 93:4

**bases** 26:11

**basic** 19:6 53:11

**basically** 27:7 49:2 53:18 61:8 68:21 97:4

**basing** 21:3 22:5

**basis** 26:3 27:23 29:13,17, 18 32:9,14,19 34:4,16 40:7 41:24 48:11 55:10 93:6

**beat** 67:14

**begin** 45:7 58:11

**beginning** 37:16 70:3 77:10

**belief** 85:6

**believed** 74:25

**believer** 85:3

**Ben** 16:25 98:6

**beneficiary** 71:18

**bid** 62:14,16,18, 23 63:14 66:24 79:22

**bidding** 73:8, 12,18

**bids** 62:22

**big** 24:1 31:4,10 32:2,3,4 35:21 47:18 81:19

**bigger** 11:10

**Bill** 25:10

**Bishoff** 13:9

**bit** 11:18 40:22 74:15

**bleeding** 31:1

**board** 10:21,23 62:14 63:15 67:8 79:22

**boards** 62:16, 18,23 66:24

**bonus** 74:23 75:2 96:16,20

**bonuses** 74:18,21 75:3 96:25

**book** 37:12

**boots** 60:21

**borne** 62:5,7

**bottom** 18:9,15 22:8 28:14 58:13, 17 96:15

**box** 49:5 55:14, 22 67:4,6 77:3 80:12 82:10,20, 25 85:10

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

Index: boxed..component

**boxed** 49:6
63:24

**Brad** 13:3 31:20
44:20 90:2

**Brad's** 97:15

**Bradley** 6:18
8:14

**breach** 13:21
87:3,14,19 94:6

**break** 7:10
44:11,14 78:9,11

**briefly** 9:15

**bring** 64:13
82:11

**bringing** 84:5

**broadly** 19:19,
20

**brokerage**
80:19

**brought** 21:8
30:14 35:24 49:6
82:5

**BTX** 20:19,24
21:11 22:13 23:5,
24 25:18 26:5
37:9,11,16 45:8,9
46:9,22 48:12
49:7 54:21,22
55:11,12 57:16,
19 58:4,5,7 60:10
61:10 63:25
65:11 66:8,20
67:8,15,23 70:3,
11,13,18,19
71:10,19,25
72:11,14 73:1
75:21,25 76:3,11
79:14,16,17,23
81:14 82:11 83:1,
5 85:10 89:11
90:4,7,11,18,19,
25 91:2,9,13

**BTX's** 57:8,25
58:9 72:9,19
76:19 83:17

**Buick** 35:10

**bumped** 68:5

**business** 10:4
29:13 37:13
45:21 46:7,15
52:21 53:11,13
60:8 66:24 67:12
68:23 72:20,22
76:20 77:21 81:6
84:17 85:6 89:18
90:5

**businesses**
80:19 91:8

**but-for** 34:18

**by-customer**
46:11 51:4

**C**

**C-2A** 42:23

**C-6** 51:2

**caboodle** 8:1

**calculate**
77:14

**calculated**
41:3 44:8 58:10

**calculating**
72:5

**calculation**
36:12 38:2,8,18
41:23 57:19,20
69:14 90:23
91:20

**calculations**
20:2

**call** 41:8 59:2
66:25 82:7 88:18

**called** 41:11

**calling** 21:13
40:22

**camera** 6:3

**candid** 85:5

**candidly** 36:14
37:25

**capability**
64:13

**capable** 64:6,
18

**career** 10:24

**case** 11:8 12:3,
9,21 13:6,11
14:25 15:7,11,16
16:2,9 17:4 18:4
20:9 25:17 28:12
32:21 33:10 34:9
37:2 50:9 52:9
62:6 65:1 67:4,25
68:2 75:10 77:7
84:3,21 91:10
95:10

**cases** 13:15,18
14:5,7,18

**cash** 44:25

**causal** 23:10,11

**causally** 84:20

**causation**
22:17,25 50:12
56:11 84:24

**caused** 48:23
70:12

**central** 20:16
21:2,4,13,21,23

**CEO** 35:8

**CFO** 24:10

**Chad** 67:5

**challenges**
61:18

**change** 58:19
75:15

**characterizati
on** 22:2 49:9

**characterize**
15:13 47:16
60:20

**characterized**
22:1 85:1

**charge** 83:21

**charged** 78:9

**Chicago** 10:9

**chip** 15:2

**chopping**
14:13

**chose** 93:15

**chunk** 45:21,25

**circumvent**
79:16

**citation** 61:7

**cite** 19:24 45:6
60:12 83:12

**cited** 83:15,24

**cities** 10:11
14:1

**citing** 60:18
61:19 66:13,15

**clarification**
7:14 23:9

**clarifies** 22:18

**clarify** 12:2
25:15 31:13
46:19 76:6

**clear** 54:21
64:21 67:4 72:2
81:13 83:6 93:22
94:21

**clearing** 59:25

**clients** 85:3

**cling** 77:5,12

**close** 59:7,11

**College** 33:7,8
46:25 84:12

**College's**
47:14

**comfortable**
73:25

**committing**
11:22

**common** 91:5
94:5

**communicati
on** 8:8 25:7 26:19
84:7,14

**communicati
ons** 26:20 84:18
85:2

**company**
60:17

**comparable**
60:4

**comparables**
34:3

**compare** 34:7
94:11

**compared**
40:8

**comparing**
34:25

**comparison**
54:24

**comparisons**
33:18

**compelling**
65:2,3,4

**compensatio
n** 74:20 89:3 93:4
94:4 95:2 96:13,
24

**competency**
63:9

**competition**
67:3

**competitor**
71:21

**competitors**
26:5 66:22 67:12,
14 68:12

**Complaint**
86:22 92:19,21

**complete**
26:10 58:11

**completely**
22:18 67:16
68:23 70:25

**Complying**
6:4,6,11

**component**
61:13 77:23

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

Index: Compound..define

**Compound** 79:9

**comprehensive** 63:23

**computer** 56:1,3

**concept** 42:9 76:24 91:21

**concert** 37:15

**conclude** 58:21

**concluded** 98:13

**conclusion** 68:3 69:9 74:9 82:25

**conclusions** 28:8,12 56:9 80:9,16 87:15

**conduct** 7:1 70:19,20

**conducted** 23:18,22

**confidence** 50:2

**confidential** 16:8,11,12 78:1 97:14,16

**confidentiality** 78:1

**confirmation** 18:11

**confirmed** 30:9

**connect** 70:13 87:6

**connecting** 87:8

**connection** 22:15 23:10,11

**consecutive** 30:21

**conservative** 41:2,24 44:9

68:14 69:21 70:2 72:5

**considered** 18:22 19:9 26:17 30:12 67:3 91:20

**consistent** 29:22 30:23 35:22 42:1,4 43:20 44:4 81:1,2 95:17

**constitutes** 25:16 43:15

**consulting** 8:18 9:23

**contact** 46:20

**contained** 16:8 36:6 56:18, 23

**contemplated** 74:20

**context** 9:7 49:11 61:23 64:24 77:13 80:23

**contextual** 19:15 79:10

**continue** 69:22,23

**continued** 66:9,13 67:11 70:6

**contributed** 15:11

**contributes** 35:4

**contributing** 56:23

**conversation** 36:14

**conversations** 25:10 30:4 95:23

**cool** 33:1

**copy** 17:3 98:6, 9

**core** 21:6

**correct** 7:23,24 8:3 10:10 15:24, 25 16:3 17:5 27:3,18 28:4 31:2,11,20,21,23, 24,25 37:2,3,5 38:21 42:13 47:3 56:16 59:8 61:20 67:25 69:10 74:3, 6 79:19 88:4,7 89:13 93:24,25 94:14,15,23 95:3 96:18,19 97:6,8

