UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RADIANT GLOBAL LOGISTICS, INC., a
Washington Corporation,                         Case No. 18-12783
                        Plaintiff/Counter-
Defendant,                                      Paul D. Borman
v.                                              United States District Judge

BTX AIR EXPRESS OF DETROIT LLC,                 R. Steven Whalen
a Connecticut limited liability company         United States Magistrate Judge
                        Defendant,
and

CHARLES FURSTENAU, JR., an individual
and Michigan resident
                        Defendant/Counter-Plaintiff.

_____

**OPINION AND ORDER**

**(1) DENYING PLAINTIFF RADIANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO COUNTS II AND IV (ECF No. 118);**

**(2) DENYING DEFENDANT CHARLES FURSTENAU'S MOTION FOR
SUMMARY JUDGMENT AS TO COUNTS II, III, AND VI (ECF No. 124);**

**(3) DENYING DEFENDANT BTX'S MOTION FOR SUMMARY
JUDGMENT AS TO COUNTS III, IV AND V (ECF No. 125)**

I.      **PROCEDURAL HISTORY**

Plaintiff Radiant Global Logistics, Inc., filed a Complaint in this Court on

September 7, 2018 against Defendant Charles Furstenau, Jr., ("Furstenau") the

former Radiant General Manager of their Detroit branch ("Radiant-Detroit"), and

1

Defendant BTX Air Express of Detroit, LLC ("BTX-Detroit"), his new employer. (Complaint, ECF No. 1.)

Radiant's Complaint contains six counts:

I.   Declaratory Judgment
II.  Breach of Fiduciary duty (against Furstenau)
III. Misappropriation of Trade Secrets (against Furstenau and BTX)
IV.  Aiding and Abetting Breach of Fiduciary Duty and Misappropriation of Trade Secrets (against BTX)
V.   Tortious Interference with Contract (against BTX)
VI.  Common Law and Statutory Conversion (against Furstenau)

Plaintiff Radiant filed a motion for preliminary injunction on September 14, 2018. (Motion for Preliminary Injunction, ECF No. 7.) After a two-day evidentiary hearing, this Court granted Plaintiff Radiant's motion for a preliminary injunction. (Preliminary Injunction Order, ECF No. 52.) This Court ordered that Defendant Furstenau and all other former Radiant employees then employed at the new BTX-Detroit office be enjoined for six months from soliciting business from or otherwise contacting customers, carriers, and agents they had worked with at Radiant, as well as enjoined from disclosing or using any Radiant confidential information or trade secrets. (*Id*. at PageID.2746.) BTX's Motion for reconsideration of the Preliminary Injunction Order (ECF No. 54) was denied. (ECF No. 57.) The United States Court of Appeals for the Sixth Circuit denied BTX's motion for a stay of the injunction,

and thereafter, denied its appeal of the injunction, as moot. *See Radiant Glob. Logistics, Inc. v. Furstenau*, 951 F.3d 393 (6th Cir. 2020).

After additional discovery, all three parties party filed summary judgment motions on September 11, 2020. Plaintiff Radiant filed a Motion for Partial Summary Judgment as to Counts II (Breach of Fiduciary Duty against Furstenau) and IV (Aiding and Abetting Breach of Fiduciary Duty against BTX). On that same date, Defendant Furstenau filed a Motion for Summary Judgment on the claims against him for Breach of Fiduciary Duty, Misappropriation of Trade Secrets, and Conversion (ECF No. 124), and Defendant BTX-Detroit filed a Motion for Summary Judgment on the claims against it for Misappropriation of Trade Secrets, Aiding and Abetting Breach of Fiduciary duty and Misappropriation of Trade Secrets, and Tortious Interference with Contract. (ECF No. 125.) On February 9, 2021, the Court held a hearing on those three motions. (ECF No. 168.)

Defendant Charles Furstenau filed a Counter Complaint against Radiant on November 14, 2018, alleging four Counts: I. Breach of Employment Agreement; II. Quantum Meruit, III. Intentional Infliction of Emotional Distress; and IV. Defamation/Defamation per se. (ECF No. 31) Plaintiff/Counter-Defendant Radiant filed a Motion for Summary Judgment on Furstenau's counter-claims on September 11, 2020. (ECF No. 119.) The Counter Complaint is not addressed in this Opinion and Order.

## II.   FACTUAL BACKGROUND
### a.  Radiant's Detroit Location

Plaintiff Radiant Global Logistics is a third party logistics and supply chain management company in the freight brokerage industry. (Complaint ¶12, ECF No. 1.) Radiant provides transportation and logistics services – freight forwarding services – to companies in the consumer goods, food and beverage, manufacturing, and retail sectors. (*Id*. at ¶13.) Radiant has numerous store locations (offices or stations) around the country, including 16 company-owned stores and over one hundred independently franchised locations. (Deposition of Tim O'Brien, Vice President of Radiant Company Stores, Oct. 19, 2018, 18:1-12, ECF No. 36-3, PageID 1688.) Radiant's Detroit location where Furstenau served as the General Manager and "Director of Automotive Operations," was a company-owned store primarily serving the automotive industry.

Beginning in 1994, Defendant Charles Furstenau was employed in the third-party logistics industry by United American and continued employment after it was acquired by the freight brokerage company Stonepath in 2002. (Prelim. Inj. Hr'g, Tim O'Brien Test. 55:3-19, ECF No. 43 PageID 2032.) Plaintiff Radiant purchased Stonepath's assets in 2005 and asked Furstenau to stay on with Radiant-Detroit as the General Manager. (*Id*.) Furstenau was the highest ranking employee and sole manager at Radiant-Detroit. (Prelim. Inj. Hr'g, Chad Furstenau Test. 134:23-135:5, ECF No. 43 PageID 2111-12.) He reported to Tim O'Brien, Radiant's Vice President

4

of Company Stores, who is "responsible for the company-owned offices of Radiant

Global throughout the United States." (O'Brien Dep. 7:15-17, ECF No. 36-3,

PageID.1677.)

During his tenure with Radiant, Furstenau never signed a non-compete or non-

solicitation contract. (Prelim. Inj. Hr'g, O'Brien Test. 95:14-23, ECF No. 43.) In

May 2018, when presented with a non-compete contract by Radiant, Furstenau

refused to sign it. (*Id*. at 95:24-25, 96:1-2, PageID.2072-73; Email Bento to

Furstenau, ECF No. 145-19 PageID.13518-20.) However, Furstenau had previously

signed an acknowledgment of, and agreement to abide by Radiant's Code of Ethics,

which included the following "Conflicts of Interest" and "Confidentiality"

provisions:

> **CONFIDENTIALITY**
>
> Directors, officers and employees should maintain the confidentiality of information entrusted to them by [Radiant] and any other confidential information about [Radiant], its business, customers or suppliers, from whatever source, except when disclosure is authorized….For the purposes of this Code, "confidential information" includes all non-public information relating to [Radiant], its business, customers or suppliers.
>
> ****
>
> **CONFLICTS OF INTEREST**
>
> Employees must not use their position or knowledge gained as a result of their position for private or personal advantage or for improper benefits. No one should also

5

engage in other duties, responsibilities or obligations that run counter to his or her duty to [Radiant].

Any employee involved in a conflict of interest or a transaction or relationship that reasonably could be expected to give rise to conflict, must report the matter promptly to the employee's management. Any officer or director in such situations must make reports to the Board of Directors or a designated Board committee.

(Code of Ethics, ECF No. 68-3 PageID.3068; Furstenau Acknowledgement, ECF No. 70-10 PageID.3332.)

