UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RADIANT GLOBAL LOGISTICS, INC.,

    Plaintiff/Counter-Defendant,

v.

BTX AIR EXPRESS OF DETROIT LLC,

    Defendant,

and

CHARLES FURSTENAU, JR.,

    Defendant/Counter-Plaintiff.

Case No. 18-12783

Paul D. Borman
United States District Judge

---

**OPINION AND ORDER GRANTING PLAINTIFF/COUNTER-DEFENDANT RADIANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 119) AS TO DEFENDANT/COUNTER-PLAINTIFF CHARLES FURSTENAU JR.'s FIRST AMENDED COUNTER COMPLAINT (ECF No. 31)**

**I.    Procedural History**

This case involves former Radiant-Detroit-office General Manager Charles Furstenau, Jr.'s departure with several Radiant team members at the opening of a new competing BTX-Detroit office in late August, 2018. On September 7, 2018, Radiant filed a Complaint against Furstenau and BTX Air Express of Detroit, seeking a declaratory judgment, and alleging claims of Breach of Fiduciary Duty, Misappropriation of Trade Secrets, Tortious Interference, Aiding and Abetting, and

1

Common Law and Statutory Conversion. (ECF No. 1.) On February 20, 2019, the Court granted Plaintiff's Motion for Preliminary Injunction against Defendant Charles Furstenau, Jr., and BTX Air Express of Detroit. (ECF No. 52.) Relevant background in this case is also contained in the Court's prior Opinion and Order on the cross-motions for summary judgment issued on April 8, 2021, denying Plaintiff Radiant's Motion for Partial Summary Judgment as to Counts II and IV, denying Defendant Furstenau's Motion for Summary Judgment as to Counts II, III and VI, and Denying Defendant BTX's Motion for Summary Judgment as to Counts III, IV, and V. (ECF No. 169.)

On November 14, 2018, Defendant/Counter-Plaintiff Charles Furstenau, Jr. filed the instant Amended four-count Counter-Complaint against Plaintiff/Counter-Defendant Radiant Global Logistics (ECF No. 31), asserting:

    Count I: Breach of Employment Agreement

    Count II: Quantum Meruit

    Count III: Intentional Infliction of Emotional Distress

    Count IV: Defamation/Defamation Per Se

Now before the Court is Radiant's Motion for Summary Judgment as to Furstenau's Counter-Complaint. (ECF No. 119.) Furstenau filed a Response on

2

October 8, 2020 (ECF No. 144), and Radiant filed a Reply on October 22, 2020 (ECF No. 149.) The Court held a hearing on this motion on August 9, 2021.

## II.     Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986).

In reviewing a motion for summary judgment this Court cannot weigh the evidence, make credibility determinations, or resolve material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (stating that on a motion for summary judgment "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge"). "Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569–70 (6th Cir. 2012) (citing *Matsushita*, 475 U.S. at 587; *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 252. The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476–80 (6th Cir. 1989).

### III. Analysis

#### a. Breach of Contract: Bonus Payments

Furstenau alleges that Radiant violated the employment contract between the parties by failing to pay the full amount of bonus money owed to him: 10% of the Detroit station's quarterly net profits, totaling $34,069.94. (Response, ECF No. 144 PageID.13449.) The parties dispute whether the bonus payments were discretionary, as Radiant argues, or a mandatory part of Furstenau's employment agreement, as Furstenau argues. A party asserting a breach of contract must establish that (1) there

was a contract, (2) which the other party breached, (3) thereby resulting in damages to the party claiming breach. *Miller-Davis Co. v. Ahrens Const., Inc.,* 495 Mich. 161, 178 (2014).

