## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| RADIANT GLOBAL LOGISTICS, INC., A Washington corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>CHARLES FURSTENAU, JR. an Individual and Michigan resident, and BTX AIR EXPRESS OF DETROIT, LLC, A Connecticut limited liability company,<br><br>        Defendants. | Case No. 2:18-cv-12783-BAF-DRG |

## DEFENDANTS' MOTION FOR ATTORNEY'S FEES

Defendants, Charles Furstenau, Jr. and BTX Air Express of Detroit, LLC ("Defendants"), by counsel, move for an award of attorney's fees incurred in defending against Radiant Global Logistics, Inc.'s ("Radiant") claim for misappropriation of trade secrets. Under the Michigan Uniform Trade Secrets Act (Mich. Comp. Laws § 445.1905), Defendants should be awarded their fees as the prevailing party because Radiant made its claim for misappropriation of trade secrets in bad faith.

Defendants sought concurrence from Radiant regarding the relief sought by this Motion, but Radiant did not concur.

WHEREFORE, Defendants hereby respectfully request that the Court grant Defendants' Motion for Attorney's Fees.


Date: November 2, 2023

Respectfully submitted,

*/s/ Andrew F. Marquis*
Andrew F. Marquis / Attorney No. P82641
amarquis@scopelitis.com
Peter C. Morton / Attorney No. 32698-53
pmorton@scopelitis.com
SCOPELITIS GARVIN LIGHT HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, Indiana 46204
Telephone: 317-637-1777
Facsimile: 317-687-2414

*Attorneys for Defendants BTX Air Express of Detroit, LLC & Charles Furstenau, Jr.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| RADIANT GLOBAL LOGISTICS, INC., A Washington corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>CHARLES FURSTENAU, JR. an Individual and Michigan resident, and BTX AIR EXPRESS OF DETROIT, LLC, A Connecticut limited liability company,<br><br>    Defendants. | Case No. 2:18-cv-12783-BAF-DRG |

## DEFENDANTS' BRIEF IN SUPPORT OF
## <u>THEIR MOTION FOR ATTORNEY'S FEES</u>

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

STATEMENT OF ISSUES PRESENTED ..................................................... 1

STATEMENT OF CONTROLLING AUTHORITY ...................................... 2

I.     INTRODUCTION .......................................................................... 1

II.    STATEMENT OF FACTS ............................................................ 2

    A.    Radiant's Self-Inflicted Wounds ....................................... 2

        1.    Furstenau prepares for Radiant to potentially fire him ........ 3

        2.    Radiant prepares to replace Furstenau ................................ 3

        3.    Radiant alienates its Radiant Detroit station employees with the new SAP system. ................................................... 5

        4.    Radiant fails to replace its employees after they resign. ...... 5

        5.    Radiant pursues unprofitable business and has customer service failures. ................................................................... 7

    B.    Radiant Never Had Any Evidence to Support its Trade Secrets Claim ................................................................................. 7

        1.    Radiant never had any trade secrets at issue in this case ...... 8

            i.    Radiant's "customer solutions" are not trade secrets. ......................................................................... 8

            ii.    The emails Furstenau sent himself are not trade secrets. ......................................................................... 9

        2.    Radiant never had, nor introduced, evidence of use or disclosure. ........................................................................... 9

        3.    Radiant Attempted to Manipulate Evidence to Show a Dramatic Impact ............................................................... 12

4.    Radiant never linked its alleged damages to its trade secrets claim ........................................................................ 13

III.    STANDARD OF REVIEW ........................................................ 14

IV.    ARGUMENT ............................................................................ 14

A.    Radiant Brought Its Trade Secret Claim in Bad Faith .................. 14

1.    Radiant never identified a protectable trade secret. ............. 16

2.    Radiant never introduced evidence of Defendants using or threatening to use Radiant's alleged trade secrets. ............... 18

3.    Radiant knew of real causes for its alleged damages other than alleged misappropriation of trade secrets. .................... 20

4.    Radiant filed its trade secret claim to harass Defendants and restrain legitimate competition. ..................................... 21

B.    Determining An Award of Attorney's Fees ................................... 23

V.    CONCLUSION ......................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Ajuba Int'l, LLC v. Saharia*,
  No. 2:11-cv-12936, 2014 WL 3420524 (E.D. Mich. July 14, 2014) ........................ 19

*CMI Int'l, Inc. v. Intermet Int'l Corp.,*
  649 N.W.2d 808 (Mich. App. Ct. 2002) ...................................................................... 18

*Compuware Corp. v. Int'l Bus. Machines Corp.*,
  No. 02-CV-70906, 2003 WL 23212863 (E.D. Mich. Dec. 19, 2003) ....................... 17

*Degussa Admixtures, Inc. v. Burnett*,
  277 F. App'x 530 (6th Cir. 2008)............................................2, 14, 15, 18, 19, 20, 21

*Degussa Admixtures, Inc. v. Burnett*,
  471 F. Supp. 2d 848 (W.D. Mich. 2007)............................................................. 15, 18

*Delphi Automotive PLC v. Absmeier*,
  167 F. Supp. 3d 868 (E.D. Mich. 2016) ...................................................................... 18

*Dice Corp. v. Bold Techs. Ltd.*,
  No. 11-CV-13578, 2014 WL 2763618,
  (E.D. Mich. June 18, 2014)......................................................2, 15, 16, 18, 19, 20, 21