**costs** 72:12,14

**count** 14:5 73:2,3

**Counter** 92:19, 21

**counts** 86:22, 25 87:7,9

**couple** 7:25 18:7 35:25 36:2 40:1 42:18 72:7

**court** 16:5 74:11

**cover** 17:6 72:7

**covered** 25:25 86:2

**covering** 57:7

**covers** 64:1 87:23

**COVID** 95:12

**CPA/CFF** 6:18

**Crain** 24:5,13 28:1

**Crain's** 27:19

**created** 29:3 83:5 86:9

**creating** 96:5

**credence** 74:17

**credibility** 60:23

**critical** 63:9

**customer** 22:2 36:6 46:23 47:17 48:1,2 49:22 50:17,18 62:9 81:9,24 82:2,16, 21 83:16 84:6,13 86:5 91:9,12

**customer-by-customer** 32:9,14,19

**customers** 26:5 32:10,23 33:3,9 45:2,3,5,6, 9,10,11,16,18,22 46:1,3,4,5,9,20 47:18,20 48:6,7, 8,15 50:16 52:5, 9,16,20 53:2 60:14 67:1,24 70:22 72:10,17, 21,22 75:23 76:21 81:5 82:9 83:17 86:13

**customers'** 60:8

**cyclicality** 29:12 30:2

**cyclically** 30:11 32:7,18 88:21

———

**D**

**Dallas** 89:18,22 90:25

**damage** 29:2 38:2,8 41:23 69:7,8 70:11 87:8

**damaged** 70:7 94:3

**damages** 11:9, 12,19,25 12:5,8, 20 19:21 22:16, 20,24 23:2 37:2 38:4,18 39:6 41:4 44:8 50:14 54:1 56:13 67:25 68:24 69:1,3,5, 14,23 71:5,12,16 72:1 73:25 74:9

75:18 76:12 77:15 87:1,6,11, 16 88:2,25 89:7 93:23 94:24

**data** 23:24 24:16 30:18 36:6,11 37:7 38:7 41:17, 18,22 42:4 43:16, 17,19,20 44:9,24 45:10 48:3 51:4 52:23 54:10 57:3 65:24 74:14 75:7 77:25 78:1,2 88:9 95:12,18 96:21

**date** 74:9 75:1

**dated** 17:20

**dates** 20:5 66:1

**day** 14:20 63:25 93:18

**days** 26:22 84:15 88:13

**de-designated** 97:20

**deal** 22:3 25:3 54:12 56:18 64:13 91:15

**dealership** 35:11

**dealing** 66:7

**December** 17:20 32:3

**decisions** 95:13

**decline** 66:13

**decreased** 48:15

**deemed** 88:1

**default** 97:18

**defection** 66:8

**defendants** 79:1 87:14

**Defense** 17:16

**define** 65:4

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

Index: defined..end

**defined** 81:24

**definition** 9:2

**definitions** 82:4

**delivered** 63:24

**Denver** 10:12, 17

**depart** 77:6

**departed** 48:7, 9,15,17 50:24 52:3,20 63:16 64:4,19 75:5 83:7

**departing** 96:6

**departure** 48:23 49:17 50:4 53:23 55:2 60:3 85:14

**dependent** 77:20

**depending** 14:24 75:15

**depends** 14:21

**deposition** 7:1 16:18,20 27:12,15,19 28:2 37:8 61:15 83:13 93:21 98:11,13

**depositions** 7:8,21 27:13,16

**Depot** 50:17

**derive** 25:20

**describe** 39:16 60:19 79:11 88:10

**describing** 55:23 58:6 60:25

**description** 62:8

**descriptions** 83:20

**designate** 97:14

**desirable** 53:13

**detail** 55:8 74:23 82:24

**determinatio n** 22:21,23 23:14 38:16 53:4 64:8 71:2,3,14 75:19 77:15 87:10

**determine** 43:15 50:6 56:13

**determined** 43:19 69:20,24 71:25

**determines** 68:21

**determining** 22:22 72:14

**detracting** 70:23

**Detroit** 10:12, 15 24:24 25:3,5, 11,18,19 29:14 32:7 33:3 35:4,5 36:21 42:25 48:12,25 50:2 51:14 52:4,9 53:19 55:11,13 59:11,16 60:22 62:19 66:20 75:21,25 76:2 79:17,23,24 81:13,14 83:1,2 85:9 89:11,16 90:4,7,11 92:16 94:19

**Detroit's** 45:21 47:15 49:3

**developed** 86:8

**difference** 39:20

**dipping** 71:13

**direct** 15:3 64:12

**direction** 68:3 76:8

**directly** 93:9

**disagree** 35:1

**disclaim** 63:4

**disclaimer** 23:6

**disclosed** 80:5

**disconnect** 68:6

**discovery** 84:2

**discuss** 29:4 30:5 55:8

**discussed** 67:16

**discusses** 66:19

**discussion** 12:17 19:23 34:21

**discussions** 34:24

**disgorge** 38:18

**disgorged** 37:1 38:22 89:7 95:2

**disgorgemen t** 74:15 75:1 90:23

**dispel** 30:22

**dispute** 19:7, 17 20:17 21:2,4, 13,21,23 22:7 50:8 55:9 64:25 65:1 78:3 91:25

**disputed** 22:1 77:8

**disputes** 56:12

**distract** 53:9

**Diverting** 90:8

**document** 16:12 17:8 18:18

**documents** 26:10,16 27:22

33:12 56:19

**dollar** 30:19 60:1

**dollar-wise** 47:18

**dollars** 29:8 73:6

**domains** 56:6

**door** 60:16

**double** 40:5 71:13 96:2

**downtown** 10:12,16

**draws** 84:25

**dream** 10:3

**drives** 95:12

**driving** 72:16

**drop-off** 31:5, 25

**dropping** 68:23

**duly** 6:19

**duty** 13:21 87:3, 15,20 94:6

**E**

**e-mail** 56:18

**e-mails** 28:5,7 30:13 48:13 51:7, 15 55:25 56:5,9, 14,23 63:15 79:25 80:5 83:23

**earlier** 14:17 17:24 30:15 33:14 49:12 74:15

**early** 37:9,11 47:7

**earmarked** 75:4,8

**earned** 39:11 76:11

**earnings** 30:21 38:19,22 67:23 70:23 72:9 74:16 75:21 77:18

**ebbs** 35:9

**economic** 11:9,12,19,25 12:8,19 22:11,20, 24 23:2,4,7 34:11 37:20 39:6 41:3 49:16 50:14 56:13 58:4,6 68:24 71:5,8 77:15 83:2,3 87:11 89:9 93:12, 23 94:24