Furstenau also had signed an acknowledgment of receiving Radiant's Employee Handbook ("Handbook") (Furstenau Handbook Acknowledgement, ECF No. 70-7 PageID.3321), which contained a "Computer, Internet & Software Policy" ("Computer Policy") (ECF No. 68-2 PageID.3065) The Computer Policy required employees to:

[k]eep confidential all [Radiant] data and all information provided to [Radiant] by other entities….Each user is bound by obligation not to disclose Radiant Logistics' business information unless authorized to do so. Breach of confidentiality through accidental or negligent disclosure may expose User to disciplinary action.

(*Id*.) The acknowledgment page states that the Handbook "is intended to provide general information about the policies, benefits, and regulations governing the employees of the Company" and is an "overview." (ECF No. 70-7 PageID.3321.)

Defendant Furstenau testified that he became increasingly disenchanted with Radiant over compensation and bonus issues and Radiant's attempt to implement a new transportation management software system—SAP. (Dep. of Charles Furstenau, Oct. 16, 2018, 58:23-59:20, ECF No. 36-2 PageID 1547-48; Email Re: Bonus Plan, Aug. 22, 2020, ECF No. 121-7 PageID.6580.) Furstenau discussed his concerns about the software systems with Radiant's Tim O'Brien and Joe Bento, Radiant's chief operating officer. (Furstenau Dep.  62:21-63:4, ECF No.36-2, PageID 1550-51.) The parties agree that there was a contentious call regarding the SAP system in January 2018 between Furstenau and high-ranking Radiant Executives. (Deposition of Bohn Crain, CEO of Radiant Global Logistics, at 204:20-205:8; O'Brien Dep. at 12:19-13:9.)

Shortly after the contentious phone call between Furstenau and Radiant executives, Radiant CEO Bohn Crain set up an "email synchronization" process whereby he could access and monitor Furstenau's Radiant email. (Email Synchronization Jan. 18, 2018, ECF No. 124-2 PageID.6868.) There is no evidence that Crain ever personally accessed or monitored Furstenau's email. Furstenau was excluded from future Radiant conference calls regarding the SAP system rollout, after the January call. (Deposition of Mark Rowe, Radiant Chief Technology Officer, 77:9-79:25). At this time that Furstenau began forwarding emails from his

Radiant email account to his personal Comcast email account, in violation of the Radiant "Confidentiality" and "Computer" policies.

Furstenau terminated his employment with Radiant on Friday evening, August 24, 2018, and opened a new BTX-Detroit office as its manager on the next business day, Monday, August 27, 2018. (Resignation Email, ECF No. 68-4 PageID.3073.) Furstenau brought to BTX-Detroit five key Radiant-Detroit office employees, two on that Monday, and two others soon thereafter. (Prelim. Inj. Hr'g, Furstenau Test. 141:21-142:20, ECF No. 43 PageID 2018-19.) Present at the new BTX-Detroit office on Monday morning, August 27, 2018, were Angela "Angie" Dupree and Chris Higgins, who had resigned from Radiant on Sunday, August 26, 2018. (*Id*.) Three other Radiant employees, two in Detroit – Liana Renteria and Kari Piper, and Ben Watkins, who was embedded in Memphis at Radiant client George P. Johnson Co., resigned from Radiant and joined BTX-Detroit shortly thereafter. (*Id*. at 81:8-15.) Watkins was the only exiting Radiant employee who had executed a non-competition/non-solicitation agreement. (Watkins Non-compete, ECF No. 69-22 PageID.1357-58; ECF No. 125 PageID.7099.) Because Watkins had signed a non-compete/non-solicit contract, BTX arranged for him to become an employee of George P. Johnson rather than BTX. Radiant contends that Higgins, Dupree, Renteria, and Piper all perform the same job functions for BTX-Detroit as they did for Radiant (as does Watkins for George P. Johnson).

**B.     Formation of BTX-Detroit**

From 2003 to 2005, BTX Global had serviced the Detroit market through a Detroit office. (Dep. of Rosario (Ross) Bacarella, CEO of BTX Global, Oct. 18, 2018, 9:4-11, ECF No. 36-1, PageID 1349.) From 2005 through August 27, 2018, BTX did not have a Detroit office location.

Defendant Furstenau had initially contacted BTX CEO Ross Bacarella in mid-February 2018, expressing his interest in opening an independent BTX office location in Detroit. (Prelim. Inj. Hr'g, Furstenau Test. 153:7-154:12, ECF No. 43 PageID.2130-31.) In an email exchange with Bacarella during February 2018, Furstenau confirms that he can meet the BTX "criteria" for a BTX-Detroit store: a sales/operations team that would produce $3 million in annual gross revenue. (ECF No. 69-30 PageID.3229-37.) Furstenau testified, and the evidence shows, that he continued communicating back-and-forth with Bacarella from February through Friday, August 24, 2018, the date of his late-night resignation from Radiant. (Prelim. Inj. Hr'g, Furstenau Test. 142:11-15, ECF No. 43 PageID.2119.)

On June 3, 2018, Furstenau created and sent a pro-forma budget for a Detroit BTX office, including employee pay rates, to BTX CFO, Martin Capuano (ECF No. 45 PageID.2289 PI Hr'g Bacarella Test., 53.) Capuano responded, confirming that Furstenau "would have a full staff" and "would be able to bring all the revenues in

the first month," making "the station budget very profitable[.]" (ECF No. 70-14 PageID.3368.)

Following these discussions and agreements, BTX proceeded, with Furstenau's assistance, to lease a location for the new BTX-Detroit station, consistent with Furstenau's agreement with BTX. (ECF No. 70-1 PageID.3247-48.) Thus, while still employed as Radiant's General Manager, Furstenau worked with Bacarella to locate and set up the facility for BTX-Detroit. (Prelim. Inj. Hr'g Bacarella Test., 54, ECF No. 45 PageID.2290) On July 19, 2018, Furstenau, and Bacarella, who had travelled to Detroit, did a walkthrough of the facility and had four vendors view the space and provide pricing. (Joint Ex. 61, ECF No. 70-6, PageID 3320.) Furstenau also installed Formica countertops and selected carpeting. (Furstenau Dep., 79, ECF No. 36-2 PageID 1567; Prelim. Inj. Hr'g, Bacarella Test., 55-56, ECF No. 45 PageID 2291-92.)

On August 14, 2018, while still employed at Radiant, Furstenau sent Bacarella a list of his Radiant "travel team," names of his Radiant employees coming to BTX, who would need computers at BTX-Detroit immediately when it opened up. Those listed Radiant employees that would soon join Furstenau at BTX were: Chad Furstenau, Kari Piper, Liana Renteria, Angie Dupree, Chris Higgins, and Ben Watkins (customer location.) (ECF No. 69-29 PageID.3228.) In that same email, Furstenau also inquired about benefits for the soon-to-be BTX employees, telling

Bacarella, "some folks were inquiring on a 401(k)[.] can you provide any information?" (*Id*.) In his testimony at the preliminary injunction hearing, Furstenau stated that "some folks" just meant him. (Prelim. Inj. Hr'g Furstenau Test. 162:2-163:22, ECF No. 43 PageID.2140.) Bacarella's testimony at that hearing echoed Furstenau: "some folks" "[c]ould mean himself." (Prelim. Inj. Hr'g Bacarella Test. 72:1-2, ECF No. 45 PageID.2308.)