The parties recognize the existence of an employment agreement between Furstenau and Radiant, although there is a question of whether that agreement was modified by the October 30, 2017 email from Radiant CEO Bohn Crain to Furstenau to include a 20% of net profits bonus opportunity, half of which would go to the Station Manager Furstenau. (ECF No. 145-6 PageID.13489) The email states:

> *Further to our call today, effective November 1 we are increasing your base salary to $115K and a monthly auto allowance of $500.*
>
> *We are also increasing the quarterly station <u>bonus opportunity</u> to 20%, 10% for the Station Manager and the remaining 10% allocated across other members of your team <u>in amounts to be approved by Tim O'Brien</u>.* [Vice President of Company Stores]
>
> *We really appreciate all your hard work and look forward to working with you and your team on the launch of SAP TM and collaboration with the operation shared service center in PHX*

(ECF No. 145-6 PageID.13489.) (emphasis added)

The parties dispute whether this email creates, (1) a bonus structure that is a mandatory part of Furstenau's employment contract, such that Radiant would be obligated to pay 10% of the Radiant Detroit station's quarterly net profits to

5

Furstenau as bonus during his employment, or (2) whether it is merely an opportunity for a bonus that is required to be approved by Radiant's Vice President of Company Stores Tim O'Brien, and further conditioned on Furstenau's working and collaborating on the launch of the SAP system, and collaborating with the Phoenix shared services center.

"In order for a contract to be formed, there must be an offer and acceptance, as well as a mutual assent to all essential terms. This required mutual assent on all material terms is judged by an objective standard based on the express words of the parties and not on their subjective state of mind." *Bodnar v. St. John Providence*, Inc., 327 Mich. App. 203, 213 (2019) (citations omitted).

Radiant argues in support of summary judgment that the October 30, 2017 email from Crain does not guarantee a mandatory bonus structure, as it refers to a "bonus *opportunity*," "amounts to be approved by Tim O'Brien," and does not contain sufficient details to constitute a "meeting of the minds" needed to create a binding contract for bonus payments. Radiant also argues the opportunity for an increased bonus "was predicated on the station participating in (a) the launch of the SAP transportation management software program, and (b) the operational shared services center in Phoenix," both of which Furstenau opposed.

6

Radiant identifies significant evidence demonstrating that both Radiant and Furstenau understood that the bonuses were discretionary: a June, 2018 email chain between Radiant Vice President and Chief Financial Officer Joe Bento, Vice President of Company Stores Tim O'Brien, and Furstenau, where Bento stated that "all Radiant bonus programs . . . are completely discretionary at Radiant's election," and Furstenau's response, stating that, "it is now my understanding that both the . . . bonus programs are discretionary." (ECF No. 121-7 PageID.6581.)

Radiant further asserts that, when asked during his second deposition what amounts he was seeking in his claim for bonus payments, Furstenau testified that he was "not prepared to quantify that number," and to his knowledge, nobody had prepared a number regarding how much he was owed. (July 9, 2020 Deposition of Charles Furstenau ("Furstenau Dep.") 49:17–52:1, ECF No. 121-3.) It was apparently not until his Response to Radiant's Motion for Summary Judgment that Furstenau attempted to quantify the bonuses allegedly owed.

Finally, Radiant Human Resources Manager Renee Kiss stated in an affidavit that the bonus programs in place in 2017 and 2018 "were discretionary," and any payments had to be approved by Radiant's Board of Directors. (Declaration of Renee Kiss ("Kiss Dec.") ¶ 8, ECF No. 121-1.) Kiss further stated that Furstenau was "paid all bonus amounts approved by company management and the board in 2017 and 2018." (*Id*. at ¶ 12).

Furstenau, on the other hand, argues that the October 30, 2017 email from Radiant CEO Bohn Crain to Furstenau concerning pay and bonus structure created a mandatory bonus payment structure. Furstenau also offers a May 21, 2018 email from Radiant Corporate Counsel John Sobba to Renee Kiss which states that "Joe [Bento] wants to deny participation in the STIP/LTIP bonus programs because Chad [Furstenau] refused to sign the agreement (e.g. non-compete) we presented to him last week." (ECF No. 145-21 PageID.13524.) Following Furstenau's August 22, 2018 request for bonus payments, which Bento denied (ECF No. 121-7 PageID.6580), and his resignation two days later, Bento wrote to Bohn Crain on August 25, 2018:

> *Bohn, I think I mentioned it to you, Tim and I talked about it, but I triggered the resignation.*
>
> *I said I was not going to pay him his back bonuses and do that extra work. I had spoken with him about the issues numerous times over the phone.*

(ECF No. 145-13 PageID.13504.) Thus, Bento appears to have concluded that his days-before denial of Furstenau's late August request for additional bonus payments triggered Furstenau's resignation two days later.