*Imwalle v. Reliance Med. Products, Inc.*,
  515 F.3d 531 (6th Cir. 2008) ....................................................................................... 23

*Kubik, Inc. v. Hull*,
  224 N.W.2d 80 (Mich. Ct. App. 1974).................................................................... 17

*McKesson Med.-Surgical Inc. v. Micro Bio-Medics, Inc.*,
  266 F. Supp. 2d 590 (E.D. Mich. 2003) ............................................................. 17, 23

*Nedschroef Detroit Corp. v. Bemas Enters. LLC*,
  106 F. Supp. 3d 874 ................................................................................................... 17

*Paschal v. Flagstar Bank*,
  297 F.3d 431 (6th Cir. 2002) ....................................................................................... 24

*Raymond James & Assocs., Inc. v. Leonard & Co.*,
  411 F. Supp. 2d 689 (E.D. Mich. 2006) ............................................................. 18, 23

iii

*Rothschild v. Ford Motor Co*.,
  2 F. Supp. 2d 941 (E.D. Mich. 1998) ........................................................................ 18

*United Rentals (N. Am.), Inc. v. Keizer,*
  355 F.3d 399 (6th Cir.2004) ..................................................................................... 18

*Whitesell Int'l Corp v. Whitaker*,
  No. 287569, 2010 WL 3564841 (Mich. Ct. App. Sept. 14, 2010) ...................... 16, 22

*Wysong Corp. v. M.I. Indus.,*
  412 F. Supp. 2d 612 (E.D. Mich. 2005) ................................................................... 18

## **Statutes**

Mich. Comp. Laws § 445.1902 ...................................................................................... 17
Mich. Comp. Laws § 445.1905 ............................................................................... 1, 2, 14

## STATEMENT OF ISSUES PRESENTED

Under E.D. Mich. LCR 7.1(d)(2), Defendants identify the following issue:

1.     Should Defendants be awarded their attorney's fees incurred in defending against Radiant's misappropriation of trade secrets claim because Radiant brought and maintained its claim in bad faith?

**Defendants answer: Yes.**

**STATEMENT OF CONTROLLING AUTHORITY**

Pursuant to E.D. Mich. LCR 7.1(d)(2), Defendants state that the following authorities are the controlling or most appropriate authorities in support of their Brief:

1.   *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530 (6th Cir. 2008)

2.   *Dice Corp. v. Bold Techs. Ltd.*, No. 11-CV-13578, 2014 WL 2763618, (E.D. Mich. June 18, 2014)

3.   Michigan Uniform Trade Secrets Act, Mich. Comp. Laws § 445.1905

**BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION FOR ATTORNEY'S FEES**

## I.   INTRODUCTION

After more than five years of burdensome litigation, Radiant's misappropriation of trade secrets claim was roundly rejected by a jury, which concluded that Radiant's supposed trade secrets were not trade secrets at all. Radiant's three main witnesses admitted at both jury trials that, while Radiant "believed" that the Defendants had misappropriated trade secrets, they had no evidence to support that belief. Indeed, Radiant failed to establish that it had any trade secrets at issue in the first place. However, there *is* evidence—from the inception of this case through both trials—that Radiant brought its misappropriation of trade secrets claim in bad faith and for the improper purpose of attempting to restrain legitimate competition and limit job mobility. Radiant knew of other causes of its alleged damages—specifically, its own self-inflicted wounds in alienating most of the Radiant Detroit station with the SAP system, failing to have non-compete agreements in place, and failing to replace the employees who left, which led to customer service problems. Even though it had no evidence of misappropriation and knew there were no trade secrets at issue, Radiant brought, and pursued for over five years, its trade secrets claim against Defendants, seemingly as a means to make up for its own above-described failures.

1

Although the jury reached the correct result in the end, the resolution of this case came at a tremendous cost to Defendants, who incurred over $1.4 million in attorney's fees in defending against Radiant's claims. Radiant's actions in bringing its unfounded trade secrets claim and perpetuating litigation through two jury trials were unjustified. Radiant should be made to bear the consequences of its actions through an order compelling it to pay the substantial fees the Defendants incurred in this case.

## II.      STATEMENT OF FACTS[1]

### A.      Radiant's Self-Inflicted Wounds

In early 2018, Radiant began utilizing a new transportation management software system called SAP. ECF No. 209 at 88:15-89:5. On a conference call on January 16, 2018, there was a heated, passionate discussion between Radiant CEO Bohn Crain and Furstenau concerning the SAP system. ECF No. 210 at 49:24-50:10. Crain admitted that he informed Furstenau that he needed to get on-board with the SAP system if he wanted to keep working at Radiant, implying that Chad could resign if he did not like it. ECF No. 212 at 90:8-91:6. Crain also threatened to reallocate some of Furstenau's customers, including some that he had worked with since the 1990s, to other stations. ECF No. 210 at 104:17-105:20. Because of Crain's statements, Furstenau understandably believed he was at risk of losing his

---

[1] In support of their Motion, Defendants cite generally to the full transcripts of both jury trials. *See* ECF Nos. 209 – 214, 239 – 248.

job. *Id.* at 149:16-150:8. After the phone call, both sides took a number of actions because they believed that Furstenau's departure was likely imminent. ECF No. 210 at 61:14-22; ECF No. 211 at 104:17-105:20, 107:24-108:13, 109:14-110:8; ECF No. 212 at 47:24-48:8.