**economically** 70:7 94:3

**economy** 80:14

**effect** 46:17 49:10 65:13

**efforts** 15:3 53:20 54:8,9,19 60:19,20

**embedded** 79:13

**emphasis** 11:18 40:14

**employ** 90:6

**employed** 8:17

**employee** 36:21 48:25 49:20,21 79:14, 15,16 86:14

**employees** 10:14,18 20:24 21:7,10 48:21 49:1,15,17 50:4 54:21,22 61:24 63:16 67:5 77:20, 25 78:5,25 79:1,6 85:10

**employment** 89:1

**end** 17:12 26:9 32:5 40:12 69:1,

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

Index: endeavor..formalized

8,19 70:2 72:4
74:1,8 88:21
93:16

**endeavor** 6:25

**ending** 65:23
69:11

**ends** 43:24

**energy** 73:8,11

**engage** 70:20

**engaged** 14:16
17:24

**engagement**
18:1 64:9

**entire** 42:9
60:15,16 63:24
66:19

**entities** 23:25
25:16 33:5 63:11
77:10 83:15 92:3

**entitled** 39:1,7,
10

**entity** 34:1 35:4,
15 79:12

**environment**
53:14

**era** 95:12

**essentially**
75:20

**establish** 29:2
34:12,18 60:23

**established**
45:1,4,17 46:3
66:25

**establishing**
29:3,13

**estimated**
89:5

**evaluate** 85:7

**events** 65:21

**everybody's**
81:12

**evidence**
29:12,20 30:2
53:3 65:6 75:16

78:4,24 89:9
90:4,14

**exact** 15:18
55:17 82:10

**examination**
6:21 11:3,20
92:11

**examined**
6:19 81:4 97:1

**examining**
43:16

**exception**
40:16

**exceptional**
30:21

**exceptionally**
36:1,7,13 37:4,24
38:12,13,24 39:2,
11,17,19,23
40:11,14,15 41:8
88:11 96:5

**exceptions**
30:1

**exchanging**
37:10

**exclusive** 12:7

**exclusively**
9:17,20 15:1

**execution**
49:1 61:17 63:8,9

**exhaustive**
12:4 27:21

**exhibit** 16:6,9,
11 17:16 26:12,
18,23 27:14 28:1,
9 42:23,24 46:19
51:2,9 65:16,19
86:17,19 98:11

**exhibits** 17:13
24:16 27:4

**existing** 76:21

**exited** 68:16

**expect** 68:12

**expecting**
74:11

**expense** 46:9
90:19,23

**expenses**
57:15,19,22 58:9

**experience**
49:23 54:25 55:1,
23 63:10

**experiences**
63:13

**expert** 14:2
15:23 56:3 63:3
84:16 85:6

**expert's** 83:12

**experts'** 56:2

**explain** 42:16
80:23

**explained**
66:8

**explanation**
96:3

**extends** 74:1

**extensive** 12:4
61:17

**extent** 54:2,4

**extent(sic)**
54:3

**extrapolation**
35:12,14

**extremely**
65:2 83:17 91:16,
18

---

**F**

**fact** 16:10 19:22
20:22,23 21:10
22:21 23:15 39:8
50:6 52:15 56:12,
20 63:16 64:16
70:5 71:1 75:19
77:6 85:8,17
87:10 90:9 93:3,
24 94:24 96:7

**factor** 34:5,6
85:16

**factors** 80:18

**facts** 18:22,24
19:2,8,13,15
23:18 24:25 50:7
52:13 53:15
64:24,25 65:1,14,
18 74:7,8 75:15
77:8 90:13 91:1,
23 95:13

**factual** 18:25
52:18 55:10 65:6,
25

**factually** 52:3
54:6 70:10 79:19

**fair** 8:9 18:24
35:1 40:23 49:24
53:25 54:23 56:7
66:14 69:4 74:5
97:21

**fairly** 24:1
29:11,22,25 30:8,
23 34:11 68:1
81:1

**fairness** 41:2

**fall** 27:15 66:10

**falls** 43:17

**familiarity**
13:4 64:14

**fashion** 68:22

**February** 9:25
65:23 74:24,25
93:5,6,14,15,17
94:2,10,11,17
96:1,17 97:7

**feedback** 85:3,
4

**Feel** 7:13

**fiduciary** 13:21
87:15,20 94:6

**figure** 33:15
38:4 59:13

**figures** 88:2

**filed** 92:19

**filings** 25:22

**financial** 23:24

24:16 33:12
56:18 82:14 87:3
90:17

**find** 39:14 43:22
53:20 70:21

**finding** 87:13,
19

**findings** 22:10

**fine** 44:13 78:10

**finite** 69:8

**firm** 10:11 15:1

**fiscal** 31:1

**fit** 25:18,19

**fits** 84:6

**fitting** 8:8

**flat** 30:8

**flip** 87:18

**flows** 35:10
44:25

**focus** 54:18
73:16

**focused** 73:7

**folks** 15:20 30:4
38:3 82:3 95:24

**follow** 73:12

**footnote** 42:23
43:2

**footprints**
24:2

**Ford** 50:17,19,
20 53:3 62:11

**forecast** 96:5

**forensic** 9:1,2,
9,17,20 10:19
15:5,10,13,15
56:1,3

**foreseeability**
85:21

**form** 22:23
61:12

**formalized**
15:23

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

Index: formed..impacting

**formed** 9:23

**forming** 10:1
18:22 19:9

**forms** 71:18

**forwarded**
55:25 56:6

**forwarders**
81:6

**forwarding**
91:6,7

**found** 12:6 28:8
34:22 43:25
71:15

**foundation**
90:10

**frame** 93:14

**fraud** 10:24
11:3,7,19,24 12:4

**free** 7:14

**freight** 80:19
91:6,7

**frequency**
43:18

**front** 15:17
16:15 17:3,9
35:19 86:19

**full** 35:22 54:2,4

**functionality**
91:16 92:4

**Furstenau**
15:16 20:17,23
21:6 22:13 23:5
25:4 36:19,20
37:18 38:3,14,19
39:3 46:21 47:6
48:7,9,15,16,20,
24 50:24 52:3,10,
15,22 53:15
55:21,25 59:3
65:9,21 67:5
70:12 71:25
73:19 74:19 75:4
76:19 78:5,25
79:7 80:5 82:15
83:7,9,19,21,24
84:8 85:9,22
86:14 88:6,12

89:1 90:6,20,21
91:17 92:19 93:4,
8,10 94:3,18 96:4

**Furstenau's**
27:15 37:8 64:11
66:8 74:16 93:20
96:12,24

**G**

**gains** 89:11
90:18

**gather** 24:13

**gave** 28:21 34:3
49:12

**geared** 85:19

**general** 26:3,
15 35:9,10 62:8
86:15

**generally** 8:24
35:15 53:8 62:14
64:22 69:12,16
91:3

**generate** 27:23
54:17 55:5 77:21

**generated**
56:3

**generating**
64:7

**generation**
56:24

**George** 47:25
61:20

**gig** 75:9

**give** 6:13 7:6,15
15:17 18:10
40:25 49:9 51:1
61:23 74:17 78:7
85:25 86:10

**Global** 13:5

**God** 6:14

**good** 6:23,24
33:20 68:11
69:25 92:14,15
97:23 98:10

**goodwill** 60:13
61:8,12,13 62:9,
11,15 63:19 83:8

**government-
issued** 6:2

**graph** 29:5,23
32:6 88:14 94:8
95:15

**great** 6:7,16
22:3 25:3 30:1
56:18 64:13,25
70:1 91:15

**gross** 28:19,21
29:1 33:14 34:15
57:14 58:14,18,
22,25 59:3,4,5,
12,13,17 67:6
72:14,17,20,21,
24,25 76:10,22
89:10 90:19,24