In early July 2018, while still employed at Radiant, Bacarella provided Furstenau with a BTX-issued cell phone. Furstenau had numerous communications on that phone with BTX, and also with his Radiant "travel team." On July 10, Furstenau sent a text message to Dupree telling her to call him on this phone "to discuss August." (Furstenau BTX Phone Text Message Records, ECF No. 120-4 PageID.6336.) On July 12, Furstenau texted Piper and Higgins, identifying himself and his new phone number. (*Id*. PageID. 6337, 6340) On July 19, he texted Dupree the address for BTX-Detroit's new location. (*Id*. PageID.6343.) On August 18, the week before his resignation, Furstenau sent messages to Dupree, Higgins, Piper and Renteria scheduling a meeting with them at BTX's new Detroit address. Per his direction, most of those Radiant employees met with him at the new BTX office location. Furstenau maintains that there was no discussion of BTX at this meeting. (Furstenau Dep. 105:1-111:14, ECF No. 120-6 PageID.6426-28.) Apparently, there was no need to discuss the reality that this was their new BTX office.

Furstenau emailed his resignation to Radiant on the night of Friday August 24, 2018, and commenced contacting Radiant clients and suppliers on behalf of BTX-Detroit.  (ECF No. 68-8 PageID.3080-3100; Furstenau Dep. 98:15-24, ECF No. 36-2, PageID 1586.) On Sunday, August 26, the day Higgins resigned from Radiant, he texted Furstenau "headed there now" and then sent Furstenau messages containing seven email addresses of contacts for four Radiant customers. (*Id.*, PageID.6358-64.) The BTX-Detroit location headed by Furstenau officially commenced operations on the morning of Monday, August 27, 2018. As noted, two long-time Radiant employees – Chris Higgins and Angela Dupree – who had submitted their resignations to Radiant on Sunday, August 26, 2018 and joined Furstenau as BTX-Detroit employees the next morning. (Furstenau Dep. 72:16-21, ECF No. 36-2, PageID.1558.)

## C. Furstenau's Emails to his Personal Comcast Account

Throughout the January to August 2018 period, prior to Furstenau's departure from Radiant, Furstenau forwarded approximately 300 emails from his Radiant account to his personal Comcast Account. (Prelim. Inj. Hr'g, Furstenau Test. 143:4-7, ECF No. 43 PageID 2120.) This violated Radiant's Confidentiality and Computer policies that Furstenau had acknowledged signing. Those emails reportedly included Radiant financial forecasts, budgets, profit and loss statements, profit margin data, customer lists, customer reports detailing activity and profitability, salaries of the

Radiant employees, agent/carrier lists, and some personal emails. (*Id.*, Prelim. Inj. Hr'g O'Brien Test. 17:9-16. ETC No. 43 PageID.1994).

BTX presented a forensic report performed by its expert, Scott Polus, that examined Furstenau's personal laptop, the BTX-issued laptop, Furstenau's Samsung smartphone, and Furstenau's Comcast email account. (Expert Report of Scott Polus, ECF No. 133.) BTX contends that this analysis revealed that no relevant emails or files had been opened or viewed on Furstenau's devices. (*Id.*, PageID.12948.) The Polus report also stated that of the 217 messages in Furstenau's Comcast account that originated from Furstenau's Radiant account, only 7 had been opened, and all 7 appear to be personal in nature. (*Id.* at PageID.12945.) However, on cross-examination at his deposition, Polus acknowledged significant limitations on his Report's conclusion that these messages were never viewed by Furstenau. [1] (Deposition of Scott Polus, 47:2-58:17, ECF No. 131-5 PageID.11150.)

---

[1] When asked whether "Anyone with his password could access his Comcast account form any computer anywhere in the world so long as they have Internet access; is that accurate?" Polus responded, "Yes." (Polus Dep. 31:18-24, ECF No. 131-5.)

When asked whether he had "no evidence or facts that one way other whether or not Mr. Furstenau employed the read/unread functionality in his Comcast account?" Polus responded, "Correct." (Polus Dep. 50:25-51:4.)

When asked whether he had an opinion "whether Mr. Furstenau has downloaded the attachments to those Radiant e-mails to any other device at any other point in time?" Polus responded, "Outside of the two computers we examined? No." (*Id.*, at 56:7-12.)

When asked "And so this sentence, over 96 percent of the Radiant e-mails were never opened, you can't say that that's actually true; is that fair?" Polus responded, "Yeah, that's fair." (*Id.*, at 52:22-25.)

## I.     Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment, the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). Where the moving party bears the ultimate burden of persuasion at trial, "the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Cockrell v. Shelby County School Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (quoting 11 James William Moore et al., Moore's Federal Practice § 56.13[1], at 56-138 (3d ed. 2000)).

In reviewing a motion for summary judgment this Court cannot weigh the evidence, make credibility determinations, or resolve material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013); *see Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986) (stating that on a motion for summary judgment "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). "Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569-70 (6th Cir. 2012) (citing *Matsushita*, 475 U.S. at 587; *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). Nevertheless, the mere existence of a scintilla of evidence in support of the nonmovant's position is not sufficient to create a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 252. The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## II.   Analysis

### a.  Count II – Breach of Fiduciary Duty Against Furstenau

Both Plaintiff Radiant and Defendant Furstenau move for Summary Judgment on the Breach of Fiduciary Duty alleged against Furstenau. According to Radiant, as General Manager, "Director of Automotive Operations," and the senior-most person in the Detroit facility, Furstenau was a fiduciary of Radiant. Furstenau "had access to all the facility's confidential information; oversaw all the employees, customer relations and sales initiative; tracked revenues and costs; and implemented

corporate initiatives." (Plaintiff's Motion for Summary Judgment, ECF No. 118 PageID. 6045-46.) Radiant then argues that Furstenau breached that duty by "serving two masters" during his last months at Radiant, by recruiting Radiant employees during his employment at Radiant to join him at BTX, and by taking "Radiant's confidential, trade secret information relating to its customers and operations to use at BTX Detroit." (ECF No. 118, PageID.6047.)  Furstenau, on the other hand, argues first that under the Michigan Uniform Trade Secrets Act ("MUTSA"), the Misappropriation of Trade Secrets claim preempts the Breach of Fiduciary Duty claim, and further, that should the claim go forward, that he did not owe Radiant a fiduciary duty. This issue of whether Furstenau was at an employment level that created a fiduciary is a key contested issue between the parties.

"The elements of a [breach of] fiduciary duty claim are (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) proximately causing damages." *Delphi Auto. PLC v. Absmeier*, 167 F. Supp. 3d 868, 884 (E.D. Mich. 2016) (citation omitted).  "Under Michigan law, 'a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another.' " *Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 765–66 (6th Cir. 2012) (quoting *Teadt v. Lutheran Church Mo. Synod*, 237 Mich. App. 567, 580–81, 603 N.W.2d 816 (1999)). A fiduciary has a duty to act for the benefit of the principal

regarding matters within the scope of the relationship. *Id*. at 766. Courts determine

whether a fiduciary duty exists. *Id*.

### i. MUTSA Preemption

Defendant Furstenau argues that the Michigan Uniform Trade Secrets

Act, Mich. Comp. Laws § 445.1901 *et seq.,* displaces the breach of fiduciary duty

claim. Plaintiff Radiant contends that the breach of fiduciary duty claim is not based

factually or legally on Furstenau's misappropriation of trade secrets and should not

be displaced.

Section 8 of the Act states:

> (1) Except as provided in subsection (2), this act displaces
> conflicting tort, restitutionary, and other law of this state
> providing civil remedies for misappropriation of a trade
> secret.
> (2) This act does not affect any of the following:
>> (a) Contractual remedies, whether or not based upon
>> misappropriation of a trade secret.
>> (b) Other civil remedies that are not based upon
>> misappropriation of a trade secret.
>> (c) Criminal remedies, whether or not based upon
>> misappropriation of a trade secret.

Mich. Comp. Laws § 445.1908.

"The critical inquiry for courts in determining whether a claim is displaced by

the MUTSA is whether the claim in question is based solely on the misappropriation

of a trade secret." *American Furukawa v. Hossain,* 103 F. Supp. 3d 864, 884 (E.D.