Furstenau also points to the Q3 2018 (January–March) bonus payment that matched what Bohn Crain had told Furstenau he would be paid in the October 2017 email—half of 20% of net profit (ECF No. 144 PageID.13448), and an email

8

between Radiant employees indicating that Radiant Detroit paid bonuses based on the 20% rate after his departure. (ECF No. 145-14 PageID.13505–06.)

The Court finds that Furstenau has failed to raise a question of material fact to support his argument that the Radiant bonus program had become mandatory because of the October 30, 2017 email from Radiant CEO Bohn Crain. That October 30, 2017 email does not create a valid contract for mandatory bonus payments. That email refers to bonus payments as a "bonus *opportunity*," explicitly reserves approval of bonus payments to Radiant VP Tim O'Brien, and references the need for the Radiant-Detroit station to participate in the launch of the SAP program and the shared services center in Phoenix.

The October 30, 2017 email from CEO Crain does not contain detailed objectives and resultant bonuses like the plan contained in the Sixth Circuit decision, *Bahr v. Tech Consumer Prod.*, 601 F. App'x 359, 366-67 (6th Cir. 2015), where the court held that, despite reserving discretion over bonus payments to the employer, the plan at issue applied mandatorily because it detailed percentages of base salary to be paid based on a set of targets or accomplishments to be met by the employee.[1]

---

[1] *Bahr* dealt with an interpretation of Minnesota law. In *Bahr*, the bonus plan at issue detailed percentages of base salary to be paid based on a set of targets or accomplishments to be met by the employee. The Sixth Circuit found that under Minnesota law, the bonus plan constituted a sufficiently definite offer and was not discretionary, despite the inclusion of a provision in the bonus plan explicitly reserving discretion to the company. *Id.* at 363–68. In the instant case,

Further, prior to the October 2017 email, the Radiant bonus program operated with significant corporate discretion. According to Radiant Human Resources Director Kiss, Radiant leadership created total bonus amounts, and then typically deferred to Furstenau's recommendations as to the allocation of bonus amounts to be paid among the Detroit station employees, including himself. (Kiss Dec. ¶ 9, ECF No. 121-1.) Furstenau retained 93%, 95%, 50% and 100% of the entire bonus pool for himself during the 2017 respective quarters, when he allocated money from the bonus pool to his employees. (*See* Chart[2], ECF No. 119 PageID.6111; Kiss Dec. ¶11, ECF No. 121-1; Furstenau Dep. 30:13–25, ECF No. 121-3.)

In light of the operative email of October 30, 2021 from CEO Bohn Crain, which fails to indicate a "meeting of the minds" that the new bonus structure was mandatory, and Furstenau's admission in an email to Bento that he understood that bonus payments were discretionary, the evidence fails to raise a question of material

---

Michigan law applies. Further, the instant plan contains additional conditions, apart from the discretion issue.

[2]

| Quarter (Calendar) | Furstenau's Percentage of Total Bonus Money for Radiant-Detroit |
|---|---|
| Q1 2017 | 93% |
| Q2 2017 | 95% |
| Q3 2017 | 50% |
| Q4 2017 | 100% |
| Q1 2018 | 50% |
| Q2 2018 | 50% |

fact supporting Furstenau's argument that the bonus program was mandatory, such that he would be entitled to 10% of quarterly profits. Accordingly, Radiant's Motion for Summary Judgment on the counterclaim for breach of contract regarding unpaid bonuses is GRANTED.