### 1.    Furstenau prepares for Radiant to potentially fire him.

Following the January heated phone call, Furstenau started sending emails from his Radiant account to his personal email account. ECF No. 211 at 111:25-112:12, 113:10-114:13. He sent emails to his personal email account because a lawyer recommended that he retain information and documents and because he believed that he was being shorted by Radiant on commissions. *Id.* Specifically, Furstenau sent himself profit and loss statements because his bonuses were based off of the Detroit station's profitability. *Id.* Radiant admitted that these exact documents are, in fact, used to calculate bonuses. ECF No. 212 at 131:13-19. In one email, Furstenau actually sent himself a calendar reminder on May 12, 2018 to review profit and loss statements to figure out his bonuses. ECF No. 211 at 114:25-115:13. When Chad sent emails to his personal email account, he never copied other people on the email or sent them to Ross Bacarella at BTX. *Id.* at 117:9-17.

### 2.    Radiant prepares to replace Furstenau.

Radiant took several steps after the contentious conference call between Crain and Furstenau. First, Crain began monitoring Furstenau's emails. ECF No.

212 at 48:9-49:9. Crain specifically had access to all of Furstenau's emails, including his inbox, sent items, deleted items, and contacts list. *Id.* at 104:9-105:9. Crain claims that he did not review any of the emails that Furstenau sent to his Comcast account even though he could have if he was worried about it. *Id.* at 104:9-105:9. However, Crain did admit that he checked Furstenau's emails once on January 18, 2018, and by that time Furstenau had already sent at least one email to his Comcast account. ECF No. 240 at 239:14-241:25.

Second, Radiant began hunting for a replacement for Furstenau. ECF No. 210 at 63:9-64:15; ECF No. 212 at 48:9-49:9, 94:5-98:1. From January to July 2018, Radiant Vice President Tim O'Brien met with potential candidates for the general manager position at the Detroit station. ECF No. 210 at 65:17-66:1, 66:16-67:4. Even though Radiant started looking in January 2018, Radiant did not find a replacement for Furstenau by August 2018. ECF No. 212 at 92:20-93:7.

Radiant also checked to see if Furstenau had a restrictive covenant in place, including a non-competition agreement. When it discovered he did not, Radiant tried to get him to sign one in May 2018. ECF No. 211 at 123:9-22; ECF No. 212 at 48:9-49:9. Furstenau decided not to sign the noncompete agreement because he believed it was a trap. ECF No. 211 at 124:7-125:3. Crain admitted that he wanted to restrain Furstenau from pursuing the same customers as Radiant even though Furstenau did not have a non-competition agreement. ECF No. 125, PageID.7083.

4

Crain also believed that it was "nefarious" for Furstenau to explore other employment opportunities while still employed with Radiant. ECF No. 212 at 85:10-13.

### 3.    Radiant alienates its Radiant Detroit station employees with the new SAP system.

Radiant employee Angie Dupree explained that the new SAP system "did not work properly" and "it caused more headache" for the Radiant Detroit station. ECF No. 213 at 37:17-39:6, 40:21-41:8. The system slowed down everyday tasks, which was particularly stressful due to the time-sensitive nature of the station's work. *Id.* Each of the employees who followed Furstenau were likewise thoroughly frustrated by their employment at Radiant, particularly with the SAP system. *See* ECF No. 125, PageID.7078. Despite the former employees' complaints about the failures of the SAP system, Radiant failed to address the problems, which is one of the reasons why they quit. *See, e.g.,* ECF No. 129, PageID.7666; ECF No. 147, PageID.13793 – 13794.

### 4.    Radiant fails to replace its employees after they resign.

Furstenau and five other employees—Chris Higgins, Angie Dupree, Kari Piper, Liana Renteria, and Benjamin Watkins—all left Radiant between August 24 and September 7, 2018. *See* Plaintiff's Trial Exhibit 229. Radiant replaced Furstenau with Bill Sims even though he was admittedly not ready for the role of

station manager. ECF No. 242 at 54:9-23. Sims remains the station manager five years later. ECF No. 241 at 28:3-11.

The Radiant Detroit station's number one customer was Ford c/o XPO/NLM (which is a customer where work is won and lost on an automotive bid board). ECF No. 239 at 64:8-21. Higgins and Furstenau were the two employees who worked on the bid boards at the Radiant Detroit station. ECF No. 239 at 8:23-9:5, 22:7-8, 35:24-36:6. When they left, Radiant no longer had anyone who could work on that number one account. ECF No. 239 at 35:24-36:6. Radiant knew that it needed to hire two people to replace Higgins and Furstenau on the bid boards, but it only hired one person, Don Harrison. ECF No. 239 at 35:24-36:19, 68:16-69:18. Harrison had far less experience than Higgins and Furstenau combined. ECF No. 239 at 69:3-7.