**ground** 7:25
60:21

**group** 8:19 9:23
10:1 48:3 55:10
75:21 83:24

**guess** 7:15 8:4
14:10

**guidance**
86:12

**guilt** 77:16

**gutted** 49:3
53:19 61:16
63:22 84:15

**guys** 12:15
78:16 97:19

**H**

**half** 29:9 78:15

**hamstrung**
67:16

**hand** 6:9 41:25
54:12 55:5

**handle** 77:17

**handling** 89:17

**Hang** 51:18,20
78:6

**happen** 85:22

**happened**
46:10 57:8

**hate** 83:12

**Hauck** 13:9

**head** 33:11

**heading** 18:25

**heard** 12:13
13:1 82:8

**hearing** 73:24

**hearings** 93:21

**heavy** 32:25

**held** 12:17

**helped** 24:13,
18

**Hey** 12:15 30:7

**Hickey** 13:9

**high** 36:1,7,13,
22,23,24 37:4,24
38:12,14,24 39:2,
11,17 40:8,11,22
41:8,21,25 81:1
88:11 95:21 96:5

**higher** 37:23
38:5 41:23 44:7
47:22 68:5

**highest** 40:16
42:10 44:3 95:6

**highly** 45:1,4,
18 46:3 47:21

**highs** 29:25

**Hillsdale** 33:6,
8 46:25 47:2,14
84:12

**hired** 55:2

**hires** 64:3

**historically**
52:12

**hold** 50:10

**holding** 6:2

**hole** 83:2 85:11

**hot** 32:25

**hour** 44:12
78:13,15

**hundreds** 42:3

**hurt** 46:23

**hypothetical**
49:19,25

**hypothetically** 87:12,13

**I**

**idea** 11:6 17:25
56:25 63:1 72:3

**identical** 55:13
72:25

**identification**
6:2 98:12

**identified** 21:2
37:23 41:16
43:21 44:6 45:11
65:15 87:6 88:20

**identifies**
42:24 47:19

**identify** 8:25
19:18 20:22
21:21 28:1 42:5
45:16 85:8

**identifying**
42:6 43:8 61:9
88:25

**Image** 84:11

**immediately**
83:5

**impact** 47:18
48:11,19 49:16
56:15 58:4,6,22
61:24 63:14 65:9,
10

**impacted**
62:15

**impacting**

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

Index: imply..local

80:18

**imply** 42:11

**improper** 70:18,20 79:5,6

**inability** 85:20

**include** 61:23

**included** 26:11 43:5 77:9

**including** 17:13 33:13 96:8

**income** 29:14

**inconsistenc y** 39:14

**incorrect** 87:4

**increase** 51:13 53:21

**increased** 48:9,16

**increasing** 11:18

**independent** 23:18,21 26:1

**indicating** 46:12

**indicative** 59:22 80:11

**individual** 9:4 35:16

**individuals** 37:14 63:10

**industry** 81:14, 17 91:3

**information** 16:8,12 24:12 25:20 37:10 56:18 79:25 80:22 82:15,16, 19,20 86:7,12 90:17

**inherent** 49:22

**injunction** 19:22,24 46:22 49:12 52:16,22 57:8 58:1,3,4,24

59:5,23 60:7,10 61:2,11 63:21 65:11,22 66:10, 14,23 68:4,8,9, 15,17,19,20 69:2, 9,16 70:3,5,8,24 71:6,12,23,24 72:4 73:5 74:1,10 79:17

**instance** 95:13

**intended** 18:21

**interesting** 80:23

**internal** 26:20

**interpret** 32:6 64:23

**interpretation** 62:4 87:5

**introduce** 86:1

**investigation** 11:7 12:4

**investigation s** 10:25

**investigative** 11:13 14:22

**investors** 33:16,25 34:3,7

**invoices** 15:17

**involve** 13:15, 19 33:10

**involved** 13:14,22 15:5 77:24

**issue** 21:6 50:8

**issued** 19:23

**issues** 47:8 49:13 50:5 83:15, 18,22

**item** 44:20

**items** 24:22

**J**

**J-O-H-N** 8:14

**January** 37:16 74:24 93:10 96:1, 17 97:5,7

**Jeffers** 13:9 31:13 42:14,19 44:10 51:18,20, 23 54:3 78:10,14, 18 79:9 83:10 84:22 90:10 97:12,24 98:7

**job** 8:24 94:18

**John** 6:18 8:14 13:3 16:22 17:15 90:1 97:25

**Johnson** 47:25 61:20 62:2 79:12, 14

**joining** 20:18

**judge** 69:20

**juice** 78:7

**July** 31:9,22 43:3 88:12,21

**jump** 35:23

**June** 32:4 88:12,22

**K**

**Kaiser** 47:1

**key** 21:6 48:25 49:1,15,17,20,21 50:4 54:21 61:16, 18,24 63:24 66:20 77:1,20,25 85:17

**kind** 8:2,7 9:13 14:17 15:9,22 19:23 22:18 24:6, 12 25:25 33:15 35:24 38:11 49:9 54:4,24 57:6,12 62:15 63:14 66:4 70:23 75:23

81:16 84:1 86:7,8

**kindly** 6:1

**kinks** 7:7

**kit** 8:1

**knowledge** 9:5 13:4 21:7,25 49:22 55:23 62:20 77:25 91:5

**Kobiljak** 92:12, 18 97:10,23 98:10

**Kurt** 92:18 97:13 98:9

**L**

**lack** 83:4 85:21

**lady's** 47:2

**language** 23:7 39:20 46:6

**large** 14:22 24:1 45:25 47:25 48:1 72:19

**larger** 38:2 45:20 84:13

**late** 37:16

**lawsuit** 92:21

**laying** 7:25

**leading** 18:1 61:22

**leads** 93:6 95:8, 10

**leave** 49:16

**leaves** 49:21 69:2 89:1

**leaving** 20:18 21:8 65:10,22 90:20

**led** 10:1 28:25 41:4,22

**left** 20:23,24 21:10 22:3 25:4 46:21 47:6,7 48:21,25 49:23

52:11,15,22 53:16 54:20,25 55:10,13 59:3,5 64:7 82:11 83:2, 25 85:10 88:6 93:16

**Legal** 98:1

**lends** 70:25

**length** 49:13

**lengthy** 24:6

**lent** 79:24

**level** 83:14,15 93:12

**levels** 60:3,4

**liability** 22:21, 22,24 23:14 50:13 71:1,3 75:19 87:10,19

**liable** 71:25

**lie** 35:20 39:25 47:13 55:10 59:21 71:4,7,9 81:18 83:5 88:10

**linear** 68:22

**lines** 46:24

**list** 26:10 27:21 45:6,23 46:21 82:21

**listed** 26:18,23 45:9,10,12 50:22

**listen** 40:24 83:12

**lists** 50:16 82:16

**literally** 25:18 96:1

**litigation** 9:6, 18 10:20,22 11:1 12:3 14:12,13,18, 23 21:9 75:14

**live/work** 10:16

**loaded** 54:5

**local** 64:14

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

Index: located..moves

**located** 10:9

**location** 89:18, 20,22,24

**logistics** 13:5 80:18 84:7

**long** 9:13

**longer** 46:15 70:3,19

**looked** 26:17 27:15 29:14 32:16 48:10 64:23,24 80:15 82:23

**lose** 44:25 67:12 68:22

**losing** 58:14

**loss** 22:11 23:4, 7 60:13 61:8 62:8,11,15 63:19 83:8 86:23 89:9

**losses** 50:2 57:22,25 58:9 71:5,8,10,19

**lost** 11:7,10 34:14,19 45:1,4, 17,24 46:1,4,5 47:18 48:7 57:16, 19 58:10 60:8 71:20 72:11 76:20

**lot** 7:9 11:15 27:11 30:10,11 40:13 81:20 91:8

**low** 36:22,23 39:19,23 40:6,8, 12,15,21,22 42:1, 2 95:17

**lower** 36:2 39:18 41:4,11 42:2,3,6,11 59:4 68:17 88:22

**lowered** 38:8 41:3 44:7,8

**lowest** 39:18 40:17 42:10 44:5 81:1 95:7

**lows** 29:25

## M

**Macomber** 24:10

**made** 27:9 53:4, 21 58:20 64:3 69:14 93:22

**maintain** 52:10

**major** 65:21

**majority** 13:24 25:20 46:7

**make** 8:6 12:13 13:1 14:17 40:10 46:19 51:9 60:24 64:8 88:4

**makes** 42:4 49:20

**making** 22:15 35:9 37:10 38:7, 16 59:25 71:14 85:25

**manager** 25:11 94:19

**managing** 8:18,21 10:5,6

**March** 30:20 31:17 32:4 36:9, 24 37:24 38:11, 19 39:17 43:3 74:24 88:11 96:2, 17 97:8

**margin** 28:21 33:14 34:15,20 38:6 42:25 57:14 58:14,18,22,25 59:3,4,6,12,17,25 61:2 65:8 67:6 72:15,18,20,21, 25 73:6,21 76:22