Mich. 2015). If a claim is based solely upon the misappropriation of a trade secret,

MUTSA displaces it, and it must be dismissed. *Id.* On the other hand, causes of

action that are not dependent on trade secrets are not displaced. *Id.* In determining

whether the MUTSA displaces a specific claim, the Court will look at the allegations

in the complaint to determine if the claim states any "wrongful conduct independent

of the misappropriation of trade secrets." *See Bliss Clearing Niagara, Inc. v.*

*Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 950 (W.D. Mich. 2003); *Konica*

*Minolta Bus. Sols., U.S.A., Inc. v. Lowery Corp.*, No. 15-11254, 2016 WL 6828472,

at \*4 (E.D. Mich. 2016).

 The allegations contained in Radiant's Complaint demonstrate that while the

factual bases between these claims may overlap, the breach of fiduciary duty claim

is not based *solely* on the misappropriation claim. *See American Furukawa*, 103 F.

Supp. 3d at 884. As Radiant argues, "Radiant's breach of fiduciary duty claim is

based on Furstenau concealing his serving two masters . . . [and] based upon the acts

associated with Furstenau conspiring with a direct competitor to form, staff and

launch a competing business during the seven month period before he resigned from

Radiant." (ECF No. 151 PageID.14023) (emphasis omitted).

 To the extent that Radiant's Breach of Fiduciary Duty claim rests upon the

misappropriation of trade secrets, the claim is preempted; however, to the extent the

Breach of Fiduciary duty claim rests upon other grounds found within the allegations

in the Complaint, notably the recruitment of fellow Radiant employees and

interactions with BTX, they will be considered under breach of fiduciary duty. *See*

*Lube USA Inc. v. Michigan Mfrs. Serv. Inc.,* No. 07-CV-14284, 2009 WL 2777332, at *9 (E.D. Mich. 2009); see also *Wysong Corp. v. M.I. Indus.,* 412 F.Supp.2d 612, 623–24 (E.D. Mich. 2005) ("A claim for breach of fiduciary duty and breach of duty of loyalty is really the opposite of a misappropriation claim in that it is the agent or employee that withholds information or conceals activity of his own when the relationship gives rise to a duty to disclose, whereas the essence of a misappropriation claim is the theft of the employer's information."); *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 753 (E.D. Mich. 2014) (citing the above language from *Wysong* to underlie the finding that the claim for breach of fiduciary duty, which concerned competition, was separate from claims concerning trade secrets).

## ii.  Existence of Fiduciary Duty

"The general rule is that the employer-employee relationship does not give rise to a fiduciary relationship unless the employee is a high-level employee, or if there is a specific agency relationship." *Stryker Corp. v. Ridgeway*, No. 1:13-CV-1066, 2015 WL 8759220, at *3 (W.D. Mich. 2015); *See also Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.*, No. 1:10–CV–450, 2012 WL 2524008, at *11 (W.D. Mich. 2012) (interpreting "high-level employees" to include corporate officers and members of corporate boards of directors and determining that all employees do not owe their employer a fiduciary duty). A fiduciary relationship may arise in one of

the following situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, [or] (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship. *Mike Vaughn Custom Sports, Inc.,* 15 F.Supp.3d at 753. Courts have traditionally recognized the following as fiduciary relationships: trustees to beneficiaries, guardians to wards, attorneys to clients, and doctors to patients. *See, e.g., Ford Motor Co. v. Ghreiwati Auto*, 945 F.Supp.2d 851, 865 (E.D. Mich. 2013).

When a particular relationship falls outside of these well-defined examples, determining whether it amounts to a fiduciary relationship is a question of fact. *Id.* Because there is no rule in the Sixth Circuit that a particular relationship could never impose fiduciary obligations, the Court must look to the actual relationship that existed between the parties. *Fremont Reorganizing Corp. v. Duke*, 811 F.Supp.2d 1323, 1345 (E.D. Mich. 2011); *see also Muglia v. Kaumagraph Corp*., 64 F.3d 663, 1995 WL 492933, at *5 (6th Cir. 1995) (table) ("Except for certain per se fiduciary relationships ... fiduciary relationships arise from the facts and circumstances surrounding the relationship between the parties."). "[T]he inquiry as to whether a fiduciary relationship exists is fact-specific" *Ajuba Int'l, L.L.C. v. Saharia*, 871 F.Supp.2d 671, 688 (E.D. Mich. 2012).

Furstenau argues that the record, now fully developed, shows Radiant is overstating his responsibilities as the General Manager of "1 of 100 or more Radiant Stations." Furstenau also argues that he did not have ultimate responsibility for the Detroit station's performance with Radiant corporate, as that responsibility laid with Tim O'Brien. (O'Brien Dep. 9:12-10:24, ECF No. 36-3 PageID.1680.) O'Brien confirmed in his preliminary injunction hearing testimony that Furstenau was "not privy" to corporate matters beyond Radiant-Detroit and is not ultimately responsible for overall financial performance. (O'Brien Prelim. Inj. Hr'g Test. 59:17–61:11, ECF No. 43.) Radiant's CEO Bohn Crain testified that Furstenau's responsibility was limited to his station, was unaware of Furstenau's title as "Director of Automotive Operations," and noted that it was likely "more marketing oriented than responsibility oriented." (Crain Dep. 78:19-79:11, ECF No. 131-1.) Radiant's expert noted that Detroit represented 1% of the overall revenues of Radiant. (Sargent Dep. at 35:1-14, ECF No. 116-11 PageID.5319.)

Radiant acknowledges that all employees at Radiant-Detroit had access to some of its confidential information. (Plaintiff's Response to BTX's Motion for Summary Judgment, ECF No. 143 PageID.13286.) The record is less clear on which Radiant employees had access to what confidential information. Tim O'Brien testified that station level employees such has Chris Higgins or Angie Dupree would not have access to confidential information (O'Brien Dep. 66:16-67:9, ECF No. 36-

3), while Bohn Crain testified that station-level employees like Chris Higgins or Angie Dupree would have access to certain confidential information such as historical volumes and shipping patterns, but would not have access to all confidential information. (Crain Dep. 178:15-179:22; ECF No. 131-1.) However, Crain testified that only station managers were entitled to have access to station-level budgets, profit and loss statements, and forecasts. (Id., at 184-185.)

Radiant points to several cases from Federal courts in Michigan showing that employees who are agents of the employer may owe a fiduciary duty. *See American Furukawa, Inc. v. Isthihar Hossain, HT Wire & Cable Americas, LLC*, No. 14-CV-13633, 2016 WL 3444079, at *6 (E.D. Mich. 2016) (finding an employee "senior production manager" owed a fiduciary duty to employer as a result of agency relationship, but ultimately denied summary judgment to plaintiff on breach); *Stryker Corp. v. Ridgeway*, No. 1:13-CV-1066, 2015 WL 8759220, at *5 (W.D. Mich. 2015) (finding an outstanding question of material fact on whether a sales representative owed a fiduciary duty, where the sales representative cultivated client relationships, recruited and trained new sales representatives and "acted as the face" of the company to clients, despite "little evidence in support of [employee's] assertion that he did not owe . . . a fiduciary duty" and evidence of an agency relationship); *Nedschroef Detroit Corp. v. Bemas Enterprises LLC*, 106 F. Supp. 3d 874, 883 (E.D. Mich. 2015), aff'd, 646 F. App'x 418 (6th Cir. 2016) (employees in

question were agents and therefore owed a fiduciary duty). Radiant makes no specific argument that Furstenau was acting as an agent of Radiant.