### b. Breach of Contract: Stock Option Plans

The Radiant Stock option programs relevant to this motion are the 2005 Stock Incentive Plan ("2005 Plan") and the 2012 Stock Option and Performance Award Plan ("2012 Plan") (Mot. for Sum. Judg., ECF No. 144 PageID.13450; Renee Kiss Dec. ¶¶ 3, 5, ECF No. 121-1.) Furstenau alleges that he was prevented from exercising his vested stock options under both plans. (First Am. Counter Compl., ECF No. 31, ¶ 29.)

Renee Kiss' declaration states that Furstenau had exercised all of his options under the 2005 Plan, and there were zero shares remaining as of Furstenau's resignation date. (Kiss Dec. ¶ 4.) Furstenau's "Closing Statement," dated August 27, 2018, shows the number of shares "granted" to him matches the number of shares he "exercised," and the number of shares exercisable, as zero. (Closing Statement, ECF No. 121-2 PageID.6740.)

11

Radiant also has carried its burden demonstrating that Furstenau was not entitled to any remaining stock options under the 2012 Plan, which clearly states that an employee who voluntarily leaves the company forfeits his or her rights to exercise options. (2012 Plan Terms VI(e), ECF No. 121-4 PageID.6546.) Furstenau voluntarily resigned from Radiant. Furstenau's Closing Statement lists August 24, 2018, the date of Furstenau's resignation, which was last day for which he could have exercised options under the 2012 plan. (Closing Statement ECF No. 121-2 PageID.6740.) As of that date, Furstenau had exercised all but 892 options under the 2012 Plan. (Kiss Dec. ¶¶ 5, 7.)

Furstenau points to a letter from Human Resources Director Renee Kiss sent on August 28, 2018, after his resignation, outlining his final paycheck, benefits, and stock options, among other human resources issues. (ECF No. 145-15.) In the paragraph entitled "Stock Options," the email states: "You have 90 days from your termination date to exercise any of your Radiant Global Logistics vested options." (*Id*.) Furstenau argues that, after his voluntary resignation, Radiant did not permit him to exercise any stock options, identifying an email from October 4, 2018 where Renee Kiss failed to respond to an email from Furstenau about how to exercise his stock options. (ECF No. 145-26 PageID.13511.)

These emails are insufficient to undermine the clear language in Furstenau's Closing Statement showing that he has no exercisable options in the 2005 Plan, and

12

the clear language in the 2012 Plan that an individual who voluntarily resigns from the company forfeits their right to stock options. Thus, Furstenau, who voluntarily resigned on August 24, 2018, was not entitled to exercise any remaining stock options.

On Furstenau's counterclaim for breach of contract regarding the Stock Plans, Radiant's Motion for Summary Judgment is GRANTED.

### c. Quantum Meruit

Furstenau brings a claim for quantum meruit in the alternative to his claim for breach of contract. Radiant argues that Furstenau will be unable to recover under both quantum meruit and breach of employment agreement, and that they are entitled to summary judgment on this claim. (ECF No. 119 PageID.6120). In *Llewellyn-Jones v. Metro Prop. Grp., LLC,* a district court in this circuit noted that "pleading an express contract and implied contract (whether styled as unjust enrichment or *quantum meruit*) is allowed when, for instance, there is a dispute between the parties as to whether an express agreement exists." 22 F. Supp. 3d 760, 793 (E.D. Mich. 2014). However, "If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract."

*Id*. (citing *Advanced Plastics Corp. v. White Consol. Indus., Inc*., 828 F. Supp. 484, 491 (E.D. Mich. 1993)).

Radiant argues in its motion for summary judgment that "Radiant and Furstenau do not dispute the existence of the employment agreement between the parties, therefore, Furstenau cannot plead breach of his employment agreement in the alternative, plead quantum meruit." (ECF No. 119 PageID.6120.)

In this case, the parties agree that there was an employment agreement between Radiant and Furstenau, and they merely "dispute its terms or effect" with regard to bonus payments and stock options. *Llewellyn-Jones*, 22 F. Supp. 3d at 793. Accordingly, Radiant's Motion for Summary Judgment on the counterclaim for Quantum Meruit is GRANTED.