Three months after Kari Piper left, Radiant had failed to replace her. ECF No. 242 at 174:8-25. Piper had handled Radiant's invoicing process. ECF No. 239 at 39:10-16. Three months after she left, Radiant was still trying to learn all the details of invoicing its customers. ECF No. 242 at 174:8-25; ECF No. 239 at 38:16-19, 66:9-12. Radiant did not replace Piper with someone who could competently perform the work. ECF No. 242 at 175:1-7. Instead, they replaced her with a "non-expert," which made invoicing more difficult and slowed down Radiant's revenues. ECF No. 239 at 72:16-73:12.

6

### 5. Radiant pursues unprofitable business and has customer service failures.

Just before Furstenau left in August 2018, Radiant's number three account was Ford National Parts Depot. ECF No. 239 at 74:21-75:5, 77:19-25. This account was flagged as unprofitable and had a negative impact on Radiant's bottom line, which fact was discussed internally at Radiant in November 2018. *Id.* at 78:1-22. As of April 2019, approximately eight months after Furstenau had left Radiant, Ford National Parts Depot had become Radiant's number one account. *Id.* at 79:6-80:15.

XPO Logistics was the number two account for the Radiant Detroit station. ECF No. 242 at 177:19-21. After Furstenau left Radiant, XPO Logistics complained to Radiant that they were not handling XPO Logistics' business quickly enough. *Id.* at 178:11-180:7. Specifically, instead of providing a response to XPO Logistics' request for quote in the same hour or same day, Radiant was taking three days, a week, or even longer to respond. *Id.* Other customers similarly complained of Radiant's customer service after Furstenau left. *See* ECF 125, PageID.7090.

## B. Radiant Never Had Any Evidence to Support its Trade Secrets Claim

On September 7, 2018—just two weeks after Furstenau resigned from Radiant—Radiant filed a verified Complaint alleging five counts, including

7

misappropriation of trade secrets. *See* ECF No. 1, PageID.19-22. Radiant claimed that it had trade secrets in the form of "Customer Solutions" and other "Confidential Information," including customer and supplier contact information, routing methods, customer requirements, profitability metrics, budget projections, pricing information, the methods for servicing key customers, and employees performance and compensation. ECF No. 1, PageID.19-20. Throughout litigation, from its inception and up through both jury trials, it was clear that these alleged "trade secrets" were not trade secrets.

### 1. Radiant never had any trade secrets at issue in this case.

#### i. Radiant's "customer solutions" are not trade secrets.

Regarding "Customer Solutions," Radiant witness Bill Sims acknowledged that he had never heard the term before this case and that no one at Radiant ever defined it for him. ECF No. 212 at 242:15-23; *see also* ECF No. 125, PageID.7085. Moreover, Radiant witness Tim O'Brien admitted that Radiant's "Customer Solutions" are neither unique to Radiant nor specific. ECF No. 210 at 71:5-72:11, 74:7-20. Radiant also admitted that the components of its "Customer Solutions" are not secret—they are known to others in the industry. *Id.* With respect to Radiant's "pricing," Radiant conceded that its pricing changes "day to day" and is "pretty fluid" and that pricing is fairly straightforward and common across the industry. ECF No. 212 at 196:19-22, 205:9-21; *see also* ECF No. 125,

PageID.7083. Similarly, customer contact information consisted of easily reproducible email addresses. *See* ECF No. 211 at 152:8-12.

### ii. The emails Furstenau sent himself are not trade secrets.

Radiant never identified how the batch of emails Furstenau sent to himself had any "independent economic value" as required under the MUTSA. In fact, O'Brien admitted BTX Detroit would not use Radiant information to determine its pricing for making bids on the automotive bid boards where business is won. ECF No. 210 at 69:7-20. Likewise, Sims testified that Radiant's pricing changed day to day and that the information in the emails would quickly become stale. ECF No. 212 at 196:19-197:2. Further, Sims testified that he changed Radiant's pricing guideline after Furstenau left, meaning that pricing information contained in the emails (if any) had no value. *Id.* at 197:7-198:1. Even before trial, Radiant witnesses admitted that the information contained in the emails was not the type of information useful for winning business in the freight forwarding industry. *See, e.g.,* ECF No. 148, PageID.13989.

### 2. Radiant never had, nor introduced, evidence of use or disclosure.

Near the very beginning of this case, at the preliminary injunction hearing on December 14, 2018, O'Brien testified that he had no evidence of Defendants using any Radiant information—rather, it was his "belief" that they did because, in his

opinion, there was no way that Furstenau could have kept servicing the same customers he had for the previous 24 years without using Radiant's information (even though Furstenau had worked with those customers for 13 years before Radiant came into existence). ECF No. 43 at 54:20-55:4, 67:22-69:18, 105:16-23. Radiant believed that its former employees were using "knowledge" and experience, not documents, at BTX Detroit. ECF No. 125, PageID.7090 - 7091. O'Brien also admitted at the hearing that he had no reason to say that Furstenau did not send himself the emails because of his concerns about his pay or about the SAP system. ECF No. 43 at 83:2-24.

Notably, in September 2018 (well in advance of the preliminary injunction hearing), the parties agreed to designate one in-house representative to review documents marked "highly confidential." *See* ECF No. 19, PageID.347. Radiant designated Bill Sims to be its representative to review BTX Detroit's highly confidential information. *Id.* At the preliminary injunction hearing, however, Radiant did not produce Sims. *See* ECF No. 43, PageID.2040-2044. Instead, Radiant only produced Tim O'Brien. *See id.* When counsel for Defendants questioned O'Brien about whether Radiant had discovered any Radiant information in BTX Detroit's documents, Radiant's counsel objected and claimed that O'Brien had no foundation to testify regarding the documents since only Sims, as the designee, was allowed to review them under the Court's protective order.