**margins** 28:19 29:1 52:17 72:24 80:24 81:2 89:10

**mark** 16:5

**marked** 17:16 18:17 98:11

**market** 23:25 25:13,16 26:4 64:15 68:13 70:4, 12 89:16

**marketplace** 60:23

**MARQUIS** 6:22 13:2 16:4, 13,20,24 17:15, 18,19 31:15,19 42:18,21 44:13, 18,19 51:22,25 52:2 54:14 78:8, 13,15 79:3,21 84:4,24 85:12,25 86:4 90:1,3,15 92:7 97:22 98:4

**master** 94:7

**masters** 37:19, 22 38:15 89:4 90:22 94:5 95:1

**matter** 20:17 39:8 41:5 53:24 55:9 64:10

**matters** 10:20 14:23 75:15

**Matthew** 28:6

**meaning** 43:11 56:14 87:6

**means** 35:5

**measure** 19:21 34:20 70:8 73:23 75:7,18 87:8

**measured** 73:6

**measurement** 68:7,10 69:6 70:1 73:23 75:1

**measuring** 75:6

**meet** 59:18

**member** 8:18, 21 10:5,7

**members** 10:6

**mention** 19:16 21:16,22 30:13

36:5

**mentioned** 10:19 19:3 25:13 28:5 30:7,25 41:6 61:1 83:19 88:8 90:25

**mentioning** 19:13

**method** 28:25 34:14

**metrics** 93:12

**Mexico** 91:7

**Michigan** 14:3 35:11

**million** 29:7 30:19 34:1 35:4,5 36:7 37:12 40:2,4 93:12

**mind** 77:19 85:20

**mine** 10:3 56:13

**minimal** 89:15

**minute** 20:6 53:1 78:7,9 85:25

**minutes** 66:3

**misappropriated** 88:1

**misappropriation** 13:15 87:3, 14,20

**mischaracterization** 39:4

**misleading** 90:12

**missed** 61:5

**mitigate** 53:17

**mitigating** 54:1

**mitigation** 54:7,9,19 60:19, 20

**mode** 67:18

**model** 29:3 58:11,19,20 73:25 74:9 75:20, 23

**modeling** 58:8

**moment** 25:13 51:1 90:25

**month** 32:3,4 39:10 40:1,4 41:12 57:16 58:15 71:11

**month-by-month** 48:10

**month-to-month** 34:16

**monthly** 28:18, 21 29:1,16 38:5 43:5 57:9,13,14 66:9

**months** 29:7,8 30:19,25 31:4,10, 16 32:2 35:21 36:1,2,7,22,24,25 37:4 38:19,24 39:2,3,11,17,19, 23 40:1,6,8,11, 12,19,20,22 41:8, 9,12,16,21 42:11 43:3,5 44:3,5,7 65:23 81:19,20 88:11 94:13 95:14,15,21 96:5, 8

**morning** 6:23, 24 92:14,15

**Motors** 35:9,10

**move** 42:20 44:10

**moved** 55:15 67:24 68:2,4 82:25

**movement** 67:4 81:20

**movements** 80:23 81:16

**moves** 91:6

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020                                                           Index: moving..personnel

**moving** 44:20
76:7,11

**multiple** 11:1

**mutually** 12:7

**N**

**named** 79:1

**narrative**
27:11

**national** 50:17
79:16

**nature** 24:3
82:17

**necessarily**
14:8 35:16 50:10
54:24 73:10
80:10 86:1 87:8

**negative** 74:21
85:4

**Nlm** 48:1 62:12

**non-
profitable** 52:5
53:2,9 73:9

**normal** 31:8
78:11 88:19

**note** 21:17 32:2
43:4

**noted** 24:22
30:18 50:19
83:23

**noteworthy**
58:12,20

**notice** 29:16
51:1,15

**noting** 58:13

**November**
32:3 83:25 84:8

**NPD** 50:19,20
53:3

**number** 7:21
15:18 18:12
29:10 31:8 38:3
41:4,23 44:7

55:24 59:18 63:7
64:20 69:7,8
73:17 76:10,13

**numbered**
17:12

**numbers**
29:11,22 30:8,17
35:19,20 38:1
39:25 40:5,21,25
41:1,21 47:12,13
48:10 55:9 59:21
64:20,22 65:2,6,
17,18,20,24,25
67:4,7,9 71:4,7,9
72:15,24 73:23
81:18 82:21 83:5
87:20

**numerically**
55:12

**O**

**O'BRIEN** 24:7,
13 25:2,6 26:20
28:5 30:14 48:13
51:8,16 53:16
60:25 61:7,14
62:1 64:11 82:8

**O'Brien's**
60:12,17 66:2,6

**object** 42:14,19
90:10

**Objection**
79:9

**objective**
75:11,13

**observation**
29:5 47:11 77:9

**observe** 43:16

**observed**
41:21 80:25

**occurred**
80:21

**occurring**
70:11

**occurs** 70:19

**October** 32:2
51:11,12,23,24
84:8

**offer** 91:13

**offered** 16:2

**offering** 23:1

**office** 10:15,17
15:12 53:18,19
60:15,16

**offices** 10:11
13:25

**onset** 75:17

**open** 69:2

**opened** 49:7
90:11

**operations**
25:11 49:3 67:17
93:13

**opine** 56:21

**opinion** 19:25
38:25 39:1,5,6,9
49:12 54:7,8,18
57:2 59:10,15
63:4 64:16,17
65:3 67:21,22
77:14 84:16,17
86:22

**opinions** 18:22
19:9 22:11,19,25
23:20 26:11
27:23,24 56:4
59:15 74:6 97:17

**opportunity**
69:18

**opposing**
83:12

**order** 16:9
33:19 54:17 56:9,
15 62:22 86:10
98:2

**original** 98:2

**originally**
79:13

**outlier** 36:11
41:6 43:5,10,15,
21 81:1

**outliers** 29:10
30:24 38:6 41:3,
7,9,11,17,18
42:5,6,8,9,12
43:8,22,23 95:6

**outputting**
81:6

**outreach**
86:13

**overall's** 35:6

**overlap** 11:15

**owed** 74:18

**P**

**p.m.** 98:13

**package** 55:22

**packed** 55:15

**pages** 17:12

**paid** 74:19

**paragraph**
18:9,12,20 20:13,
22 21:19 22:9
23:3,16 26:8,9
28:15,22 35:23
38:2 39:16 40:25
44:20,22 45:7,13
46:12 47:18,19
50:15,16 51:2
57:4,14,15 58:12,
21 60:6 66:2
76:16 77:19

**paragraphs**
45:7 58:6

**part** 15:11 18:2
20:4 21:12,23
34:8 37:1 38:17
39:12 55:22 61:5
67:2 73:9 76:11
80:2 84:2 91:9,20

**parties** 19:7
26:6

**parts** 50:17
66:20

**past** 7:22 13:12

**pay** 39:3

**payback** 71:19

**payment** 94:7

**payroll** 96:22
97:2,3

**PDF** 18:18

**people** 15:1,3
22:4 23:23 51:10
61:16,18 63:6,10
64:4,5 82:10,12
85:17

**people's** 33:7

**perceived**
85:14

**percent** 14:19,
24 35:6 47:14,15
58:23,24 72:17,
25 84:6,11

**percentage**
28:22 40:7 42:25
58:25 59:3,4,6,
12,17 61:2

**perfect** 7:17

**perform** 69:18

**performance**
34:11 35:7 68:11

**performing**
94:18

**period** 9:8 20:3
24:6 28:17 29:11
30:3,19,21 32:8
33:18 34:25
35:22 58:1,3,24
68:15,17 69:19,
20,25 70:9,24
71:6,12,20 72:1,4
74:1 76:15 77:18
80:25 81:21 86:9
89:12 94:17,22
95:16 97:1