In response, Furstenau cites to *Dana Ltd. v. Am. Axle & Mfg. Holdings,* where the court granted summary judgment to mid-level employee defendants, holding that they were not fiduciaries, as there was no "evidence that they were high level executives or key designers of the company's strategic plans and operations," nor was there evidence of an agency relationship. 2012 WL 2524008, at *12 (W.D. Mich. 2012). The employees in question had job titles of "Product Engineer II," and "Chief Engineer," and had some access to confidential information. *Id.* at *11. While Furstenau appears to have a higher-level role in Radiant's operations than the defendants in *Dana Ltd*, it is a question for the trial whether Furstenau, as Radiant-Detroit's station manager, owed a fiduciary duty to Radiant.

In May 2018, Radiant executives presented Furstenau with a non-compete agreement, which he refused to sign. Tim O'Brien testified that he had met with job candidates to work at the Detroit office. (O'Brien Dep. 54:2-11, ECF No. 131-2 PageID.10648.) Radiant CEO Bohn Crain admitted that when Furstenau and his "travel team" departed, Radiant had been caught, "flat footed" despite the departure being a "long time coming." (ECF No. 124-2 PageID.6883.)

The record provides evidence that could convince reasonable jurors that Furstenau, as General Manager of Radiant-Detroit, owed Radiant a fiduciary duty.

However, given that "fiduciary relationships are the exception rather than the rule in employer-employee relationships," that evidence is not so strong that no reasonable juror could disbelieve it. *Stryker*, 2015 WL 8759220, at *5. Thus, while there is significant evidence of a breach of a fiduciary relationship, there remain outstanding questions of material fact as to whether Furstenau owed Radiant a fiduciary duty. Summary judgment in favor of Radiant on the Breach of Fiduciary Duty claim is DENIED.

### iii.  Breach and Proximate Cause

Given the MUTSA's displacement of any claims relating to misappropriation of trade secrets, any breach of fiduciary duty that arises from those claims relating to trade secrets will be considered under that claim. The alleged breach therefore revolves around the claim of Furstenau's "serving two masters" while employed by Radiant and his solicitation of his key subordinates to defect from Radiant *en masse* to join him at BTX. Radiant argues that Furstenau breached his fiduciary duty by working with BTX CEO Bacarella and using a BTX-provided cell phone to set up BTX-Detroit and staff it with a Radiant "travel team" to create a BTX-Detroit location while still employed at Radiant. (*See* Text Messages with Radiant co-workers, ECF No. 120-4 PageID.6336-65.) Furstenau's main argument concerning breach is that his actions constitute his mere "preparations to leave."

A fiduciary has a duty to act for the benefit of the principal regarding matters within the scope of the relationship. *Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 766 (6th Cir.2012). Post-employment, a former employee is free to compete with former employer using his general skills and knowledge, but he may not use former employer's trade secrets. *Hayes–Albion,* 421 Mich. at 180, 364 N.W.2d 609 (citing Glucol *Mfg. Co. v. Schulist,* 239 Mich. 70, 74, 214 N.W. 152 (1927)). It is often asserted that employer cannot maintain a claim for post-employment breach of fiduciary duty based on solicitation of former clients unless the parties had executed an appropriate non competition agreement. *Id.* (citing *McKesson Med.—Surgical Inc. v. Micro Bio-Medics, Inc.,* 266 F.Supp.2d 590 (E.D.Mich.2003)); *Creelgroup v. Brieden,* No. 09-12493, 2010 WL 3023815, at *3 (E.D. Mich. 2010). The instant case expands that inquiry into the impact of the Radiant "Confidentiality" and "Computer" policies during his Radiant employment.

In *Chem–Trend, Inc. v. McCarthy,* the court found egregious behavior that demonstrated a breach of fiduciary duty. 780 F.Supp. 458, 461 (E.D. Mich. 1991). The defendant manufactured competitive products, marketed those products exclusively to the employer's existing clients, and actually consummated bulk scale sales several weeks before the left the company. *Id.* In comparison, the defendant in *Raymond James* waited until he resigned before competing with his former employer and did not use information entrusted to him or made by him for use in the

25

principal's business, thus there was no breach of fiduciary duty. *Raymond James,* 411 F.Supp.2d 689, 700 (E.D. Mich. 2006); *Creelgroup v. Brieden*, No. 09-12493, 2010 WL 3023815, at *3 (E.D. Mich. 2010).

Regarding preparations to compete, Michigan courts have found that "[p]reparations, of themselves, do not support a breach of fiduciary duty . . . given "the public policy of Michigan ... of protecting and encouraging the right of the individual to pursue his livelihood in the vocation he chooses, including the right to migrate from one job to another." *Raymond James*, 411 F. Supp. 2d at 700 quoting *Hayes–Albion,* 421 Mich. at 188. Regarding solicitation of co-workers or subordinates, courts outside of Michigan have held that "a managerial employee may breach his fiduciary duty if, during the course of his employment, he solicits the departure of his subordinates." *Hedgeye Risk Mgmt., LLC v. Heldman*, 412 F. Supp. 3d 15, 30 (D.D.C. 2019). Whether soliciting employees to join a competing enterprise goes beyond mere "preparations to compete" is a fact-intensive question not easily resolved at summary judgment. *See Cent. States Indus. Supply, Inc. v. McCullough*, 279 F. Supp. 2d 1005, 1044 (N.D. Iowa 2003) ("whether or not a departing employee accused of soliciting employees merely presented his colleagues with an opportunity for employment elsewhere, or crossed the line into "solicitation" in violation of a fiduciary duty, is a fact question that is generally for the jury to decide.")

26

While it is undisputed that Furstenau did not directly compete with Radiant, or solicit customers for BTX while employed with Radiant, the evidence leaves disputed questions of material fact regarding the extent of Furstenau's pre-resignation contacts/solicitation of his Radiant "travel team," his use of his BTX-provided cell phone, and the impact of his alleged breaches of his fiduciary duty to Radiant. Viewed in a light most favorably to Radiant, the non-moving party on Defendants' motions, the numerous communications and contact between Furstenau and his Radiant co-workers, viewed alongside his numerous communications with BTX, indicate that a reasonable juror could find that Furstenau went beyond mere preparations to compete and violated his fiduciary duty to Radiant.

Questions of material fact remain on each element of Breach of Fiduciary Duty. Accordingly, both Radiant and Furstenau are DENIED summary judgment on Breach, or not, of Fiduciary Duty.

### b. Count III - Misappropriation of Trade Secrets

Defendants BTX and Furstenau have both moved for summary judgment on Count III of the Complaint for Misappropriation of Trade Secrets. Radiant, who holds the burden of proof, and does not move for summary judgment on this count, alleges that Furstenau stole trade secrets from Radiant and used those trade secrets to set up the BTX-Detroit office and immediately secure customers. Radiant identifies roughly 300 emails forwarded by Furstenau to a personal email address,

alleging that these emails contain the "customer solutions" that make up Radiant's trade secrets, and were used by Furstenau and BTX to gain a competitive advantage over Radiant. Furstenau and BTX argue that the emails and "customer solutions" found within are not trade secrets as defined by MUTSA, were not used by Furstenau or BTX, and there are no proximately caused damages.

The MUTSA defines a "trade secret" as information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902. Michigan courts use the following factors to determine if information is a trade secret:

> (1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owner and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.

*Compuware Corp. v. Serena Software Int'l, Inc.,* 77 F.Supp.2d 816, 820 (E.D. Mich. 1999); *see also Hayes–Albion v. Kuberski,* 421 Mich. 170, 182, 364 N.W.2d 609, 614 (1984). Under Michigan law, "[t]o be a trade secret, the information must, of necessity, be a Secret." *Kubik, Inc. v. Hull,* 56 Mich.App. 335, 347, 224 N.W.2d 80, 87 (1974); *see* Mich. Comp. Laws § 445.1902. Trade secrets do not "encompass information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty or hardship." *Kubik, Inc.,* 56 Mich. App. at 348, 224 N.W.2d at 87; *see* Mich. Comp. Laws § 445.1902(d)(i).