### d. Intentional Infliction of Emotional Distress

The elements of intentional infliction of emotional distress (IIED) are (1) "extreme and outrageous" conduct; (2) intent or recklessness; (3) causation; and (4) "severe emotional distress." *Roberts v. Auto-Owners Ins. Co*., 422 Mich. 594, 602 (1985).

In order to meet the "extreme and outrageous" conduct element of IIED, a defendant's actions must go "beyond all possible bounds of decency" such that those

actions would be "regarded as atrocious and utterly intolerable in a civilized community." *Linebaugh v. Sheraton Michigan Corp.*, 198 Mich. App. 335, 342 (2013). Furstenau identifies the following Radiant actions to support his IIED claim: Radiant (1) hid the SAP IT information from him after he criticized the new program, (2) eliminated him from corporate meetings regarding the new SAP system after he stated that he was firmly opposed to its implementation, and (3) informed two members of his former Radiant staff, Kari Piper and Liana Renteria, on the first business day after he resigned, that he had misappropriated their earned bonuses for his own benefit, thereby damaging his reputation. (ECF No. 144 PageID.13462-63.) As a matter of law, these actions, in context, do not rise to the level of outrageousness needed to succeed on a claim for IIED. Factually, it is undisputed that those two staffers, Piper and Renteria, followed him over to BTX-Detroit a few days after he left Radiant.

Radiant cites several cases illustrating the type of conduct a court can deem extreme and outrageous. (*See* ECF No. 119 PageID.6122) citing *Linebaugh v. Sheraton Michigan Corp*, 198 Mich. App. 335 (1993) (coworker drawing another coworker in a sexually compromising position); *Lewis v. Legrow*, 258 Mich. App. 175 (2003) (defendant secretly videotaped intimate relations); *Haverbush v. Powelson*, 217 Mich. App. 228 (1996) (defendant sent threatening letters to the plaintiff and his family and put a hatchet and lingerie on plaintiff's vehicles.) The

15

conduct here comes nowhere close to this level, and Furstenau is unable to establish any questions of material fact on the first element of IIED.

Furstenau is also unable to produce any record evidence that he actually suffered any emotional distress. Furstenau argues in his response brief that he experienced "significant stress and anxiety," and was "treated both locally and at Cleveland Clinic for the psychological and physical impact of these stressors." (ECF No. 144 PageID.13463.) There is no evidence of these medical visit costs. Further, when asked during his July 9, 2020 deposition how much he was seeking in damages as a result of his intentional infliction of emotional distress claim, Furstenau was unable to provide an answer. (Furstenau Dep. 95:4–10, ECF No. 121-3.)

Accordingly, Radiant's Motion for Summary Judgment on the claim for Intentional Infliction of Emotional Distress is GRANTED.

e. Defamation

Furstenau alleges that Radiant, via Tim O'Brien, defamed him by indicating to then-Radiant employees (soon to be BTX employees) Kari Piper and Liana Renteria, that Furstenau had "kept those monies / bonuses owed to his fellow team members to himself." (First Am. Counter Compl., ECF No. 31 ¶ 83; August 30, 2018 Email, Kari Piper to Furstenau, ECF No. 31-1 PageID.918–20.) Specifically, Kari

Piper testified that O'Brien came into the Radiant-Detroit office on the Monday after Furstenau's resignation and in a discussion of future bonuses, told her that "you won't have to worry about Chad taking 90% of it." (Deposition of Karen Piper 62:15–65:14, ECF No. 120-2 PageID.6242.)

To establish a defamation claim, a plaintiff must prove (1) that defendant made a false and defamatory statement to a third party; (2) which was unprivileged; (3) with fault amounting to at least negligence; and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod). *Burden v. Elias Bros. Big Boy Restaurants*, 240 Mich. App. 723, 726 (2000).