*See id.* The Court sustained the objection, and Defendants did not have the opportunity to question Radiant on whether it had discovered any evidence of use or disclosure from reviewing BTX Detroit's documents. *See id.* Radiant presented no evidence regarding use or disclosure at the hearing, other than O'Brien's personal beliefs. *See* ECF No. 43, PageID.2046.

Later in the case, after the Court had already entered the preliminary injunction against Defendants, it became apparent why Radiant did not make Sims available for the preliminary injunction hearing. When Sims did eventually testify (at his deposition), he admitted that he never bothered to review the documents that BTX Detroit produced. *See* ECF No. 125, PageID.7080-7081.[2] This concept— asking for documents from BTX Detroit that hypothetically *could* establish use or disclosure but then not reviewing them to *prove* use or disclosure—is telling in that it shows either (a) disinterest in the content of the competitor's documents, which is inconsistent with a plaintiff legitimately believing in its trade secrets case; or (b) knowledge that such documents would not contain Radiant information anyway, which is consistent with Radiant fully understanding the lack of foundation to its case.

Radiant continued to rely solely on unfounded "belief" rather than evidence, up to and at the second jury trial in this case. *See* ECF No. 242, PageID.18524-

---

[2] Shockingly, Radiant CEO Crain testified that reviewing these documents was not a high priority and not the best use of Sims' time. *See* ECF No. 125, PageID.7081.

18525 (Radiant vice president Tim O'Brien acknowledging that he has no evidence to support his personal belief that Furstenau used the emails he sent to himself); ECF No.239, PageID.17830-17835 (current Radiant Detroit station manager Bill Sims stating that it was his "belief" that Defendants used Radiant information but that he has no evidence to support his belief); ECF No. 240, PageID.18178 (Radiant CEO Bohn Crain admitting that Radiant found no evidence of Defendants using Radiant information like pricing or cost).

### 3. Radiant Attempted to Manipulate Evidence to Show a Dramatic Impact

Throughout the case, Radiant contended that it suffered damages as a result of Defendants' misappropriation of trade secrets. Specifically, at the preliminary injunction hearing on December 14, 2018, O'Brien specifically testified that Radiant had lost revenue with its top six customers following the departure of Furstenau and the other former employees. *See* ECF No. 43, PageID.2021. However, internal Radiant emails from just days *before* the hearing reveal that Radiant's top six customers did <u>not</u> show decreased revenue across the board. ECF No. 89, PageID.3506. Instead, Radiant actually saw *increased* revenues from some of its top six customers after Furstenau resigned. *Id.*, PageID.3506 – 3507. Further, the emails show that Radiant knew that only one customer (the bid boards) "truly had an effect on the profitability of the station." *Id.* However, in these same emails, O'Brien wrote that he specifically wanted to "portray the data in a way that shows

12

the most dramatic impact." *Id.* Even with all this, O'Brien ultimately brought no graphs with him days later at the hearing; he instead opted to verbally portray the most "dramatic impact" without using the inconsistent numbers seen on internal graphs. *See* ECF No. 43, PageID.2048.

### 4. Radiant never linked its alleged damages to its trade secrets claim.

Notably, Radiant's own damages expert admitted that he had no opinion on whether misappropriation of trade secrets, assuming it happened, could cause Radiant to lose profits. ECF No. 93:18-94:10. Instead, he assumed that, because BTX Detroit was able to do business quickly with some of the same customers as Radiant, Defendants must have misappropriated trade secrets. *See id.* But he also acknowledged that Radiant may have suffered lost profits without any misappropriation of trade secrets by Defendants. Specifically, he acknowledged that it was possible for the departure of Radiant's employees alone, without any misappropriation of trade secrets, to negatively impact Radiant's ability to generate profits. *Id.* He also admitted that Defendants may have won business from the same customers who did business with Radiant because of the relationships Furstenau had with those customers or because Furstenau used his own knowledge and experience that he had gained over many years in the industry. ECF No. 241 at 97:7-14. And he acknowledged that Defendants could have won business without using any Radiant information. *Id.* at 99:23-100:12.

Radiant was aware that most of its lost profits were from its number one account, Ford c/o XPO/NLM (i.e., the automotive bid boards). *See, e.g.,* ECF No. 239 at 64:8-21; ECF No. 241 at 109:24-110:22, 142:12-24. Radiant also knew and ultimately admitted that Defendants were not using Radiant information to win business on the bid boards. ECF No. 210 at 69:16-20.

## III.   STANDARD OF REVIEW

When reviewing a motion for attorney's fees, the Sixth Circuit has explained that questions of fact are committed to the district court judge. *See Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 536 (6th Cir.2008). Further, a district court, "as the factfinder in the attorney-fee context, is not required to draw all inferences in favor of the non-moving party but instead is permitted to make factual findings in accordance with his or her own view of the evidence." *Id.*

## IV.   ARGUMENT

### A.   Radiant Brought Its Trade Secret Claim in Bad Faith

The Michigan Uniform Trade Secrets Act ("MUTSA") authorizes a court to award reasonable attorney's fees to a prevailing defendant if a plaintiff brings a misappropriation of trade secrets claim in bad faith. Mich. Comp. Laws § 445.1905. The Act imposes two requirements on a party seeking attorney's fees: (1) that the party is the "prevailing party"; and (2) that the opposing party's "claim

of misappropriation is made in bad faith." *Degussa*, 277 F. App'x at 534 (citing Mich. Comp. Laws § 445.1905). Both requirements are met here.