**periods** 32:2
58:2

**person** 7:13

**personal** 85:5

**personnel**
54:17 64:19 77:1,

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

2,3

**phone** 24:5

**physical** 10:13,15,17

**physically** 10:8

**picked** 82:25

**picture** 11:10

**pieces** 72:8

**pile** 83:3

**place** 46:23 52:17 59:24 63:21 65:23 66:10,14 68:17, 18 92:3 93:13,14

**placing** 40:13

**plans** 20:8

**play** 82:1 85:14 91:9 92:4

**played** 73:3 80:15 82:21 85:23

**pleadings** 81:12

**point** 6:1 9:16, 22 68:25 69:15, 24 72:23 89:16 98:3

**points** 36:11 42:10 55:7 95:17

**portion** 11:19 57:25 60:7

**positive** 63:11, 13 74:21 85:4

**possibility** 69:2

**possibly** 13:13 43:21 96:22

**post-injunction** 68:8 76:6,14

**potential** 10:22 14:13 22:11 23:7 41:3 60:13 69:23

**potentially** 90:22 92:23

**practice** 37:12 49:5,6 61:16 63:23,24 64:2 66:18,19 84:15 91:19,21 93:12

**pre-furstenau** 60:2

**pre-injunction** 68:7 76:5,15 77:18

**pre-litigation** 9:7

**preceding** 40:24

**predeparture** 59:6,13

**predicate** 37:20

**predicated** 21:9

**predictability** 85:21

**predominantly** 10:24

**premium** 8:6

**prepare** 37:15

**presence** 10:15

**presences** 10:13

**present** 6:1 69:6,8

**presented** 29:23

**presents** 22:10

**presuming** 77:15

**pretty** 23:6 39:4 62:20 63:23

**previously** 14:21 16:4 94:9

**price** 63:6,7

**pricing** 82:16, 20 86:13

**primarily** 9:6

**primary** 50:5

**prior** 12:9,20 13:5 90:20

**process** 84:3

**proclamation** 35:9

**product** 91:6

**professional** 49:4 85:6

**profit** 29:14 34:17,19,20 38:6 47:22 52:17 65:8 71:22 81:2 90:24

**profitability** 34:19 53:22 56:16,24 60:4 62:16 73:21 88:6 89:8

**profitable** 45:1,5,8,18,20,22 46:4 47:21 52:11 53:5,10 59:24 66:25 73:8,18

**profits** 11:7,10 34:14 50:24 53:13 58:10 68:16 71:20 72:11 90:19

**Projecting** 34:17

**proprietary** 78:2

**prorated** 74:24 75:1 97:9

**protective** 16:9

**provide** 14:2 27:6 65:7,24 69:17 75:10 97:2

**provided** 16:4 24:19,23 29:5 41:4 88:8

**public** 25:22

**pulled** 72:11

**purpose** 69:16

**purposes** 11:23 22:20 39:6 50:14

**purses** 16:18

**pursue** 52:10

**pursuing** 52:4

**pursuit** 53:10

**pushed** 90:7

**put** 14:25 20:8 24:14 48:5 52:17 55:17 63:21 82:21 86:18 89:5

**puts** 33:13

**putting** 28:3 34:13 48:5 75:11

--- 

**Q**

**Q1** 29:18 30:17, 18,22 31:5,9,23

**Q3** 30:25

**Q4** 30:16,22 31:1 32:5 33:19 34:7,8

**Q4's** 30:17

**qualified** 64:18

**quality** 54:25 55:1,4

**quantified** 12:5

**quarter** 33:20 97:3,4

**quarterly** 29:17

**question** 7:12, 16 12:19,23,25 13:3 15:8 22:19 24:21 25:23 26:15 32:11,12 52:7 53:1,12 54:6 56:22 61:22 70:15 73:13

**public** 25:22

**pulled** 72:11

**purpose** 69:16

**purposes** 11:23 22:20 39:6 50:14

**purses** 16:18

**pursue** 52:10

**pursuing** 52:4

**pursuit** 53:10

**pushed** 90:7

**put** 14:25 20:8 24:14 48:5 52:17 55:17 63:21 82:21 86:18 89:5

**puts** 33:13

**putting** 28:3 34:13 48:5 75:11

78:23 81:8 85:19 88:24 90:12

**questioning** 78:12

**questions** 7:17 18:7 92:8,24 97:12

**quick** 12:16 51:3

**quotes** 46:19

--- 

**R**

**Radiant** 12:9, 20 13:5 15:16 20:18 21:10 22:2, 12 23:23,24 24:4 25:19 26:5,20 28:18 29:14 30:4 31:1,9,23 32:7 33:3,13 34:1 35:5,6 36:21 38:4 39:1,7,10 42:25 44:25 45:10,21 46:14 47:6,7,14 48:11,25 49:3 50:2 51:14 52:4, 9,21 53:4,16 54:1 55:11,12,13 56:6 57:21 58:1,10 59:1,11,16,22 60:7,14,17 61:25 65:10,11 66:7,20, 23 67:10,11,24, 25 68:5,15,22 69:17,21 70:6 71:4,12,16,18 72:1,10,11 73:1, 3,16 75:22 76:1, 2,11,20 77:1,21 79:23 81:13,24 82:11 83:1,2,8 85:8 86:14,23 87:11 89:1,3 90:5,7,18,22 91:14 92:20 94:2 95:24 96:21

**Radiant's** 45:8 46:9 54:7,9,19 55:21 66:9 68:11 72:21 76:25

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

77:17 78:2 83:17 90:19

**raise** 6:9

**range** 14:10

**ranking** 36:21 48:25

**reach** 10:25

**reached** 93:9

**read** 27:12

**Reading** 12:18 78:22

**reads** 96:18

**ready** 44:10

**real** 12:16 66:6

**reason** 19:12 21:18,22 38:17 39:20 46:2 95:2, 20

**reasonable** 35:12,13 69:24

**reasons** 11:1

**rebound** 63:20 85:20

**rebounded** 59:6

**recall** 17:25 24:11 25:4,8,12 26:25 27:20 30:6 32:16,22 33:2,17, 21 34:2,23 36:15, 20 47:24 48:2,4, 18 50:19,20,25 51:6,17 52:1,24, 25 53:6 61:21 79:10,11 80:20 83:18 84:13 89:15 95:22,24 96:2

**received** 74:20 75:6 90:18 96:16, 20,24

**receiving** 94:7

**recent** 26:21

**recently** 26:19

**recess** 44:15 78:19

**reclaim** 60:7

**recollection** 75:13 79:18 93:20

**reconciled** 45:9

**record** 8:12 12:15,17 31:14 44:17,18 78:17, 21

**records** 96:22

**recover** 61:10 69:18

**reduction** 57:13

**reference** 19:21 42:23 51:2 84:1

**referenced** 27:4,11 33:6 93:2,3

**references** 25:21 27:9 34:24 69:5 80:20

**referencing** 20:3 26:1 62:1

**referring** 31:17 45:3 46:25 65:5 84:10

**reform** 7:17

**regain** 61:1

**regard** 64:17

**regular** 7:8

**regularly** 13:14,23 14:2

**reiterate** 65:14

**relate** 87:1

**related** 10:20 50:18 84:20

**relationships** 49:22 60:22

**relative** 90:11

**relayed** 18:23 65:18

**relevance** 19:17

**relevant** 19:14 20:2,4 33:10 35:2 38:7 62:18 81:22

**relied** 26:10 27:22 56:2 64:20

**rely** 33:15 47:12

**relying** 49:8 56:8 87:9

**remained** 52:16,19 55:1

**remember** 24:4,12

**reminder** 8:4

**remove** 30:23 41:25 42:1

**removed** 36:11,16 41:2,10, 17,18,24 95:16

**removing** 29:6

**remuneration** 71:19

**render** 54:8

**rendering** 54:7,18 56:4 63:3

**repair** 60:21,22

**repeat** 61:4 70:14

**rephrase** 15:9

**replicated** 53:18 82:11

**replicating** 91:19,21

**replication** 66:18,19

**report** 14:25 15:6,11,16,22,23 16:1,4,14,19,21 17:4,23 18:2,3,8, 24 19:3,10,14,16

20:9,12 22:10 24:14,17,22 25:21 26:2,12,17 27:2,5,10 28:8 29:6,23,24 31:6 33:6,8 34:5,8 38:1,9 39:12 44:21 45:13 46:2, 18 47:11 54:8 55:8 56:3,10 57:5,21,25 59:1 60:18 61:14 68:25 69:13 70:21 72:8 74:4, 12,23 75:10,12, 17 77:11,14 80:3 82:6 83:13,20 86:2,16,18 87:2, 5,16 88:4 93:1