"Sufficient measures" taken to protect the secrecy of such confidential information have been found to include

> either an express agreement between the employer and employee restricting or prohibiting disclosure by the latter to third parties; a disclosure by employer to employee in confidence or with a tacit understanding, inferable from the attendant circumstances, that the information is confidential; or security precautions utilized by the employer to insure that only a limited number of authorized individuals have access to the information.

*Kubik,* 56 Mich.App. at 347–348, 224 N.W.2d at 87 (1974).

Under the MUTSA, "misappropriation" is defined as:

> (i)   Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[; or]

29

    (ii)    Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

        (A) Used improper means to acquire knowledge of the trade secret.

        (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.
        (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.
Mich. Comp. Laws § 445.1902(b).

A Court in this District articulated the elements as: (1) the existence of a trade secret; (2) its acquisition in confidence; and (3) the defendant's unauthorized use of it. *Elec. Planroom, Inc. v. McGraw-Hill Companies, Inc.,* 135 F. Supp. 2d 805, 818 (E.D. Mich. 2001) citing *Aerospace America, Inc. v. Abatement Technologies, Inc.,* 738 F.Supp. 1061, 1069 (E.D. Mich. 1990).

**a.  Existence of Protectable Trade Secret**

Radiant argues that the trade secrets misappropriated by Furstenau and BTX are Radiant's "customer solutions," and that Furstenau forwarded emails to himself in the form of spreadsheets and other documents containing that information. (ECF

No. 143 PageID.13296.) Radiant defines "customer solutions" in their Motion for

Summary Judgment as:

> Radiant's proprietary operational practices of crafting
> carrier, routing and pricing solutions for customers which
> was based on many years of accumulating the historical
> volumes and shipping patterns of particular customers,
> identifying carriers/suppliers who can provide optimal
> routing, negotiating pricing with those preferred
> carriers/suppliers and configuring/combining loads,
> routing, carriers, and pricing so that the customer is
> provided an optimal transportation solution

(ECF No. 146 PageID.13670 n.1.)

The emails Furstenau forwarded to himself included "Radiant financial

forecasts, budgets, profit and loss statements, profit margin data, customer lists,

customer reports detailing activity and profitability, salaries of the Radiant

employees, agent/carrier lists, and some personal emails." (Prelim Inj. Order ECF

No. 52 PageID.2722.) One such email sent by Furstenau to his Comcast account was

a compilation of agents used by Radiant: a massive agent list over 45 pages in length

listing agent names, state locations, phone numbers, fax numbers, account user ID

and passwords. (Joint Ex. No. 47; ECF No. 69-23 PageID.3159-3205.)  Much of this

information, which goes beyond simple customer lists, is generally protectable as a

trade secret. "[A]n employer's pricing schemes, the details of its customer contacts,

its markups, [and] employee information" are examples of possible trade secrets

under MUTSA. *PrimePay, LLC v. Barnes*, 2015 WL 2405702, at *22 (E.D. Mich.

2015) (Borman, J.); *See also Am. Furukawa, Inc. v. Hossain*, No. 14-13633, 2017

WL 4324945, at *5 (E.D. Mich. Sept. 29, 2017) ("A trade secret may consist of a compilation of information, even if it is compiled from outside sources available to other persons.") !

Defendant Furstenau presents evidence calling into question whether "customer solutions" can be protected as a trade secret, pointing to Radiant executives' sometimes broad and varying definitions of customer solutions and references to certain employee knowledge, which is not protected as a trade secret, and cannot be protected by a confidentiality agreement. *See e.g.*, *United Rentals (N. Am.), Inc. v. Keizer*, 202 F. Supp. 2d 727, 741 (W.D. Mich. 2002), aff'd, 355 F.3d 399 (6th Cir. 2004) ("It is black letter law that confidential information does not include "general knowledge, skill, or facility acquired through training or experience while working for an employer ...." (citation omitted)). Furstenau also argues that the type of information allegedly stolen and used to set up BTX-Detroit, including historical pricing data, customer lists, vendor information, and other spreadsheets, ignores how business is actually conducted in the freight logistics industry and would not be useful to a competitor. Defendants cite to the testimony of Bill Sims, the new Radiant-Detroit office manager, who described setting margins and winning business as a "continuing evolving process," and that the industry as a whole follows the same guidelines in quoting and setting margins. (Bill Sims Dep. 120:19-122:23; ECF No. 131-11.) Furstenau also points to Tim O'Brien's admission that Radiant's

information would not be used to win bid-board business and winning bids on bid board relies on "skill." (O'Brien Dep. 109:2-113:10, ECF No. 131-2.) Bid board business was where Radiant saw the largest decrease in business following Furstenau's departure. (*Id*. at 120:22-25.)

Furstenau and BTX also challenge Radiant's assertion that this alleged confidential information was sufficiently protected, as required to qualify as a trade secret under MUTSA. Mich. Comp. Laws § 445.1902 (to qualify as trade secret, the information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy.") "Sufficient measures" to protect trade secrets under MUTSA have been found in "either an express agreement between the employer and employee restricting or prohibiting disclosure by the latter to third parties; a disclosure by employer to employee in confidence or with a tacit understanding, inferable from the attendant circumstances, that the information is confidential; or security precautions utilized by the employer to insure that only a limited number of authorized individuals have access to the information." *Wysong Corp. v. M.I. Indus.,* 412 F.Supp.2d 612, 626 (E.D. Mich. 2005) citing *Kubik, Inc. v. Hull,* 56 Mich. App. 335, 347, 224 N.W.2d 80, 87 (1974).

As noted, *supra*, it is undisputed that while Radiant CEO Bohn Crain took steps that would have permitted him to monitor Furstenau's email account after the acrimonious SAP phone call (Email Re: Email Synchronization, Jan. 18, 2018, ECF

No. 124-2 PageID.6868), during the period over which Furstenau forwarded these emails to his Comcast account, Crain did not act to do any monitoring. (Responses to Second Set of RFAs, ECF No. 124-22 PageID.6956).

There is undisputed evidence, however, that Radiant had taken steps to protect its confidential and trade secret information. Radiant's Code of Ethics, which Furstenau acknowledged receiving, contained a confidentiality policy. (Code of Ethics, ECF No. 68-3 PageID.3068; Furstenau Acknowledgement, ECF No. 70-10 PageID.3332.) Furstenau signed an acknowledgment of receiving Radiant's Employee Handbook ("Handbook") (Furstenau Acknowledgement Handbook, ECF No. 70-7 PageID.3321.), which contained a "Computer, Internet & Software Policy." ("Computer Policy") (ECF No. 68-2 PageID.3065) O'Brien testified that Radiant utilized selective circulation of information by and among "certain employees" on a need-to-know basis. (O'Brien Dep. 66:16-67:9, ECF No. 36-3, PageID 1737.) The yearly budget report, for example, was a password-protected document, although O'Brien admitted that some of the many documents it deems confidential are not password protected. (*Id*. 69:23-70:22.)

Viewing the record evidence in a light favorably to Radiant, the non-moving party as to the misappropriation claim, there remain outstanding questions as to whether the information identified as trade secrets are protectable as trade secrets,

and outstanding questions concerning whether they were sufficiently protected under MUTSA.