When asked in his deposition whether he was aware that he brought a defamation claim, Furstenau responded that, "no, I didn't know. If it's in there, I'm not surprised," and that he never reviewed the Counter-Complaint (Furstenau Dep. 63:1–64:8, ECF No. 121-3.)

Furstenau makes no specific arguments regarding Defamation per se, which is a narrow cause of action. *See, e.g.*, *Daneshvar v. Kipke*, 266 F. Supp. 3d 1031, 1055 (E.D. Mich. 2017), aff'd, 749 F. App'x 986 (Fed. Cir. 2018). Michigan law codifies "the common-law principle that words imputing a lack of chastity or the commission of a crime constitute defamation per se and are actionable even in the

17

absence of an ability to prove actual or special damages, as evidenced by the statute's indication that such words are "actionable in themselves...." *Burden*, 240 Mich. App. at 728. "Although the holdings of Michigan courts have been mixed, the prevailing rule is that words constitute defamation per se if the invoked crime involves moral turpitude or would subject the person to an infamous punishment." *Daneshvar, supra* at 1055; *Lakin v. Rund*, 318 Mich. App. 127 (2016). Tim O'Brien's statement that Furstenau had taken a large share of bonuses is not an accusation involving a crime of "moral turpitude." In this case, the statements identified, which at most "paint Furstenau as a dishonest individual" (Furstenau Response, ECF No. 144 PageID.13464), do not amount to defamation per se. Further, as the undisputed facts in the chart, *supra* note 2, establish, Furstenau did retain the largest share of bonus money in 2017 for himself.

As for defamation per quod, Furstenau has failed to show any harm to his reputation. A communication is defamatory if, under all the circumstances, it tends to so harm the reputation of an individual that it lowers the individual's reputation in the community or deters others from associating or dealing with the individual. *Kefgen v. Davidson,* 241 Mich. App. 611, 617, (2000) citing *Kevorkian v. American Medical Ass'n,* 237 Mich. App. 1, 5 (1999); *Ireland v. Edwards,* 230 Mich. App. 607, 619 (1998). In the instant case, shortly after O'Brien made the allegedly defamatory statements to Piper and Renteria on the first business day after Furstenau

18

resigned, they both emailed Furstenau to tell him what was said (ECF No. 31-1 PageID.918–20) and then resigned at Radiant to join Furstenau at BTX soon after. Clearly, O'Brien's statements did not deter Piper and Renteria from immediately joining Furstenau at BTX, or harm Furstenau's reputation with the two co-workers to whom the allegedly defamatory statements were directed, and there is no evidence that these statements were made to any other individuals.

A plaintiff's failure to support an alleged harm from defamatory statements with any record evidence will result in summary judgment. *See Werme v. Mortg. Ctr., LLC*, 2017 WL 895743, at *4 (W.D. Mich. 2017) (granting summary judgment in favor of defendant where plaintiff fails to "show[] defamation per quod, by establishing 'special harm' she has suffered."); *Heike v. Guevara*, 2009 WL 3757051, at *6 (E.D. Mich. 2009), aff'd, 519 F. App'x 911 (6th Cir. 2013) (examining its prior order in the case: "The Court found that Plaintiff had not alleged any specific pecuniary harm resulting from the defamation, nor had she explained how any reputational damage translated into economic harm. Thus, the Court found that Plaintiff had not sufficiently plead her defamation claims with respect to the element of special damages.") Furstenau likewise has failed to support his defamation claim with any evidence of harm.

Accordingly, Radiant's Motion for Summary Judgment as to the defamation claims is GRANTED.

## IV. Conclusion

The Court, taking the evidence in the light most favorable to the Defendant/Counter-Plaintiff Charles Furstenau, the non-moving party, GRANTS Plaintiff/Counter-Defendant Radiant Global Logistics' Motion for Summary Judgment (ECF No. 119) in its entirety. Defendant/Counter Plaintiff Charles Furstenau's First Amended Counter-Complaint is hereby DISMISSED with prejudice.

SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: August 16, 2021