First, Defendants are the "prevailing party" under the MUTSA because the Court has entered final judgment in favor of Defendants. *See, e.g., Degussa Admixtures, Inc. v. Burnett*, 471 F. Supp. 2d 848, 857 (W.D. Mich. 2007) (noting that the defendants were the prevailing party upon entry of judgment in their favor), *aff'd,* 277 F. App'x 530 (6th Cir. 2008). With respect to the second requirement, the record establishes that Radiant brought its trade secrets claim in bad faith.

The Sixth Circuit has concluded that "bad faith" for purposes of the MUTSA "requires objective speciousness of the plaintiff's claim ... and ... subjective bad faith in bringing or maintaining the claim." *Degussa*, 277 F. App'x at 534. In determining whether a plaintiff brought a trade secrets claim in bad faith, courts consider several factors, including (1) whether the plaintiff identified a protectable trade secret; (2) whether the plaintiff had any direct evidence that the defendant had used, or was threatening to use, its alleged trade secret; (3) whether the plaintiff knew of other potential causes for its alleged damages other than misappropriation of trade secrets; and (4) whether the plaintiff filed its trade secret claim for the purpose of harassing the defendant or restraining legitimate competition. *See Degussa*, 277 F. App'x at 534; *Dice Corp. v. Bold Techs. Ltd.*,

No. 11-CV-13578, 2014 WL 2763618, at *16 (E.D. Mich. June 18, 2014); *Whitesell Int'l Corp v. Whitaker*, No. 287569, 2010 WL 3564841, at *10 (Mich. Ct. App. Sept. 14, 2010).

### 1. Radiant never identified a protectable trade secret.

"It is impossible to 'misappropriate' a non-existent trade secret." *Dice Corp.*, 2014 WL 2763618, at *17. "Whether a company possesses a trade secret is within the company's own knowledge…." *Id.* "[I]t would be disingenuous for [a plaintiff] to contend that it could not have known whether it possessed a trade secret until after discovery concluded." *Id.* A plaintiff's assertion of a trade secret claim is made in bad faith when the plaintiff "did not possess a trade secret, knew it did not possess a trade secret, but nonetheless brought a trade secret misappropriation claim against [the defendant]." *Id.* Under such circumstances, the "[d]efendant is entitled to attorney's fees associated with defending against the misappropriation claim from its inception." *Id.*

Radiant knew (or should have known) that there were no trade secrets among the information that it "believed" Defendants had misappropriated. Radiant witness Tim O'Brien admitted that Radiant's "Customer Solutions" are neither unique to Radiant nor specific. ECF No. 210 at 71:5-72:11, 74:7-20. Radiant also admitted that the components of its "Customer Solutions" are not secret—they are known to others in the industry. *Id.* With respect to Radiant's "pricing," Radiant

conceded that its pricing changes "day to day" and is "pretty fluid" and that pricing is fairly straightforward and common across the industry. ECF No. 212 at 196:19-22, 205:9-21; *see also* ECF No. 125, PageID.7083. Similarly, customer contact information consisted of easily reproducible email addresses. *See* ECF No. 211 at 152:8-12.

It is well-established that information that is known to an industry as a whole is not a "trade secret." *See Compuware Corp. v. Int'l Bus. Machines Corp.*, No. 02-CV-70906, 2003 WL 23212863, at *6 (E.D. Mich. Dec. 19, 2003) *see also Kubik, Inc. v. Hull*, 224 N.W.2d 80, 87 (Mich. Ct. App. 1974) and Mich. Comp. Laws § 445.1902. In addition, knowledge about the "needs of customers…is not protectable as a trade secret." *McKesson Med.-Surgical Inc. v. Micro Bio-Medics, Inc.*, 266 F. Supp. 2d 590, 596 (E.D. Mich. 2003) (internal quotation marks omitted); *see also Nedschroef Detroit Corp. v. Bemas Enters. LLC*, 106 F. Supp. 3d 874, 885 n. 3 (E.D. Mich. 2015).

In addition to incorrectly claiming that the above information was a trade secret, Radiant also took the untenable position that the generalized knowledge in the heads of its former employees and the former employees' personal relationships with customers constituted trade secrets. *See, e.g.,* ECF No. 212 at 150:10-25. But courts applying Michigan law are clear—knowledge of customer identities and needs are not protectable trade secrets. *McKesson*, 266 F. Supp. 2d at

596; *Raymond James & Assocs., Inc. v. Leonard & Co.*, 411 F. Supp. 2d 689, 696

(E.D. Mich. 2006); *Wysong Corp. v. M.I. Indus.,* 412 F. Supp. 2d 612, 629 (E.D.

Mich. 2005). And "[an employee's] personal relationships with customers are not

trade secrets." *Degussa*, 471 F. Supp. 2d at 855.