**reporter** 6:5,7, 12,16 12:15,18 16:5,22 17:17 78:16,22 89:22, 25 97:25 98:5,8

**reporting** 33:16

**reports** 12:9,20 18:5 20:7 34:14, 21 56:2

**represent** 32:7 51:8 92:18

**representations** 37:11 93:11

**representing** 51:11

**reputational** 61:13

**reputationally** 69:22

**research** 23:18,21,25 25:14,16 26:1 80:17

**researching** 83:16

**reserving** 74:5

**resources** 53:9

**respect** 28:11 32:25 57:25 61:20 63:15 64:18 75:22 81:4

**respective** 92:2

**responsibility** 50:11

**responsible** 71:11,15,16

**responsiveness** 63:8

**rest** 43:19,20 62:5

**result** 22:12,14 23:4 40:17 76:19

**resumed** 44:17 78:21

**retuned** 59:22

**return** 60:2,3

**returned** 31:7

**revenue** 36:6 37:4 38:5 39:19, 23 42:24 45:25 46:4 47:14,16,22 48:7,8 54:17 57:13 59:13,22, 24 60:1,3 61:10 64:7 65:7,8 66:9 67:6 72:16 73:22 76:21,25 77:21 81:21 90:19,24 94:12,14,21

**revenues** 28:18 29:1 36:8 37:24 48:19,23 51:13 55:4 56:15, 24 57:9 59:23 61:3 66:13 68:16 76:10,14 80:24 81:2,3 89:10 93:13

**review** 27:4,9 28:6 33:12 34:23 90:17 96:24

**reviewed** 15:22 26:17 27:1, 17,19,22 28:2

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

37:8 52:8 53:20
54:10 59:16
65:15 77:13 79:5
90:5 91:1,22,24

**reviewing**
51:7

**revisit** 28:7

**revolve** 50:8

**rhyme** 95:1

**rid** 43:23

**Robinson**
25:21 27:6 33:6
34:24 35:1 41:1
56:2 82:5 83:14,
23 87:4,23

**Robinson's**
27:2,5 46:18
47:11 55:8 72:8,
23 83:20 86:2,16

**robust** 30:17

**role** 9:14 80:16
82:1,21 85:15,23
92:4

**rules** 7:9,25

**run** 9:23 10:3
93:5

**running** 10:2
49:7 78:7

---

**S**

**S-A-R-G-E-N-
T** 8:15

**safe** 15:21

**sales** 54:16 55:5

**Sangsland**
26:21 28:6 30:14
48:14 51:8,16

**Sargent** 6:8,18,
23 8:14,18 16:14
17:5,20 31:17
86:21 92:8,13
95:20 97:10

**sauce** 82:8 86:6

**schedule** 27:6
43:2,7

**scheduled**
24:16

**schedules**
27:4,8

**scope** 53:23,24
55:20 64:9 80:1,2

**screen** 16:18

**seasonality**
29:12 30:2,5,11
32:7,15,18,24
34:22,25

**seasonality/
cyclicality**
29:4,21

**secret** 82:8
86:6

**secrets** 13:16,
19 21:16 87:4,25

**section** 19:4
66:2

**seeking** 44:4

**self-inflicted**
67:20

**semantics**
21:5 41:15

**sense** 40:10

**sensitive** 63:6

**sensitivity**
63:8

**sentence**
20:15 22:18
44:21 96:15

**separate** 58:20

**September**
28:17 43:1

**serve** 27:23

**service** 47:8
83:14,18

**serviced** 81:14

**services** 49:4

**servicing**
70:21 73:1 95:1

**serving** 37:19,
22 38:14 89:3
90:22 94:5,7

**set** 21:7 41:17,18
42:4 43:16,19
44:9

**sets** 11:15

**setting** 33:7

**shape** 22:22

**share** 17:2

**sharing** 16:18

**sheet** 17:6

**shipment**
73:2,3

**shipments**
73:17,18

**shipping** 92:3

**shoes** 64:5,19

**shop** 10:2

**short** 44:11,15
78:19 88:24
92:25

**shortly** 31:22

**shot** 7:6

**show** 16:19
32:10,23 33:3,10
42:7 57:22

**showing** 58:3

**shown** 79:5

**shows** 32:25
33:7 65:7 70:6
95:15

**side** 83:3 89:11

**sides** 11:16

**signed** 15:22

**significant**
44:25 63:20

**similar** 91:16,
18 92:24

**similarity**
91:15

**simple** 77:6

**simply** 37:7
46:14 49:16 50:3
55:9 73:17 77:13
85:8

**Sims** 25:10

**simultaneous
ly** 49:2

**sir** 12:10,11,12,
22,24

**sir'** 12:23

**sit** 19:18 20:9,11
36:15 47:24
50:10 52:24
73:25

**situation** 53:18
54:12

**six-month**
20:3 69:19,25
71:20

**skill** 11:15 21:7

**skills** 9:4,5

**skipping** 57:4

**sliced** 68:12

**small** 47:17
83:17

**smaller-than-
normal** 35:21

**smooth** 29:12

**snapshot**
51:23

**so-called**
67:24 75:22

**software** 92:3,
4

**sole** 10:7

**solemnly** 6:12

**solicit** 77:21

**solid** 62:20
94:21

**solutions** 22:2
81:24 82:2 86:5
91:9,13

**sort** 11:17 21:6
30:22 34:15
40:11 41:14
43:11 50:7 53:11
76:24 77:24
79:10

**sought** 23:23
37:9

**sounds** 17:10
54:4 82:3

**speak** 24:10

**speaking** 25:5
33:25 69:17
84:25

**Specialized**
50:22 51:13

**specific** 18:7
19:6 17:25,22
47:23 48:6,14
50:20 62:9 72:16
80:14,20 81:10
86:25 87:9 90:4
95:13

**specifically**
15:6 17:25 24:5
25:5,9,17 30:6
32:16,23 33:2,11
34:2 36:19,20
38:18 42:8,24
43:4,7 48:18 49:8
50:25 51:6,10,19
52:1 53:16 54:15
58:3 60:12,18
61:21 62:1 63:15
83:19 89:15
95:23,25