### b.  Use of Trade Secret

Defendants Furstenau and BTX argue that Radiant has produced no direct evidence showing that they used any particular emails, documents, or any other information identified as trade secrets in setting up and running the BTX-Detroit office. BTX introduced the Polus Forensic Report that they assert demonstrates that neither Furstenau nor BTX ever opened the emails which contained the alleged trade secrets. (ECF No. 133.) BTX contends that the report shows that neither Furstenau nor BTX opened any relevant Radiant documents forwarded by Furstenau to his Comcast account. However, Polus' deposition testimony, through Radiant's cross examination, undermines a significant portion of his forensic conclusions. By his admission, documents in question could have been opened on another device, or downloaded to a USB drive, and/or anyone with access to the account could manually mark emails as unread after opening and reading them. (Polus Dep. 47:10-50:9, ECF No. 131-5.) Thus, a jury could question whether Defendants have established that the critical emails were not accessed.

In *Dana Ltd*, the defendants were denied summary judgment on the MUTSA claim against them. *Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.*, No. 1:10–CV–450, 2012 WL 2524008 (W.D. Mich. 2012). The court noted that although

Defendants produced evidence showing that no relevant documents were found on the Defendants' corporate computers, not all potentially relevant computers were searched or preserved in the forensic analysis. *Id*. at 10 Plaintiffs also produced evidence showing that the defendant employee had maintained documents from the plaintiff on his personal computer. *Id*. That situation is comparable to that seen in this case. Here, Polus' expert report is limited to the particular devices examined and fails to show definitively that the files were never accessed. Further, the Comcast account and the relevant information therein was, and may continue to be, accessible by anyone with access to the Comcast account on any device.

Radiant argues that even in the absence of direct evidence of misappropriation, there is "overwhelming circumstantial evidence" from which to conclude misappropriation. This Court agrees that circumstantial evidence can be utilized to raise questions of material fact concerning whether the trade secrets were used. Circumstantial evidence may be used to demonstrate misappropriation of a trade secret. In *Stratienko v. Cordis Corp.,* the court observed that misappropriation and misuse of a trade secret "can rarely be proved by convincing direct evidence," and that "once evidence of access and similarity is proffered, it is entirely reasonable for the jury to infer that defendant used plaintiff's trade secret." 429 F.3d 592 (6th Cir. 2005) (internal quotes and brackets omitted). The court noted that circumstantial evidence is applicable to show misappropriation where "(1) the misappropriating

party had access to the secret and (2) the secret and the defendant's design share similar features." *Id*. at 600.

In *Veteran Med. Prod. v. Bionix Dev. Corp*, the circumstantial evidence was strong enough to infer that the trade secrets at issue (a business plan for manufacturing medical ear curettes containing manufacturing data, costs, and market projections) were misappropriated. 2008 WL 696546, at *9–10 (W.D. Mich. 2008). The alleged misapproapriators had a "total lack of knowledge" about manufacturing ear curettes but were nonetheless able to quickly secure a significant contract and quickly created an extensive ear curette marketing plan. *Id*. The court also found direct evidence of misappropriation in that one employee testified that information was taken to the second company, although there was no direct evidence that specific documents or files were used. *Id*.

In *Dana Ltd.*, the court found that the circumstantial evidence was insufficient to establish misappropriation in the absence of direct evidence and denied summary judgment to the defendants. *Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.,* No. 1:10-CV-450, 2013 WL 4498993, at *22-23 (W.D. Mich. 2013). Beyond a lack of proof that the defendant corporation had received the trade secrets, the defendant had a history of manufacturing axles and operated in a different market, expressed the information regarding axle design allegedly misappropriated from the plaintiff was of no use, and the plaintiff failed to show similarity between the products by failing

to show that the defendant "adopted competitive designs, quotes, tests, or materials that would suggest a use of [plaintiff's] trade secret." *Id*.

In this case, the circumstantial evidence of use of trade secrets falls somewhere in-between *Veteran Med. Prod,* where the circumstantial evidence was sufficient, and *Dana Ltd,* where it was not. As already established, Furstenau had access to emails containing Radiant's "customer solutions" before and during the commencement of BTX-Detroit operations. Similarity has also been established. Upon the opening of BTX-Detroit, it immediately began operations in the same market as Radiant and derived 99% of business from customers that used Radiant. Radiant experienced significant losses in revenue, while BTX immediately saw an average of nearly $400,000 in revenue monthly. (Report of Radiant Expert J. Bradley Sargent, ¶ 16, ECF No. 123-1, PageID 6675.) When the preliminary injunction was entered, which enjoined BTX and the former Radiant employees from using any Radiant information or contacting customers and third party carriers that they had done business with while at Radiant, BTX revenues fell drastically. (*Id*. ¶¶16, 28-32.) Tim O'Brien also testified in his deposition that he intercepted an email from former Radiant employee Chris Higgins' new BTX email address (Higgins sent it to Furstenau's radiant email) setting up a BTX relationship with a supplier used by Radiant–-Lynx Logistics. O'Brien testified that the fact that BTX "wasn't working with Lynx Logistics and that was part of our solution for our

customers through XPO Logistics to move their truckload business north out of Texas into the Detroit area" showed that BTX-Detroit was "looking to replicate" Radiant's customer solutions and had used Radiant's confidential information. (O'Brien Dep. 57:5-60:10, ECF No. 36-3.)

Viewing the record evidence in a light most favorable to the non-moving party Radiant, this circumstantial evidence creates outstanding questions of material fact concerning whether Radiant's trade secrets, which contain internal methodologies and data used to service Radiant clients, were used in the immediate servicing of those same clients at BTX-Detroit. Because there remain outstanding questions of material fact as to each element of the Misappropriation of Trade Secrets claim, summary judgment in favor of Furstenau and BTX on Misappropriation of Trade Secrets is DENIED.

### a. Count IV – Tortious Interference

Defendant BTX has moved for summary judgment on Count IV of Radiant's Complaint alleging Tortious Interference by BTX with Radiant's non-compete contract with Ben Watkins, its employee embedded at George P. Johnson Co. in Memphis, which prohibited him from soliciting Radiant customers after leaving Radiant. (Watkins Non-compete, ECF No. 69-22 PageID.1357-58; ECF No. 125 PageID.7099.) The elements of Tortious Interference with Contract are (1) the

existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant. *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.,* 268 Mich. App. 83, 89–90, 706 N.W.2d 843, 848–49 (2005) (citations omitted). "Tortious interference with contract exists when a third party to a contract, knowing of the contract, intentionally and wrongfully induces a breach of the contract which results in damage to a non-breaching party." *Fidelity Nat. Title Ins. Co. v. Title First Agency, Inc.*, 2008 WL 4371838, at *7 (E.D. Mich. 2008) (citing *Mino v. Clio School District*, 255 Mich. App. 60, 78 (2003)).

Radiant alleges that "BTX hired Watkins and placed him in a position and assigned him duties that result in a breach of his contractual obligations to Radiant." (Complaint, ECF No. 1 ¶ 74). Radiant argues summary judgment is improper because BTX CEO Bacarella and Furstenau "concocted a plan to avoid the plain violation of Watkins' noncompete/non solicitation agreements by arranging for Watkins to become an employee of GPJ, where he would direct its business to BTX Detroit." (ECF No. 143 PageID.13300). BTX, on the other hand, argues that Watkins never violated his contract because Radiant cannot identify any shipments that Watkins caused to go to BTX (or any other company) instead of Radiant, and that he never solicited work for one of Radiant's competitors in violation of his non-compete contract. (ECF No. 125 PageID.7100.)

Taking the facts in the light most favorable to the non-moving party, Radiant, a reasonable juror could find that BTX acted to undermine Watkins' non-compete with Radiant. Summary judgment in favor of Defendant BTX is DENIED on the claim of Tortious Interference with Contract.

### c. Count V – Aiding and Abetting against BTX

Plaintiff Radiant alleges that BTX, primarily through CEO Bacarella, was aware of Furstenau's Breach of Fiduciary Duty and Misappropriation of Trade Secrets and facilitated and encouraged those torts for the benefit of BTX-Detroit. (ECF No. 118, PageID.6048.) Radiant moves for summary judgment as to the Aiding Abetting Breach of Fiduciary Duty claim. BTX moves for summary judgment on both the Aiding and Abetting Breach of Fiduciary duty and Aiding and Abetting Misappropriation of Trade Secret claims. The elements required for aiding and abetting liability are: (1) that an independent wrong occurred; (2) that the aider or abettor had knowledge of the wrong's existence; and (3) that substantial assistance be given to effecting that wrong. *Nicholl v. Torgow*, 330 Mich. App. 660, 675 (2019); Restatement Torts, 2d, § 876(b). These claims hinge on the existence of the underlying tort.

### i. Aiding and Abetting Breach of Fiduciary Duty

Questions of material fact remain concerning Furstenau's Breach of Fiduciary Duty; Radiant was denied summary judgment on that claim. Because Aiding and

Abetting Breach of Fiduciary Duty claims require the existence of a fiduciary duty, and the issue of whether a Fiduciary Duty existed is not firmly established, summary judgment in favor of Radiant against BTX on Aiding and Abetting Breach of Fiduciary Duty is DENIED.

The record shows that BTX, primarily through CEO Bacarella, was a continuing and necessary co-conspirator to Furstenau's alleged breaches of his fiduciary duty. There is evidence that BTX had knowledge that Furstenau was recruiting Radiant employees to serve as his team at BTX-Detroit.[2] For example, on August 14, 2018, Furstenau sent a list of employee names who would need a computer to Bacarella – the same Radiant employees that would soon join Furstenau at BTX. (ECF No. 69-29 PageID.3228.) In that same email, Furstenau also inquired about benefits for the future BTX employees, telling Bacarella, "some folks were inquiring on a 401(k)[.] can you provide any information?" (*Id.*)

There is also evidence that BTX/Bacarella assisted Furstenau in committing breaches of his fiduciary duty by working with him to rent and furnish an office location to accommodate Furstenau and his "travel team," by providing Furstenau a BTX cell phone to enable him to communicate with Bacarella and his team of key

---

[2] At his deposition, Bacarella had stated that "BTX would not open the branch without making sure it was staffed properly. Any branch." (Bacarella Dep. 45:12, ECF No. 36-1 PageID.1385.)

Radiant employees (and to enable him to transfer information from his Radiant phone (ECF No. 21-1)), and by committing in advance to provide jobs and benefits on day one to those specifically-named employees. Well before Furstenau resigned from Radiant on August 24, 2018, a June 22, 2018 email to him from Bacarella, that specifies the terms of his BTX employment, states: "[o]nce [Furstenau] is an employee of BTX, BTX will establish and Office in Detroit . . ." (ECF No. 70-1.) On July 19, 2018, Bacarella, communicating with Furstenau, traveled to Detroit and spent several hours performing a walk-through of the future BTX-Detroit office location and meeting with vendors for the office. (Joint Ex. 61, ECF No. 70-6, PageID 3320.) Thus, Bacarella's email and actions regarded Furstenau as a BTX employee (albeit not yet on its payroll) well before it opened its Detroit office, and was providing continuing assistance, while Furstenau was on Radiant's payroll.

Based on this evidence, questions of material fact remain concerning whether BTX had knowledge of the actions that constitute Furstenau's alleged Breach of Fiduciary Duty, and BTX's very active aiding and abetting that breach. Accordingly, Summary judgment in favor of BTX on Radiant's claim of Aiding and Abetting Breach of Fiduciary Duty is DENIED.

### ii. Aiding and Abetting Misappropriation of Trade Secrets

The record shows that BTX was aware that Furstenau was taking Radiant trade secret information and aided him to do so. In an email from Furstenau to Bacarella on June 21, 2018, part of an email chain discussing terms of employment at BTX, Furstenau stated: "I just recalled something else we spoke about, a cell phone provided by BTX. It should be with a 734 area code and done sooner rather than later *so I can transfer information*." (ECF No. 21-1) (emphasis added). BTX provided Furstenau with a BTX cell phone shortly after this email. Bacarella, on the other hand, testified in his deposition that he never saw any emails that Furstenau had sent himself from his Radiant account, and told Furstenau and the "travel team" not to use any confidential Radiant information. (Bacarella Dep. 95:15-23, 115:15:116:14, ECF No. 36-1.) Viewing the evidence in a light favorable to the nonmoving party, Radiant, questions of material fact regarding BTX's knowledge and assistance remain unresolved. Summary judgment in favor of BTX on the claim of Aiding and Abetting Misappropriation of Trade Secrets is DENIED.

### a. Count VI – Common Law and Statutory Conversion

In Count VI, Radiant alleges that Defendant Furstenau wrongfully took possession of Radiant property "including various computer files, confidential

information, and a company-owned mobile phone." (ECF No. 1 PageID. 24 ¶ 83-84.) The claim for conversion of files or other information that forms the basis for the misappropriation of trade secrets is preempted by the MUTSA. The analysis will be limited to conversion of the Radiant-owned phone used by Furstenau while employed at Radiant and then retained by Furstenau, while he was a BTX employee – until he turned it over well into this litigation.

Under Michigan law, "conversion" is defined as "a distinct act of dominion wrongfully exerted over another's personal property ... [that is] committed by ... intentionally dispossessing another of a chattel, ... [or] ... refusing to surrender a chattel on demand." *In re Clipper Int'l Corp.*, 154 F.3d 565, 568 (6th Cir. 1998) citing *Rohe Scientific Corp. v. National Bank of Detroit,* 133 Mich. App. 462, 350 N.W.2d 280, 282 (1984) (citations and internal quotation marks omitted).

Statutory conversion allows a party to "recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees" if that person was "damaged as a result of ... [a]nother person's stealing or embezzling property or converting property to the other person's own use." Mich. Comp. Laws § 600.2919a(1)(a). Essentially, statutory conversion requires the same proof as common-law conversion, "with the added element that the property must have been converted to a defendant's 'own use.' " *Prime Rate Premium Fin. Corp. v. Larson*, 226 F. Supp. 3d 858, 869-870 (E.D. Mich. 2016).

Radiant argues that Furstenau's keeping the phone, "despite requests for its return" constitutes conversion. Furstenau argues that he kept his Radiant issued phone only until it was forensically examined as part of this litigation, and the phone is now in the possession of Radiant. (Furstenau Affidavit ¶ 19, ECF No. 124-2 PageID.6853.) Retaining control to the property of Radiant despite requests for its return may be seen by reasonable jurors as an act depriving Radiant of its rights in the property, and therefore conversion of that property. Summary Judgment in favor of Furstenau on the Common Law Conversion claim is DENIED. Because the record also leaves outstanding issues of material fact concerning "own use," summary judgment in favor of Furstenau on the Statutory Conversion claim is DENIED.

## V. Conclusion

This Court hereby ORDERS that

(1) Plaintiff Radiant's Motion for Partial Summary Judgment (ECF No. 118) as to Counts II and IV is DENIED,

(2) Defendant Furstenau's Motion for Summary Judgment (ECF No. 124) as to Counts II, III and VI is DENIED, and

(3) BTX's Motion for Summary Judgment (ECF No. 125) is DENIED as

to Counts III, IV, and V.

SO ORDERED

s/Paul D. Borman

Paul D. Borman
United States District Judge

Dated: April 8, 2021

47