Radiant knew or should have known from the inception of this case that it

had no protectable trade secrets at issue. Yet Radiant not only filed a lawsuit—it

knowingly continued to litigate its hollow trade secrets claim over the course of

five years and two jury trials. The fact that Radiant brought a trade secrets claim

without possessing a trade secret is sufficient alone to warrant awarding attorney's

fees to Defendants. *See Dice Corp.*, 2014 WL 2763618, at \*17.

### 2. Radiant never introduced evidence of Defendants using or threatening to use Radiant's alleged trade secrets.

The Sixth Circuit has explained that "for a party to make a cognizable trade-

secrets claim, the party must establish more than the existence of generalized trade

secrets and a competitor's employment of the party's former employee who has

knowledge of trade secrets." *Degussa*, 277 F. App'x at 534–35 (citing *CMI Int'l,*

*Inc. v. Intermet Int'l Corp.,* 649 N.W.2d 808, 813 (Mich. App. Ct. 2002)); *United*

*Rentals (N. Am.), Inc. v. Keizer,* 355 F.3d 399, 412–13 (6th Cir.2004).

Without disclosure or use there can be no claim for misappropriation. *See*

*United Rentals*, 355 F.3d at 412; *Delphi Automotive PLC v. Absmeier*, 167 F.

Supp. 3d 868, 883 (E.D. Mich. 2016); *Rothschild v. Ford Motor Co*., 2 F. Supp. 2d

941, 951 (E.D. Mich. 1998); *Ajuba Int'l, LLC v. Saharia*, No. 2:11-cv-12936, 2014 WL 3420524 at *9 (E.D. Mich. July 14, 2014). It is not sufficient for a plaintiff to claim "that [the defendant] had knowledge of its alleged generalized trade secrets (*e.g.,* its prices, margins, customers, mixtures and marketing strategies)...." *Degussa*, 277 F. App'x at 535.

Even if Radiant could have established that the emails Furstenau sent to himself were a trade secret under Michigan law, no evidence was presented that this information was ever used or disclosed. In fact, the forensic evidence establishes the opposite, that the emails were never even opened. ECF No. 213 at 131:1-13. Instead of offering evidence to rebut the conclusions of Defendants' forensic expert—evidence that Defendants presented just a few months after Radiant filed suit—Radiant merely introduced hypotheticals of how Furstenau *could* have used emails sent to himself. Radiant also admitted that it had no evidence of Defendants using Radiant information to win business. *See, e.g.,* ECF No. 212 at 194:10-196:18, 199:18-200:1. Worse still, Radiant did not even review business documents in this case from BTX Detroit (requested in discovery and supposedly where use or disclosure would be found) to *attempt* to support its case. Radiant's failure to present any competent evidence of misappropriation, use, or disclosure constitutes bad faith under the MUTSA. *See Dice Corp.*, 2014 WL 2763618, at *16.

### 3. Radiant knew of real causes for its alleged damages other than alleged misappropriation of trade secrets.

Bad faith may be reasonably inferred when there is evidence that a plaintiff's alleged harm was caused by its own "product quality and market shortcomings…[and] self-inflicted wounds" rather than a defendant misappropriating trade secrets. *Dice Corp.*, 2014 WL 2763618, at *16. Filing a trade secrets claim to "slow the bleeding from…self-inflicted wounds" and to avoid losing additional market share and employees to a competitor and to convert a former employee's confidentiality agreement into a non-compete agreement is evidence of bad faith. *Degussa*, 277 F. App'x at 535.

Radiant knew that someone like Furstenau who has relationships with customers is valuable in the freight forwarding industry. ECF No. 242 at 125:18-22. Radiant described Furstenau, Higgins, Dupree, Renteria, Piper, and Watkins as "mission-critical to the operation of the station in Detroit." ECF No. 242 at 48:23-49:1. Once Furstenau and the other employees left Radiant and joined BTX Detroit, Radiant knew that the "key customers," meaning the ones that drove revenue and profitability, were now being serviced by BTX Detroit. ECF No. 242 at 80:22-81:1. Radiant was also aware that Higgins and Furstenau had knowledge and experience on the bid boards (the number one account), and that they did not have a non-compete agreement to prevent them from immediately starting to compete with Radiant on the bid boards. ECF No. 242 at 81:8-18.

20

Radiant knew that Higgins and Furstenau did not need any documents in order to bid on the bid boards—they "had done it so long, they knew the pricing, they knew the loads they wanted to go for. They basically had that baked in." ECF No. 242 at 81:19-82:2, 96:17-97:8. Radiant also knew that the emails that Furstenau had sent himself had nothing to do with winning bid board freight. ECF No. 242 at 82:3-8. Even though Radiant knew Defendants were not using Radiant trade secrets to win business from the customer that was Radiant's number one account and the driver of profitability, Radiant still falsely contended that all of its lost profits, including the profits it lost from the bid boards, were caused by Defendants' misappropriation of trade secrets. *See, e.g.,* ECF No. 241 at 94:7-10, 109:24-110:22, 142:12-24; ECF No. 210 at 69:16-20. Instead of appropriately dealing with its own self-inflicted wounds, Radiant attempted to "stop the bleeding" by filing a baseless trade secrets claim against Defendants. These facts further demonstrate that Radiant brought its trade secrets claim in bad faith. *See Degussa*, 277 F. App'x at 535–36; *Dice Corp.*, 2014 WL 2763618, at *16.

### 4.  Radiant filed its trade secret claim to harass Defendants and restrain legitimate competition.

"Filing a trade-secret action to restrain legitimate competition and job mobility, needless to say, is not proper." *Degussa*, 277 F. App'x at 535–36. It is improper for a plaintiff to file a trade secrets claim for the purpose of preventing customers from doing business with a competitor. *Dice Corp.*, 2014 WL 2763618,

at \*16; *see also Whitesell*, 2010 WL 3564841, at \*10 (affirming award of attorney's fees under the MUTSA when the plaintiff's primary objective in bringing its misappropriation of trade secrets claim against its former employee was to harass him or stop him from competing, and not to obtain the relief sought in the suit).

Here, there is evidence that Radiant filed its lawsuit for the improper purpose of harassing Furstenau and trying to stop him from competing. For at least eight months before Furstenau's resignation, Radiant surreptitiously monitored his email account, cut him out of meetings, and searched for his replacement. *See* ECF No. 210 at 63:9-64:15, 65:17-66:1, 66:16-67:4; ECF No. 212 at 48:9-49:9, 94:5-98:1. While Radiant was searching for Furstenau's replacement, it also tried to get him to sign a non-competition agreement, even though he had never signed one before in his 11 years with the company. *See* ECF No. 211 at 123:9-22; ECF No. 212 at 48:9-49:9. Realizing that a non-compete would prevent him from working in the industry where he had spent his entire career if Radiant decided to fire him (and having learned that Radiant was interviewing other candidates for his job), Furstenau decided not to sign the noncompete because he believed it was a trap. ECF No. 211 at 124:7-125:3; ECF 240 at 245:23-246:5. Radiant also did not have non-compete agreements with its other long-time employees in Detroit—Dupree, Higgins, Renteria, and Piper. ECF No. 242 at 95:6-9. Radiant knew that its

22

employees, including Furstenau, could leave at any time. ECF No. 241 at 12:18-20.

Once Furstenau and the other employees left Radiant, Radiant took issue with them calling on "Radiant customers," even though they never had non-compete agreements with Radiant. *See, e.g.,* ECF No. 242 at 92:24-93:10, 95:13-23. Radiant even admitted that it wanted them to call on different customers and not compete with Radiant. *Id.* Radiant also believed that it could not compete with the employees that left and joined BTX Detroit. See ECF No. 212 at 236:21-237:6. Radiant did not file this lawsuit to prevent misappropriation of trade secrets—rather, as Radiant CEO Bohn Crain revealed, Radiant was trying get back a "book of business" it believed was "stolen." ECF No. 125, PageID.7093. It has long been established that attempting to use the MUTSA as "a blanket, statutorily created non-compete agreement between sales people and their former employers…would not serve the purpose of trade secrets law." *Raymond James*, 411 F. Supp. 2d at 696 (quoting *McKesson*, 266 F. Supp. 2d at 597). Radiant disregarded this well-established principle and should be held accountable.

## B.     Determining An Award of Attorney's Fees

The accepted method for determining an appropriate fee award is to calculate the "lodestar" amount, which is the number of hours reasonably expended in the litigation multiplied by a reasonable hourly rate. *Imwalle v. Reliance Med.*

*Products, Inc.*, 515 F.3d 531, 551 (6th Cir. 2008). In determining a reasonable fee, the court may consider factors such as:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Paschal v. Flagstar Bank*, 297 F.3d 431, 435 (6th Cir. 2002).

Defendants seek to recover $1,401,160.00 in fees billed to Defendants from the inception of the case back in August 2018 through the conclusion of the second trial on October 6, 2023. *See* Affidavit of Andrew F. Marquis, attached as <u>Exhibit A</u>. The amount of the fees is reasonable given the complexity of the work, the rates at which the work was billed, and the fact that two jury trials were required in order to reach a resolution. *See generally id.* The complexity of the work is further established by Radiant's own presentation of its trade secrets, which (as seen above) included: (a) misdirection of what was being claimed as a trade secret (customer solutions, email addresses, knowledge, relationships, etc.); (b) significant discovery requests for business records of BTX Detroit only for Radiant witnesses not to review those records; (c) the need for Defendants to prove lack of use or disclosure because of Radiant's refusal to readily acknowledge that the

24

emails Furstenau sent to himself were not "keys to the business"; and (d) exhaustive forensic requests from Plaintiff and then, ultimately, no forensic presentation by Plaintiff at trial. In sum, Defendants incurred substantial fees as a result of Plaintiff's deliberate strategy and approach, which included significant *claims* but, ultimately, no proof.

## V.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion for Attorney's Fees and enter an order requiring Radiant to pay Defendants within 21 days of the date of entry of such order the amount of $1,401,160.00 for the attorney's fees paid by Defendants for this matter.

Date: November 2, 2023              Respectfully submitted,

*/s/ Andrew F. Marquis*
Andrew F. Marquis / Attorney No. P82641
amarquis@scopelitis.com
Peter C. Morton / Attorney No. 32698-53
pmorton@scopelitis.com
SCOPELITIS GARVIN LIGHT HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, Indiana 46204
Telephone: 317-637-1777
Facsimile: 317-687-2414

*Attorneys for Defendants BTX Air Express of Detroit, LLC & Charles Furstenau, Jr.*

4883-2084-0326, v. 7