**specificity**
48:2,4 69:13

**spectrum**
43:24

**speculate**
7:15

**speculating**
14:10

**speed** 63:8

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**spelling** 8:11

**spending** 53:8

**spent** 25:2

**split** 11:6

**spoke** 23:23 24:4,7,25 25:6 90:1

**spot** 70:1

**square** 37:6,7, 18

**squared** 73:8

**stable** 30:1

**staff** 54:25 55:1, 4

**stage** 11:1

**stand** 72:3

**standpoint** 50:12 94:12,14

**start** 8:11 31:23 93:6 97:17

**started** 9:11,17, 19 10:24 17:22

**starts** 22:9 31:9

**state** 35:3 38:1 40:24 42:8 59:14 61:15 64:17

**stated** 21:25 29:20 75:10 85:8

**statement** 63:22

**states** 43:4

**static** 34:11

**stating** 8:11 64:15

**station** 24:24 25:3 51:14 52:4 54:17,20 77:22 89:8 91:2 94:19

**stations** 35:16 62:19

**statistical** 43:13

**statistically** 38:7 55:13 72:24

**stayed** 47:6 77:1

**step** 64:19

**stepped** 64:5

**stock** 16:10

**stop** 17:2 69:1, 14

**story** 65:3,4,17, 25

**streams** 81:2

**stretch** 80:14 81:7

**strikes** 80:21

**strong** 23:6 39:4

**subject** 58:25

**subsequent** 22:20,23 59:15

**subsequently** 23:19

**subset** 47:20

**substance** 97:16

**substantial** 55:24

**substantially** 48:20 52:18

**subtract** 40:10

**subtracted** 70:11

**sudden** 85:14

**suddenness** 85:16

**suffer** 69:22,23 70:7 71:19

**suffered** 22:12 50:2 70:6 71:17 72:1 76:12 87:11

**suffering** 71:5, 7

**sufficient** 34:12

**suggest** 46:3

**suggested** 63:18,19

**suggesting** 71:10 90:13 96:4

**suggests** 69:1 70:10 90:5

**suit** 79:2

**sum** 25:25

**summary** 18:21

**summation** 27:7

**summer** 37:16

**supervisor** 64:12

**supplemental** 20:9

**support** 9:18

**surprised** 34:2

**surprising** 84:17

**sustained** 86:23

**swear** 6:9,12

**sworn** 6:19

**T**

**tact** 96:7

**tail** 88:5,18

**takes** 62:22 63:2

**taking** 14:12 36:1 38:6 41:1 44:3,6 72:3 82:19 96:7

**talk** 17:3 33:22 73:11 86:3 95:5

**talked** 26:4 33:14 41:7 51:7

74:15 75:20 86:5

**talking** 16:11, 19 30:16 31:14 45:14 50:15 58:21 62:3 66:3 75:23 76:2,9 77:18 89:6

**talks** 46:21 60:13

**team** 15:13 37:13,15 93:13, 14

**team's** 15:3

**Tek** 84:11

**telephonic** 25:7

**telling** 60:14

**tend** 11:12 63:12

**tended** 30:17

**term** 37:12 40:14 43:10,12, 13 54:4,5 81:23 82:2,7 83:4

**terms** 69:17 78:12 88:9

**terrible** 84:8,19 85:2

**territory** 6:25

**test** 45:8

**testified** 6:19 32:20 93:11

**testify** 74:11

**testifying** 94:16

**testimonies** 27:12

**testimony** 6:12 46:17,23 47:5 49:10 56:10 57:3 60:12,17,25 61:7,19,23 62:6 63:6,19 66:3,6, 12,15,18 93:11, 17,19,20,23 94:9

95:4

**Texas** 89:24 91:8

**theory** 69:20

**thing** 66:12,15 86:17

**things** 24:3 30:8 31:7 32:16 34:4 50:11 56:11 64:1 75:5 77:2 82:16 88:19 91:24 97:19

**thinking** 19:19, 20 29:19 35:2 46:10 47:9,23 53:2 69:11

**thought** 55:16 84:1

**thousands** 42:3

**throw** 40:21

**tie** 50:11

**tighter** 6:5

**time** 7:5 9:8 21:8 24:7 25:3 27:1 37:19 44:13 52:21,22 53:8 57:7 66:6 80:14 81:7 83:7,21 84:19 86:9 89:6, 12 93:14 94:17, 22 96:23

**times** 13:11 35:25 40:2,19,20 42:16,18

**timing** 20:2,4 65:20

**title** 8:20,22

**today** 10:8 11:4, 22,23 19:18 20:10,11 23:9 28:9 36:15 56:10 66:5 73:24 75:24 93:23 94:17 95:11

**today's** 11:23

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SARGENT, CPA/CFF, JOHN BRADLEY
06/09/2020

**told** 36:15,17 70:19 97:9

**Tom** 24:10

**top** 18:12 20:13 33:11 61:3,10,14 73:6,21

**topic** 44:11

**total** 48:11 86:23

**track** 13:18

**trade** 13:16,19 21:16 32:10,23, 25 33:3,10 87:4, 25

**traditional** 9:9,11,13

**transactions** 24:21

**transcript** 97:14 98:2

**transferring** 75:21,25 76:3

**transitioned** 9:8 11:17

**transitioning** 10:1

**Transportation** 50:23 51:14

**treated** 38:1

**tree** 55:16,18

**triage** 53:17 67:18 69:18 85:9, 13

**triaging** 54:11, 15

**trial** 74:6,11

**trier** 22:21 23:14 39:8 50:6 56:12 71:1 75:19 87:10 93:24

**true** 35:15,16 53:8 64:22 67:8 72:9 80:3 92:17

**truth** 6:13,14

**turn** 92:8

**turned** 52:11

**Twenty-one** 9:21

**two-year** 29:11,13 30:2,19 32:8 34:10 35:22 81:21 95:16

**type** 60:16 80:17 84:14 94:6

**types** 34:13

**typical** 34:14

**Typically** 9:4

---

**U**

**U.S.** 98:1

**ultimate** 28:11 67:22 68:3

**Ultimately** 16:1

**under-describes** 77:24

**undersells** 77:24

**understand** 7:12,16 10:8 14:18 15:8 24:1, 18,25 38:9 52:6 81:8 82:5 90:16

**understanding** 20:16 21:15,24 22:6 25:2 27:14 36:24 47:5 48:22, 24 49:14 53:3,15 59:1 66:11,17 67:18,19,22 86:15

**unearthed** 75:16

**unit** 10:16,17

**unusual** 84:2 88:11

---

**V**

**vacuum** 49:23 61:15 64:23

**vague** 79:18

**valid** 72:23

**validate** 45:8

**valuable** 34:7 38:4 85:4,5

**variance** 72:19

**varied** 75:14

**varies** 11:10

**vary** 14:9

**varying** 82:4

**vast** 46:7

**venues** 9:6

**verb** 77:12

**verbal** 8:5,7 18:10

**verification** 6:3

**versus** 9:9 11:19 15:16 29:17,18 30:17 48:8,16 54:25 55:23 58:9 62:9 68:8,23 73:9

**video** 7:1,2,4

**vie** 66:24

**volume** 73:4,6 81:5 83:16

---

**W**

**wages** 37:1 39:10 89:7

**wake** 53:22

**walk** 60:16

**wanted** 12:13, 25 20:13 35:25 86:3,17

**Watkins** 79:12

**websites** 25:21

**whatnot** 97:15

**win** 62:22 63:2

**winning** 73:17

**wondering** 25:9 97:25

**Woodhaven** 35:11

**word** 41:6

**words** 38:13 49:2

**work** 7:8 9:18 10:20 11:3,19 13:18 14:22,23 15:1,4 22:24 25:15 33:4,10 40:18 62:14 63:15 73:4,8,9,12 79:23 89:16 91:8 97:18

**worked** 13:8 15:15

**working** 12:3 14:6,15,19 17:22 37:14 38:23 62:20 63:25

**works** 8:2 24:24

**world** 63:11

**write** 44:23

**writing** 75:17

**wrong** 83:11

**wrongdoing** 49:18 50:3

---

**X**

**Xpo** 48:1 62:12 84:7,13

---

**Y**

**yard** 55:17

**year** 9:15,16 11:11 13:18 14:6, 11,20,21,24 31:1, 14 34:3 51:21,24 88:21 93:13

**year-to-year** 34:4

**years** 9:19,21, 22 11:11,18 13:12

---

**Z**

**Zoom** 7:4

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy